**08 CV 00505**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

RECEIVED

JAN 1 8 2008

U.S.D.C. S.D. N.Y.

| | |
|---|---|
| MARK K. GOLDSTEIN, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiffs, | CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | |
| CENTERLINE HOLDING COMPANY, MARC D. SCHNITZER, ROBERT L. LEVY, JEFF T. BLAU, and STEPHEN M. ROSS, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, Mark K. Goldstein, individually and on behalf of all other persons or entities that purchased and/or acquired the common stock of Centerline Holding Company ("Centerline" or the "Company") between March 12, 2007 and December 28, 2007, inclusive (the "Class Period"), allege the following based upon information and belief, except as to those allegations concerning Plaintiff, which are based upon personal knowledge. Plaintiff's information and belief allegations are based upon, among other things: (a) the investigation conducted by and through his attorneys; (b) review and analysis of filings made by Centerline with the United States Securities and Exchange Commission ("SEC"); (c) review and analysis of press releases, public statements, news articles, securities analysts' reports and other publications disseminated by or concerning Centerline; and (d) other publicly available information about Centerline. Most of the facts supporting the allegations contained herein are known only to the Defendants or are within their control. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth in this Class Action Complaint ("Complaint") after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal class action on behalf of all persons or entities that purchased and/or acquired the common stock of Centerline during the Class Period, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). The Defendants are Centerline and four of the Company's most senior officers and trustees: Chief Executive Officer Marc D. Schnitzer ("Schnitzer"), Chief Financial Officer Robert L. Levy ("Levy"), Chairman Stephen M. Ross ("Ross"), and Managing

2

Trustee Jeff T. Blau ("Blau") (collectively, the "Individual Defendants" and together with Centerline, "Defendants").

2.      Centerline, formerly CharterMac, is a statutory trust that conducts substantially all of its business through its subsidiaries.[1]  Through its subsidiaries and the funds managed by them, the Company operates as a full service real estate finance and investing company.  The Company provides capital solutions to real estate developers and owners, as well as investment products to retail and institutional investors.

3.      During the Class Period, the Company operated through four business segments: (1) Affordable Housing, (2) Commercial Real Estate, (3) Asset Management, and (4) Credit Risk Products.  The Affordable Housing segment is responsible for managing Centerline's mortgage revenue bond portfolio, which is comprised primarily of tax-exempt first mortgage bonds.  During the Class Period, the Affordable Housing segment generated the majority of the Company's total revenues.  For example, during the third quarter of 2007, this segment brought in $70.2 million in revenue, representing approximately 55.6% of the Company's total revenue for the quarter.

4.      The Class Period begins on March 12, 2007, when Centerline issued a press release announcing the Company's financial results for the fourth quarter and full year ended December 31, 2006, in which Defendants touted the growth in the Company's portfolio of tax-exempt first mortgage bonds, which, at the time, had a fair value of $2.397 billion, as compared to $2.294 billion at the end of 2005.

---

[1] According to a current report on Form 8-K filed with the SEC on April 6, 2007, the Company changed its name from CharterMac to Centerline Holdings Company effective April 2, 2007. The Company's trading symbol "CHC" was not changed.

5.      Although the March 12, 2007 press release highlighted the Company's long-term evolution from a pure tax-exempt bond fund to a "full service real estate finance and investment company," this press release – and all of the Defendants' subsequent Class Period statements – gave no hint that Defendants were in the midst of structuring a sale of the Company's entire mortgage revenue bond portfolio to The Federal Home Loan Mortgage Corporation ("Freddie Mac"). Indeed, statements such as those made in the Company's 2006 annual report filed with the SEC on Form 10-K on March 12, 2007, indicated that the Company's mortgage revenue bond portfolio had expanded in 2005 and 2006. Nor did Defendants give fair warning to the investing public that such a transaction would radically transform the Company's business model and investor profile. On the contrary, the Defendants' public statements and material omissions throughout the Class Period created the false impression that the Company would retain its mortgage revenue bond portfolio and that investors would continue to benefit from the substantial dividends generated by the portfolio's income (with yields as high as 13.9%) for the indefinite future.

6.      Indeed, even as the subprime mortgage crisis gathered momentum in August 2007, dragging down the price of Centerline's shares, Defendants were steadfast that the Company's mortgage revenue bond portfolio – which did not have single-family or subprime exposure – was continuing to perform well as a core business of the Company. For instance, during an August 9, 2007 analyst conference call, Defendant Schnitzer stated:

> In spite of the instability in the financial markets, operating fundamentals in the commercial real estate and affordable housing sectors are healthy. We have sufficient capital resources to execute our business plan and are not experiencing any liquidity problems.

*    *    *

The recent market dislocation has created numerous opportunities to make investments that offer attractive returns and strong credit quality. In times of market instability, we would expect to see a flight to quality that benefits firms like Centerline…

*    *    *

The market instability has had little or no impact on our Affordable Housing group, which includes our tax-exempt bond and tax credit equity fund businesses. Affordable Housing represents approximately 65% of our annual CAD revenues.

*    *    *

The credit quality of our bond portfolio remains very strong. As of June 30th, delinquencies totaled just $70.1 million or approximately 2.5% of our $2.8 billion portfolio.

(Emphasis added.)

7. Moreover, during an analyst conference call on November 8, 2007 (less than 2 months before the Freddie Mac deal closed), Defendant Schnitzer was questioned as to whether Centerline had considered selling its mortgage revenue bond portfolio, but instead of revealing that a deal was in the works, he deliberately concealed this fact from investors, as follows:

Nicole Jacoby - Liberation Investments - Analyst

Well, I understand. I think we've had some of these discussions before about turning into a fund manager. There are two further issues. One is, you are obviously executing along that track. But the market still doesn't seem to either recognize it or be rewarding it. And, sort of related to that, *have you ever considered putting — taking the bonds off your balance sheet or letting them roll off into some other sort of vehicle?*

Marc Schnitzer - Centerline Holding Company - President and CEO

*Well, clearly a strategy like that plays into the overall evolution of the Company. So, clearly it's something that we've thought of from time to time.* We're not yet in a position where we can make the case in a very compelling way that we are a pure fund manager when we have $2.9 billion of bonds on our balance sheet which is reminiscent of the bond fund that we were. So, I think that complicates the story and our goals are really to try to simplify the story as much as we can.

Nicole Jacoby - Liberation Investments - Analyst

And is there anything -- *so you generally thought about the bond issue but I guess you're not commenting right now on the specifics of it?*

Marc Schnitzer - Centerline Holding Company - President and CEO

5

> *We've thought about that and many other options. But, clearly that's one that would come to mind right away.*

(Emphasis added.)

8.     Then, on December 28, 2007, Centerline shocked the financial markets with a press release announcing that the Company had sold its "$2.8 billion tax-exempt affordable housing bond portfolio" to Freddie Mac and, in the process, completely changed the Company's business model to a pure asset management firm.  As a result of this transaction, the Company disclosed that it would be slashing its annual dividend from $1.68 per share to only $0.60 per share.  Even more disturbing was the fact that Defendants had entered into a related party transaction with a company owned by Defendants Ross and Blau called, appropriately enough, The Related Companies, L.P. ("TRCLP"), whereby TRCLP would provide Centerline $131 million in financing, in exchange for 12.2 million shares of newly-issued convertible preferred stock that will pay these insiders an 11% dividend.  Specifically, the December 28, 2007 press release, *inter alia*, stated:

> Centerline ... *today announced the completion of a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac. For accounting purposes, most of the securitization will be treated as a sale. The transaction represents a major step in Centerline's plan to transform itself into an alternative asset management company. Centerline also announced a $131 million equity investment commitment from an affiliate of Related Companies, its largest shareholder.*

> "Over the past several years, the strategic vision embraced by Centerline's Board of Trustees and management has been to transform Centerline into an alternative asset management company," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline.  *"With the securitization of our bond portfolio with Freddie Mac, we have accelerated our progress toward that goal.* The transaction has materially improved our risk profile by reducing the funding and interest rate risk inherent in our liability structure. Centerline now has a leaner balance sheet, improved credit metrics and an increased percentage of revenues derived from asset management services. *As an alternative asset manager with $11.6 billion of assets under management, we aim to produce returns and growth comparable to other publicly-traded alternative asset managers.*"

> "Centerline's goals are to increase assets under management and to create greater earnings power. With Related's investment, we have the resources

to achieve our goals," continued Mr. Schnitzer. "Greater liquidity will enable us to capitalize on opportunities arising from the volatility in the capital markets. Our growth plans adhere to our core investment strategy of Buy-Watch-Fix: invest prudently, monitor performance diligently and manage investments aggressively."

*       *       *

Change Dividend Policy: Effective in the first quarter of 2008, **_Centerline's dividend on an annualized basis is expected to be $0.60 per share ($0.15 on a quarterly basis)_**, subject to approval by our Board of Trustees. The Company will deploy its retained cash flows to fund growth and reduce debt. Centerline anticipates 30% to 35% of the Company's income will be federally tax-exempt in 2008.

(Emphasis added.)

9.    With respect to the sweetheart deal with TRCLP, the December 28, 2007 press release, *inter alia*, stated:

**$131 Million Investment from An Affiliate of Related Companies**
An affiliate of Related Companies has committed to invest $131,250,000 in Centerline Holding Company through a newly-issued convertible preferred stock. **_The preferred stock will pay dividends at an 11% annual distribution rate and will be convertible at a $10.75 per share conversion rate for an aggregate of approximately 12.2 million common shares of Centerline Holding Company._** The transaction, which is subject to completion of definitive documentation, is expected to close in January 2008. Centerline will use the net proceeds to reduce corporate debt and fund the Company's growth plans.

(Emphasis added.)

10.    During a December 28, 2007 analyst conference call, Defendant Schnitzer revealed that the Company had been planning this institutional metamorphosis for nearly a year, stating: "This morning, **_we announced the closing of a transformational transaction that has been in the works for close to a year_** and a significant strategic investment in our firm by our larger shareholder." (Emphasis added.)

11.    During the December 28, 2007 analyst conference call, securities analysts like Tony Howard of J.J.B. Hilliard, W.L. Lyons, Inc., observed that this transaction had changed the entire basis for investing in Centerline and characterized it as "punishing" Centerline's shareholders, stating:

Final question, Marc. Was it considered as far this transformation as far as why not take the Company the private, since basically our shareholders and a lot of **_shareholders have owned your stock over the years for the_**

> *dividend and for the tax-free status*. So in some way, *you're basically not only transforming the Company, but you are changing the shareholder base. So you are basically punishing the income ... shareholders* for a more growth-oriented shareholders that may want to buy your stock in the future.

(Emphasis added.)

12.     In addition, investors expressed disgust with the related party transaction

with TRCLP, as follows:

> Matt West Private Investor
>
> This capital raise makes no sense to me. *If Related wants to participate in and fund the growth of the Company, they should be taking the same equity risk as the rest of common shareholders. They're getting an 11% coupon and a call option on 20% of the Company with no equity risk. It speaks of an affiliated entity getting a sweetheart deal.* You said there were other parties to talk to. If you want to raise capital and you want to fund growth, you owe it to your investors to get on the road and do a marketed deal. How is this an acceptable way to raise capital?
>
> \*     \*     \*
>
> Patrick Collins Private Investor
>
> I have to agree with the prior two callers. *I'm actually disgusted by this transaction. How could insiders to reach such a favorable deal for themselves?* If you really feel like they are being -- attempting to support all shareholders, then we should open this up to a rights issue and they backstop it with a preferred, right? So open up the -- for capital raise as a rights issue, and then whatever is not taken up, then they can put in the preferreds. *But this is too favorable of a deal. And I will also agree that you're completely alienating your shareholders here. Your shareholders are looking for dividend yields*, and now you're saying, will if that didn't, we're going to change it. *You're running this like it's a private company.* I would be disgusted if I were you at what you've done – I'm just disgusted. I would be ashamed at what I did.

(Emphasis added.)

13.     Defendants' disclosure that Centerline had sold its tax-exempt mortgage

revenue bond portfolio to Freddie Mac and had changed its business model overnight to

an asset management company that would be unsuitable for investors seeking income

from dividends, as well as the revelations regarding the sweetheart deal with TRCLP

revealed to the market the falsity of the Company's Class Period statements and caused

the price of Centerline stock to plummet from $10.27 per share on December 27, 2007, to

close at $7.70 per share on Friday, December 28, 2007, representing a 25% single-day decline, on unusually heavy trading volume of 4,152,688 shares.

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

15.    The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. § 240.10b-5).

16.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or its effects, including the preparation and dissemination to the investing public of materially false and misleading financial statements, occurred in this District. Additionally, the Company maintains a principal executive office in this Judicial District.

17.    In connection with the acts, omissions and other wrongs complained of herein, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

18.    Plaintiff, Mark Goldstein, purchased the publicly traded common stock of Centerline at artificially inflated prices during the Class Period, as set forth in the certification attached hereto, and has suffered economic harm as a result of the disclosure of the wrongful acts of Defendants as alleged herein.

19.    Defendant Centerline, a Delaware corporation that maintains is principal executive offices at 625 Madison Avenue, New York, New York 10022, is an investing

and finance company with a core focus on real estate. Centerline's common stock is listed on the New York Stock Exchange ("NYSE") and trades under the symbol "CHC."

20.    Defendant Schnitzer was, at all times relevant to this action, a managing trustee, Chief Executive Officer and President of Centerline. According to the Company's Definitive Proxy Statement filed with the SEC on Form DEF 14A, on April 23, 2007, Defendant Schnitzer "directs the day-to-day operations of the Company and is responsible for corporate development and strategic planning." Schnitzer reviewed, approved and signed certain of Centerline's false and misleading SEC filings during the Class Period.

21.    Defendant Levy was, at all times relevant to this action, the Chief Financial Officer of Centerline. Levy reviewed, approved and signed certain of Centerline's false and misleading SEC filings during the Class Period.

22.    Defendant Ross was, at times relevant to this action, the Chairman of the Board of Trustees (the "Board") of Centerline. Defendant Ross directly or beneficially owns 11,070,430 shares of the Company's common stock representing a 13.9% stake in the Company. Defendant Ross is also the founder, Chairman, Chief Executive Officer and Managing General Partner of The Related Companies, L.P. ("TRCLP"). According to the Company's Definitive Proxy Statement filed with the SEC on Form DEF 14A, on April 23, 2007, Defendant Ross owns 92% of TRCLP. Ross reviewed, approved and signed certain of Centerline's false and misleading SEC filings during the Class Period.

23.    Defendant Blau was, at times relevant to this action, a Managing Trustee of Centerline. Defendant Blau directly or beneficially owns 10,295,085 shares of the Company's common stock representing a 13% stake in the Company. At all times relevant to this action, Defendant Blau also served as Managing Trustee and the President of TRCLP. According to the Company's Definitive Proxy Statement filed with the SEC on Form DEF 14A, on April 23, 2007, Defendant Blau owns 8% of TRCLP. Blau

reviewed, approved and signed certain of Centerline's false and misleading SEC filings during the Class Period.

24.    During the Class Period, each of the Individual Defendants, as senior executive officers and/or trustees of Centerline, was privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board of Trustees meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

25.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein is the collective product of the narrowly defined group of defendants identified above. Each of the above officers of Centerline, by virtue of his/her high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

26.    As officers and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and were

11

traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Centerline, the Individual Defendants had access to the adverse undisclosed information about Centerline's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Centerline and its business issued or adopted by the Company materially false and misleading.

28.     The Individual Defendants, because of their positions of control and authority as officers and/or trustees of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the

12

accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

29.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Centerline's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme (i) deceived the investing public regarding Centerline's business, operations, management and the intrinsic value of Centerline's common stock; and (ii) caused Plaintiff and other members of the Class to purchase Centerline's common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND REGARDING TRCLP'S AND DEFENDANT ROSS AND BLAU'S DOMINANCE AND CONTROL OVER CENTERLINE

30.     According to the Company's Definitive Proxy Statement filed with the SEC on Form DEF 14A, on April 23, 2007, TRCLP is "the Company's only shareholder owning more than 5% of our outstanding voting shares." TRCLP, through its ownership of Related General II, L.P., owns 685 common shares and 10,194,400 Special Common Units of Centerline's subsidiary, Centerline Capital Company, LLC (formerly known as CharterMac Capital Company LLC), which are convertible into common shares of the Company on a one-for-one basis, subject to certain restrictions, and the associated 10,194,400 Special Preferred Voting Shares.  Related General II, L.P. is owned by TRCLP.

31.     TRCLP profits from its close relationship with Centerline through various services contracts and management agreements, including the following:

a.     Related Management Company, which is wholly owned by TRCLP, received $4.3 million in fees in 2006 "for performing property management services for various properties held in investment funds" managed by Centerline (*see* 2007 Proxy Statement);

b. $620,000 paid to TRCLP in 2006 for services that included "office management, payroll, human resources and other office services." *See* 2007 Proxy Statement.

32.    Defendant Ross' dominance and control over the Company is further demonstrated by options he was granted at below market price as consideration for a related party transaction with Centerline in 2003, and the Company's subsequent agreement to cancel Ross' remaining unexercised options and replace them with substitute options to allow Ross to avoid adverse tax consequences under Section 409A ("Section 409A") of the Internal Revenue Code of 1986. Specifically, on July 18, 2007, the Company filed with the SEC a current report on Form 8-K disclosing that the Company had entered into an agreement with Ross to cancel unexercised options to purchase 800,000 shares of Centerline common stock at $17.78 per share, which were granted to Ross on November 17, 2003. The Form 8-K reveals that these options were granted to Ross at a price below the market price of Centerline stock on the date of grant, in connection with the Company's acquisition of Related Capital Company (now known as Centerline Affordable Advisors LLC). To avoid the consequences under Section 409A for unexercised options that are granted with an exercise price less than the fair market value of the underlying common shares on the date of the grant, the Company agreed to provide Defendant Ross with substitute options at the same price and same expiration date (November 17, 2013), to replace the 800,000 remaining unexercised options from the Related Capital Company acquisition.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMMISIONS DURING THE CLASS PERIOD

33.    On March 12, 2007, Centerline issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2006, and concurrently filed with the SEC a current report on Form 8-K, signed by Defendant Levy, that included as an exhibit the full text of the press release. The March 12, 2007 press

release and Form 8-K reported revenues of $127.9 million for the fourth quarter of 2006, as compared to $79.8 million for the fourth quarter of 2005 (representing a 60.3% increase year-over-year), and revenue of $387.25 million for the full year 2006, as compared to $295 million for 2005 (representing a 31.2% increase year-over-year). Centerline reported the fair value of its mortgage revenue bond portfolio as $2.397 billion as of December 31, 2006, as compared to $2.294 billion at the end of 2005. Additionally, the Company reported "Cash Available for Distribution ("CAD"), CharterMac's primary performance measure," of $28.4 million and $111 million for the fourth quarter and full year 2006, respectively, as compared to $27.2 million and $114.7 million for the fourth quarter and full year 2005, respectively. The Company explained its pro forma CAD metric as follows:

> [Centerline] believes that Cash Available for Distribution ("CAD") is helpful to investors in measuring the performance of our Company. CAD is the performance measure used by our chief decision-makers to allocate resources among our segments. CAD represents net income (computed in accordance with GAAP), adjusted for:
>
> o Cash fees and other revenues received but deferred in accordance with GAAP. Fees recognized for CAD but deferred for GAAP purposes are generally earned over a period of time in connection with certain of our product lines, such as fund sponsorship and credit intermediated fees.
> o The effect of straight line revenue recognition of interest income on revenue bonds with fixed changes in interest rates.
> o Depreciation and amortization, including write-off of intangible assets.
> o Non-cash gains recognized on sale of mortgage loans when servicing rights are retained.
> o Losses on sales of loans or repayment of revenue bonds.
> o Impairment losses.
> o The portion of tax benefit or provision that is not expected to be realized in cash.
> o Non-cash compensation expenses.
> o The difference between earnings allocated to Subsidiary Equity in accordance with GAAP and distributions to holders of that equity.
>
> There is no generally accepted methodology for computing CAD, and the Company's computation of CAD may not be comparable to CAD reported by other companies. CAD does not represent net cash provided by operating activities determined in accordance with GAAP and should not be considered as an alternative to net income (determined in accordance with GAAP) as an indication of the Company's performance, as an alternative to net cash provided from operating activities (determined in

accordance with GAAP) as a measure of our liquidity, or as an indication of our ability to make cash distributions.

34.    The March 12, 2007 press release and Form 8-K also highlighted the Company's ongoing evolution from a tax-exempt bond fund to a full service real estate finance and investment company, *inter alia*, stating:

> "*We completed several major initiatives in 2006 that significantly changed our Company and transformed CharterMac from a firm focused mainly on affordable and multifamily housing to a full-service real estate finance and investment company*," said Marc D. Schnitzer, Chief Executive Officer and President of CharterMac. "Our accomplishments included the acquisition of ARCap, one of the nation's leading high-yield CMBS fund managers, the launch of Centerbrook Financial, our credit risk products company, the rollout of a new credit approval process, the divestiture of two non-core investments and the completion of a corporate re-engineering. We believe that all of these initiatives will help create a more efficient operating structure and provide us with a best-in-class platform to grow and compete in a very competitive industry. *Today we can provide a broad array of debt and equity products for any type of real estate property*."

(Emphasis added.)

35.    Defendant Schnitzer's statements concerning the evolution of the Centerline to a "full-service real estate and investment company," was materially false and misleading because it concealed from the investing public the fact that Centerline was then in the process of selling its mortgage revenue bond portfolio to Freddie Mac. Moreover, Defendant Schnitzer's statement failed to disclose that Defendants planned to close this transformational transaction before the end of 2007.    On the contrary, Defendants' statements created the impression that the Company would retain its bond portfolio (and continue paying substantial dividends out of the income generated by this portfolio) for the indefinite future.

36.    On or about March 12, 2007, Centerline filed with the SEC its 2006 annual report on Form 10-K.  The 2006 Form 10-K was signed by each of the Individual Defendants and certified by Defendants Schnitzer and Levy pursuant to the requirements of the Sarbanes-Oxley Act of 2002.  The 2006 form 10-K reiterated the financial results reported in the Company's March 12, 2007 press release and Form 8-K.  In addition, the

2006 Form 10-K described the Company's business model as a full-service real estate

finance and investing company that maintained a portfolio of "tax-exempt first mortgage

revenue bonds," *inter alia*, as follows:

> Through our subsidiaries and funds which they manage, we are a full-service real estate finance and investing company. Our subsidiaries have direct financing relationships with approximately 875 real estate developers and owners throughout the country and we have strong relationships with various institutional investors, pension funds and endowments. We provide an array of products and operate from a fully integrated platform, which enables us to originate, underwrite and manage the risk of most transactions in which we provide debt or equity. Our platform offers us several competitive advantages, including:
>
> o THE ABILITY TO CROSS-SELL FINANCING PRODUCTS. Frequently on transactions, we offer more than one component of a property's capital;
> o THE ABILITY TO ORIGINATE THE TRANSACTION WHOLESALE, which enables us to capture substantially all of the financing fees associated with each transaction;
> o THE ABILITY TO CONTROL THE CREDIT QUALITY OF THE UNDERLYING PROPERTY. By working directly with the property's owner and by managing the risks of the underlying asset, our credit losses have historically been low; and
> o THE ABILITY TO PROVIDE PRODUCTS AND SERVICES THROUGHOUT THE PROPERTY'S FINANCING LIFE CYCLE.
>
> Operating Segments
>
> We operate in four business segments:
>
> 1. ***PORTFOLIO INVESTING, which includes subsidiaries that invest primarily in tax-exempt first mortgage revenue bonds issued by various state or local governments, agencies or authorities and other investments.*** The proceeds of mortgage revenue bonds are used by the borrowers to finance the new construction, substantial rehabilitation, acquisition, or refinancing of affordable multifamily housing throughout the United States.
>
> This segment may also include loans to and other investments in other business or funds involved in real estate or real estate finance. Such investments have included our pre-acquisition investment in ARCap Investors, LLC ("ARCap").

(Emphasis added.)

      37.    With respect to the Company's mortgage revenue bond portfolio, the 2006

Form 10-K, *inter alia*, stated:

    1. PORTFOLIO INVESTING

We conduct most of our portfolio investing through our CharterMac Equity Issuer Trust I and CharterMac Equity Issuer Trust II subsidiaries. Throughout this document, we will refer to both of these subsidiaries collectively as "Equity Issuer".

*As of December 31, 2006, our revenue bond portfolio includes direct and indirect interests in mortgage revenue bonds with an aggregate fair value of approximately $2.8 billion (prior to $397.3 million of eliminations related to bonds issued by partnerships we consolidate), secured by affordable multifamily properties containing 56,048 units located in 30 states and the District of Columbia.* While most of these mortgage revenue bonds generate tax-exempt income, certain of them generate taxable income. The taxable mortgage revenue bonds are held at the parent trust.

*Our Portfolio Investing business generates most of its income and cash flow from a positive spread between the interest earned from our mortgage revenue bond portfolio and the cost of capital we use to purchase the bonds.* We occasionally receive participating interest on certain mortgage revenue bonds which is equal to a percentage of net property cash flow of the net sale or refinancing proceeds. We also receive fees from borrowers for the acquisition of new mortgage revenue bonds. The acquisition of mortgage revenue bonds requires capital. In addition to using a portion of our operating cash flows, we obtain such capital by securitizing most of the bonds we purchase and by issuing equity securities.

(Emphasis added.)

38.     Furthermore, the 2006 Form 10-K reported the Centerline had increased the size of its mortgage revenue bond portfolio during 2005 and 2006 and gave no indication that the Company was planning to do an about-face on this business strategy. Specifically, the 2006 form 10-K, *inter alia*, stated:

The increase in mortgage revenue bond interest income is primarily due to *expanding our revenue bond portfolio in 2005 and 2006*, although the rate of investment has slowed due to challenging market conditions we have experienced since 2004.

(Emphasis added.)

39.     With respect to dividends, the 2006 Form 10-K reported that the Company had paid investors a dividend of $1.68 per share in 2006, as compared to a dividend of $1.65 per share in 2005.

40.     The statements in Centerline's 2006 Form 10-K concerning the Company's business model, the expansion of its mortgage revenue bond portfolio, and

dividends were materially false and misleading because they concealed from the investing public the fact that Centerline was then in the process of selling its tax-exempt bond portfolio to Freddie Mac and that this transformational transaction was expected to close before the end of 2007.  On the contrary, Defendants' statements created the false impression that the Company would retain its bond portfolio (and continue paying substantial dividends out of the income generated by this portfolio) for the indefinite future.

41.    Under the heading "Risk Factors," Centerline's 2006 Form 10-K stated, "[W]e derive a large portion of our earnings by … investing in mortgage revenue bonds;" and listed numerous factors that could materially affect the Company's financial performance, including, a general boilerplate statement that the Company could change its business plan without prior shareholder approval, as follows:

> **OUR BOARD OF TRUSTEES CAN CHANGE OUR BUSINESS POLICIES UNILATERALLY**
> Our board of trustees may amend or revise our business plan and certain other policies without shareholder approval. Therefore, our shareholders have no control over changes in our policies, including our business policies with respect to acquisitions, financing, growth, debt, capitalization and distributions, which are determined by our board of trustees.

(Emphasis in original.)

42.    Defendants' boilerplate risk disclosures in the 2006 Form 10-K regarding the possibility of the Company changing its business plan were materially false and misleading because it failed to disclose that at the time Defendants caused the Company to publish this purported risk disclosure, Defendants were in the process of structuring a deal with Freddie Mac to sell off the Company's entire tax-exempt mortgage revenue bond portfolio and slash its dividend. Once Defendants chose to speak on this topic, they had a duty to do so completely and in a non-misleading manner.  Moreover, the 2006 Form 10-K failed to disclose the material risk that the Company was planning to enter into an agreement with related parties that would have the effect of diverting a material amount of the Company's income to insiders at the expense of the investing public.

43.    With respect to the Company's disclosure controls, the 2006 Form 10-K,

*inter alia*, stated:

> Evaluation of Disclosure Controls and Procedures. Our Chief Executive
> Officer and Chief Financial Officer have evaluated the effectiveness of our
> disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule
> 15a-15(e) under the Securities Exchange Act of 1934, as amended (the
> "Exchange Act")) as of the end of the period covered by this annual report.
> Based on such evaluation, such officers have concluded that our disclosure
> controls and procedures as of the end of the period covered by this annual
> report were effective to ensure that information required to be disclosed by
> the Company in the reports that the Company files or submits under the
> Exchange Act is recorded, processed, summarized and reported, within the
> time periods specified in the SEC rules and forms, and to ensure that such
> information is accumulated and communicated to the Company's
> management, including the Chief Executive Officer and Chief Financial
> Officer, as appropriate, to allow timely decisions regarding required
> disclosure.

44.    On March 13, 2007, Centerline held an analyst conference call during

which Defendants reiterated the financial results reported in the March 12, 2007 press

release and Form 8-K, as well as the 2006 Form 10-K.  In addition, Defendant Schnitzer

commented on the upcoming change in the Company's name and the corporate

"reengineering" completed in 2005-2006, *inter alia*, stating:

> The final initiative that I would like to discuss is our corporate
> reengineering. Following our management change in November of 2005,
> we began a complete reengineering of our organization, the goal of which
> was to create a more efficient operating platform while maintaining our
> high level of service. We examined several areas of our Company and
> found redundancies and inefficient procedures. Following the ARCap
> acquisition, we took another look at our structure in the context of our
> growth plans and the desire to broaden our asset classes. As a result of
> these efforts, we have created a new credit approval process and
> strengthened our asset management platform. We also recognized that we
> were a difficult company to understand and explain to our many
> stakeholders. Beginning in 2001, we made a series of acquisitions and as a
> result we operate through several subsidiaries, each of which has its own
> brand name. In connection with our reengineering, we launched a
> branding initiative that is nearly complete. We believe that it is critical to
> operate as one Company, with one brand name and all 530 employees
> aligned with and focused on the success of that single company.
>
> Therefore, within the next 30 days, we will announce that we will change
> the name of our Company and eliminate our subsidiary structure and all
> existing other brand names. When our new brand is rolled out, we will
> introduce our new structure, which will consist of four business groups:
> Affordable Housing, Commercial Real Estate, Asset Management and

Credit Risk Products. We have identified the leaders of each group and will announce their appointments at the time we announce our new name. The four business groups will be supported by our risk policy, legal, human resources, finance, corporate communications and information technology departments, which together will form our corporate group. We believe that this structure will enable to us reap even greater benefits from the integration of our past and future acquisitions and describe our business in a clearer fashion. Our first quarter 2007 financial reports will be modified to reflect our new structure and we will introduce new performance metrics for each of our business groups.

45.     As to Centerline's Affordable Housing group – the segment responsible for managing the Company's mortgage revenue bond portfolio – Defendant Schnitzer indicated that the Company's restructuring had not reduced its commitment to this business and expected it to continue growing, stating:

> **With respect to our Affordable Housing group, which includes our low-income housing tax credit and tax-exempt bond businesses, we expect to have another strong year.** We expect stability and modest growth from this business due to the statutory limitations on the availability of both tax credits and tax-exempt bonds. Since the inception of the tax credit program in 1986, we have been an industry leader with significant market share. **Our firm's significant growth and diversification has not reduced our commitment to the affordable housing business.** We will continue to represent the highest standard for this industry and seek innovative new products for financing affordable housing.

> At the end of 2006, investor demand in the tax-credit equity market was significantly reduced due to historic low rates of return. Since late 2006, yields have increased by more than 100 basis points and investors have shown renewed interest in early 2007. The increased yields have not yet allowed for an increase in margins. However, we believe that margins will be stable in 2007 after declining in 2006. **Our growth plans in affordable housing include the development of new complimerary [sic] -- complimentary products, incremental tax credit equity market share gains, and in expense reductions.** The additional tax credits authorized by Congress after Hurricane Katrina in the Gulf opportunity zone -- which is comprised of Louisiana, Mississippi and Alabama -- have provided us with several opportunities to finance large transactions in that area of the country.

> **With respect to tax-exempt bonds, the current supply in the market is low and the demand is at an all-time high.** Many national and regional banks have entered the private placement business in order to diversify their product offerings and meet CRA needs. In addition, Fannie Mae and Freddy Mac have become more competitive and now offer longer amortization and more aggressive terms. Overall, we expect flat tax-exempt bond originations for 2007 compared to 2006.

(Emphasis added.)

46.    As with the March 12, 2007 press release and Form 8-K and the 2006 Form 10-K, Defendants' statements during the March 13, 2007 conference call gave no hint that Defendants were in the process of selling the Company's mortgage revenue bond portfolio to Freddie Mac and that this transformational transaction was expected to close before the end of 2007. On the contrary, Defendants' statements created the false impression that the Company would retain its bond portfolio (and continue paying substantial dividends out of the income generated by this portfolio) for the indefinite future.

47.    On May 10, 2007, Centerline issued a press release announcing its financial results for the first quarter of 2007 and concurrently filed with the SEC a current report on Form 8-K, signed by Defendant Levy, that included as an exhibit the full text of the press release. The May 10, 2007 press release reported that the Company's mortgage revenue bond portfolio was then valued at $2.46 billion. In addition, the May 10, 2007 press release, *inter alia*, stated:

> "Due to the seasonality of our business, our origination volume across our business lines tends to be the slowest in the first quarter and as a result, our earnings and Cash Available for Distribution are not earned evenly throughout the year," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "In addition, our first quarter financial results were impacted by an impairment we recorded in connection with revenue bonds secured by mortgages on six properties and a charge to reserve against associated receivables. Therefore, *while our dividend payout ratio is above 100% in this quarter, we are comfortable that our annual dividend will continue to have adequate coverage*. We have solid investment pipelines in both our Commercial Real Estate Group and Affordable Housing Group and we continue to see a tremendous amount of transaction volume. In addition, *we are working on several new growth initiatives we expect to launch in 2007. Based on the progress we have made executing our business plan to date, we remain confident that we will meet our investment and financial goals for the year and do not believe it is necessary to revise our guidance at this time.*"

(Emphasis added.)

48.    Also on May 10, 2007, Centerline filed with the SEC its quarterly report on Form 10-Q for the first quarter of 2007 (the "First Quarter 10-Q"), which was signed by Defendants Schnitzer and Levy. Defendants Schnitzer and Levy certified this filing

pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 that "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Centerline." The First Quarter 10-Q reiterated the financial results reported in the Company's May 10, 2007 press release and Form 8-K, including that the fair value of the Company's mortgage revenue bonds was then $2.46 billion as compared to $2.39 billion at the end of 2006. In addition, revenue from interest income (revenue bonds and other interest income) amounted to 63.0% of the Company's total revenue, as compared to 57.6% in first quarter of 2006.

49.    With respect to the Company's disclosure controls, the First Quarter 10-Q, *inter alia*, stated:

> EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES. Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report were effective to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

50.    On May 10, 2007, Centerline held an analyst conference call during which Defendants reiterated the financial results reported in the May 10, 2007 press release and Form 8-K, as well as the First Quarter 10-Q. In addition, Defendant Schnitzer stated:

> As we stated in this morning's press release, due to the seasonality of our business our origination volume across business lines tends to be the slowest in the first quarter. As a result, our earnings and cash available for distribution are not earned evenly throughout the year. In addition, our first quarter financial results were impacted by an impairment we recorded in connection with six revenue bonds we hold on our balance sheet and a charge to reserve against associated receivables. ***Although our dividend payout ratio is above 100% in this quarter we are comfortable that our annual dividend will continue to have adequate coverage.*** We have solid investment pipelines in both our Commercial Real Estate Group and our

Affordable Housing Group, and we continue to see a tremendous amount of transaction volume.

(Emphasis added.)

51.     Based on Centerline's May 10, 2007 disclosures, analysts' expectations for 2007 remained largely unchanged.  For example, Tony Howard of  J.J.B. Hilliard, W.L. Lyons, Inc., in a report dated May 14, 2007, wrote:

> **Once again, we are adjusting our 2007 CAD [cash available for distribution] forecast from $1.96 to $1.90 a share, which would be basically flat with 2006's down performance compared to 2005.**
>
> However, we would note that despite the first quarter shortcomings, *management reiterated its guidance of a 3% to 5% improvement over 2006's down CAD results*. On the other hand, even to achieve our revised forecast, it would require a healthy increase in transactional businesses in the second half of the year. While this is clearly possible and management was right on target in its assessment that 2006 would be slightly down compared to the record 2005 performance, we would rather take a more conservative approach.
>
> \*        \*        \*
>
> Although the first quarter CAD results clearly did not cover the dividend, *management once again reiterated its commitment to the $1.68 dividend payment*. Even with our revised downward CAD forecast for 2007, we also believe the payout ratio will be well below 100%.

(Emphasis added.)

52.     The May 10, 2007 press release and Form 8-K, Frist Quarter 10-Q, and Defendants' statements during the May 10, 2007 conference call gave no hint that Defendants were in the process of selling the Company's mortgage revenue bond portfolio to Freddie Mac and that this transformational transaction was expected to close before the end of 2007.  On the contrary, Defendants' statements created the false impression that the Company would retain its bond portfolio (and continue paying substantial dividends out of the income generated by this portfolio) for the indefinite future.

53.     On August 9, 2007, Centerline issued a press release announcing its financial results for the second quarter and six months ended June 30, 2007 and concurrently filed with the SEC a current report on Form 8-K, signed by Defendant Levy,

that included the full text of the press release. The August 9, 2007 press release highlighted *"[s]table credit performance within $2.8 billion revenue bond portfolio*; At June 30, 2007, thirteen bonds with an outstanding balance of $70.1 million were delinquent, representing 2.5% of the entire portfolio." (Emphasis added.)

54.     Also on August 9, 2007, Centerline filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2007 (the "Second Quarter 10-Q"), which was signed by Defendants Schnitzer and Levy. Defendants Schnitzer and Levy certified this filing pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 that "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Centerline." The Second Quarter 10-Q reiterated the financial results reported in the Company's May 10, 2007 press release and Form 8-K.

55.     With respect to the Company's disclosure controls, the Second Quarter 10-Q, *inter alia*, stated:

> EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES
> Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

56.     Also on August 9, 2007, Centerline held an analyst conference call during which Defendants reiterated the financial results reported in the August 9, 2007 press release and Form 8-K, as well as the Second Quarter 10-Q. In addition, Defendant Schnitzer commented on the subprime mortgage crisis and the overall financial condition of Centerline, *inter alia*, stating:

In the past few weeks, the financial markets have been impacted by a re-pricing of risk and withdrawal of liquidity due to the serious credit problems in the single-family sub-prime mortgage industry. *I would like to assure you that Centerline does not have any single-family or sub-prime exposure whatsoever. We are a commercial real estate finance and investment company and we provide financing only for commercial and multi-family properties.* As evidenced by our CAD growth this quarter, *our core businesses continue to perform well* and the credit quality of the investments we manage remains strong.

In spite of the instability in the financial markets, *operating fundamentals in the commercial real estate and affordable housing sectors are healthy. We have sufficient capital resources to execute our business plan and are not experiencing any liquidity problems.* In fact, during the past 30 days, we have priced a collateralized debt obligation offering for one of our CMBS funds and closed on the expansion of our revolving credit facility. Both transactions demonstrate our ability to execute in a volatile market environment.

The recent market dislocation has created numerous opportunities to make investments that offer attractive returns and strong credit quality. *In times of market instability, we would expect to see a flight to quality that benefits firms like Centerline*, that have a proven ability to assess and manage real estate risk.

Our business is sound. Despite that, we have seen our stock price decline in recent weeks as concerns about mortgage or real estate-related businesses spread to the stock market. Many of our investors inquired as to why we did not make any public statements during this period. We felt that it was important to wait until we released our earnings so we could support the confidence we have in our business with solid facts.

As we reported in this morning's press release, we had a very strong quarter, with CAD per share of $0.46, which is a 12.2% increase over CAD per share in the second quarter of 2006. As of June 30th, our direct assets under management were $17.1 billion, an increase of 7% over the first quarter.

*The market instability has had little or no impact on our Affordable Housing group, which includes our tax-exempt bond and tax credit equity fund businesses. Affordable Housing represents approximately 65% of our annual CAD revenues.*

\*        \*        \*

In regard to our direct tax-exempt bond business, we continue to experience strong competition for originations, mostly from large banks that acquire bonds to satisfy their Community Reinvestment Act requirements. As a result we have lowered our budget for new bond originations in 2007 to $300 million from the $400 million we originally projected.

*The credit quality of our bond portfolio remains very strong.* As of June 30th, delinquencies totaled just $70.1 million or approximately 2.5% of

our $2.8 billion portfolio. After the impairments we recorded in the first quarter, we performed a thorough re-underwriting of 122 bonds in our portfolio that were not performing as well as we expected out of our total of 376 bonds. In the second quarter, we recorded only an additional $3 million in permanent impairments with respect to these bonds. Since our inception as a public company in 1997, our bond portfolio has incurred less than $30 million or approximately 1% in cumulative permanent impairments.

(Emphasis added.)

57.    During the August 9, 2007 conference call, Defendant Levy also commented on the Company's financial condition in light of the subprime crisis, *inter alia*, stating:

[W]e have almost no mark to market risk and we are fully compliant with all covenants on all of our facilities. In the past few months, we have closed on $270 million in new debt facilities as we expanded our corporate revolver and our agency facility, proving our access to capital in a very difficult environment. And our most significant funding source – our bond securitizations, are financed in what has proven to be a safe haven market.

Finally, we are being very careful to maintain our liquidity in the face of the recent market turbulence. As of June 30, 2007, Centerline had $169 million in liquidity, including $111 million in cash and $58 million in availability on our corporate revolver. I hope this description gives you some comfort as to the health of our balance sheet and our funding sources.

58.    With respect to the Company's financial results for the second quarter of 2007, Defendant Levy highlighted the Company's 9.8% increase in revenue as compared to the second quarter of 2006, which he attributed, in part, to an increase in the size of the Company's tax-exempt bond portfolio, stating:

For the 3 months ended June 30, 2007, Centerline reported Cash Available for Distribution (or CAD) of $26.9 million, or $0.46 per diluted share compared with $23.9 million, or $0.41 per diluted share in the corresponding three month period of 2006.

*              *              *

Total revenues for the three months ended June 30, 2007 were $94.6 million versus $86.2 million in the corresponding period last year. ***This year-over-year 9.8% increase is primarily due to the impact of the ARCAP acquisition and the increased size of our tax exempt bond portfolio. Over the past four quarters our bond portfolio has grown by $230 million while the average yield on the portfolio has held steady at***

> **6.6%.** Year-to-date we have had almost no repayments of bonds and do
> not expect a significant number. Our bond portfolio remains very healthy
> from a credit perspective as we recognized only $2.9 million in additional
> impairments in the second quarter, equating to 0.1% of the total principal
> outstanding.

(Emphasis added.)

59.    Defendants' Statements in the August 9, 2007 press release and Form 8-K,
Second Quarter 2007 10-Q, and the August 9, 2007 conference call were materially false
and misleading because these statements and others gave no hint that Defendants were in
the process of selling the Company's mortgage revenue bond portfolio to Freddie Mac
and that this transformational transaction was expected to close before the end of 2007.
On the contrary, Defendants' statements created the false impression that the Company
would retain its bond portfolio (and continue paying substantial dividends out of the
income generated by this portfolio) for the indefinite future.

60.    On November 8, 2007, Centerline issued a press release announcing its
financial results for the third quarter and nine months ended September 30, 2007, and
concurrently filed with the SEC a current report on Form 8-K, signed by Defendant Levy,
that included as an exhibit the full text of the press release. The November 8, 2007 press
release reported the fair value of the Company's revenue bonds portfolio as $2.578
billion, as compared to $2.397 billion as of December 31, 2006. The November 8, 2007
press release also highlighted a 2.4% increase in quarterly revenue and stable
performance of the Company's bond portfolio, *inter alia*, as follows:

> o Revenues, adjusted to exclude Consolidated Partnerships(a), of $104.8
> million, an increase of 2.4% over the third quarter of 2006;
> o Centerline's Affordable Housing Group ("Affordable Housing") raised
> $132.9 million of gross equity for various low income housing tax credit
> ("LIHTC") investment funds;
>
> *            *            *
>
> o Stable credit performance within $2.9 billion revenue bond portfolio; At
> September 30, 2007, 15 bonds with an outstanding balance of $88.9
> million were delinquent, representing 3.1% of the entire portfolio…

61.    Commenting on these results, Defendant Schnitzer stated:

Despite the ongoing credit crisis, Centerline had another solid quarter of operations … In very difficult market conditions, we closed a $585 million high-yield CMBS fund and priced and closed a $986 million CDO for one of our CMBS investment funds. We believe these accomplishments are evidence of the strength of the Centerline brand and are a strong endorsement of our ability to assess and manage real estate risk.

62.    On November 9, 2007, Centerline filed with the SEC its quarterly report on Form 10-Q for the third quarter of 2007 (the "Third Quarter 10-Q"), which was signed by Defendants Schnitzer and Levy.  Defendants Schnitzer and Levy certified this filing pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002 that "The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Centerline."  The Third Quarter 10-Q reiterated the financial results reported in the Company's November 9, 2007 press release and Form 8-K, including that the fair value of the Company's mortgage revenue bonds was then $2.578 billion as compared to $2.39 billion at the end of 2006.  In addition, the Third Quarter 10-Q reported $70.2 million in revenue from the Affordable Housing segment, representing approximately 55.6% of the Company's total revenue for the third quarter of 2007.

63.    The Third Quarter 10-Q represented that the Company's mortgage revenue bond portfolio was continuing to produce positive yields and that revenue from this portfolio had increased during 2007, *inter alia*, as follows:

### Mortgage Revenue Bond Investing

The increase in mortgage revenue bond interest income is primarily due to the higher portfolio balance due to acquisition activity in the past year offset by a lower weighted average yield when analyzed against the comparable period.

While generally declining yields of bonds acquired has gradually lowered the average yield of our portfolio, we continue to earn a positive spread on our portfolio. With an increase in the average portfolio balance, our level of securitizations also increased which resulted in higher interest expense and securitization fees. By entering into a fixed rate securitization in 2006 and using interest rate swaps to fix the rate on a large portion of our remaining securitizations, we believe that we have significantly mitigated the impact on spreads of fluctuating SIFMA rates.

(Emphasis in original.)

64.     With respect to the Centerline's business model, and in particular, its Affordable Housing segment (the segment responsible for managing the Company's mortgage revenue bond portfolio) the Third Quarter 10-Q, *inter alia*, stated:

> Affordable Housing brings together the users and providers of debt and equity capital to the affordable multifamily rental housing industry, and includes:
> o Mortgage Revenue Bond Investing - through the parent and our subsidiaries, we invest primarily in tax-exempt first mortgage revenue bonds issued by various state or local governments, agencies or authorities. The proceeds of these mortgage revenue bonds are used to finance the new construction, substantial rehabilitation, acquisition, or refinancing of affordable multifamily housing properties located throughout the United States; and

65.     With respect to the Company's disclosure controls, the Third Quarter 10-Q, *inter alia*, stated:

> EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES. Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report were effective to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

66.     On November 8, 2007, Centerline held a conference call for investors and securities analysts to discuss the Company's financial results for the third quarter of 2007.     During this conference call, Nicole Jacoby, an analyst form Liberation Investments, asked Defendant Schnitzer whether Centerline had considered selling its tax-exempt mortgage revenue bond portfolio in order to transform the Company into a pure asset management firm.     As shown below, Defendant Schnitzer admitted that Centerline had considered this possibility, but he deliberately concealed the fact that such

a deal was in the works and was expected to close before the end of 2007 (*i.e.*, in less

than two months). Specifically, Defendant Schnitzer, *inter alia*, stated:

Nicole Jacoby - Liberation Investments - Analyst

I just wanted to ask you guys, particularly in the current market environment you've been putting us [sic] out some really solid performance. However, *it's obvious in your stock price that you're not being rewarded for that in the marketplace*. You addressed before a little bit about your -- you're thinking about stock buybacks. But more generally, *can you walk us through your thinking about how you can help close that value gap or initiatives you might take to close that gap between where your stock price is and the true value of the Company?*

Marc Schnitzer - Centerline Holding Company - President and CEO

Well yes, *we believe and we have believed for some time that the way to really increase the value of the Company is to continue to evolve the Company into a fund manager.* And, many of you will recall that back in 1997, when we were called CharterMac and the company first went public, it had one line of business and that was really to be a tax-exempt bond fund that lent money long and borrowed short.

*Ever since that time, our growth has really focused on evolving into externally managed funds* whether it's our tax credit funds, our CMBS funds, our high yield debt funds, our joint venture equity funds, the CLO business. All of these significant growth initiatives and others that we're thinking about, such as this debt opportunity fund are steering us toward an evolution into much more of a pure fund manager which is where we really see the growth for the Company and *we believe that the marketplace rewards companies like that with a higher valuation* on their income stream to a much greater extent than our Company realizes today.

*So, we've been going through this evolution. We will continue to go through this evolution and our goal will be to make the Company into much more of a pure fund manager* and then go out and tell the world about it in the most effective way that we can. And our thesis would be that our multiple should go up and that's what our advisors have suggested. So, that's more of a global approach. I don't know if that is as specific an answer as you wanted.

Nicole Jacoby - Liberation Investments - Analyst

Well, I understand. I think we've had some of these discussions before about turning into a fund manager. There are two further issues. One is, you are obviously executing along that track. But the market still doesn't seem to either recognize it or be rewarding it. And, sort of related to that, *have you ever considered putting -- taking the bonds off your balance sheet or letting them roll off into some other sort of vehicle?*

Marc Schnitzer - Centerline Holding Company - President and CEO

*Well, clearly a strategy like that plays into the overall evolution of the Company. So, clearly it's something that we've thought of from time to time.* We're not yet in a position where we can make the case in a very compelling way that we are a pure fund manager when we have $2.9 billion of bonds on our balance sheet which is reminiscent of the bond fund that we were. So, I think that complicates the story and our goals are really to try to simplify the story as much as we can.

Nicole Jacoby - Liberation Investments - Analyst

And is there anything -- *so you generally thought about the bond issue but I guess you're not commenting right now on the specifics of it?*

Marc Schnitzer - Centerline Holding Company - President and CEO

*We've thought about that and many other options. But, clearly that's one that would come to mind right away.*

(Emphasis added.)

67.    The Defendants' statements in paragraphs 33-34, 36-39, 41, 43-45, 47-50, 53-58, and 60-66, were each materially false and misleading because: (i) Defendants knew but failed to disclose that the Company was in negotiations with Freddie Mac to sell its tax-exempt mortgage revenue bond portfolio (which had historically generated the majority of the Company's revenue), before the end of 2007; (ii) Defendants' statements created the reasonable expectation in the investing public that the Company would continue to hold its tax-exempt mortgage revenue bond portfolio for the indefinite future rather than selling it before the end of 2007; (iii) without the Company's tax-exempt mortgage revenue bond portfolio, the Company would no longer be capable of paying the substantial dividends (with yields as high as 13.9%) that Centerline investors expected and which provided investors with a regular and dependable stream of income that served as the basis for investors' decision to purchase Centerline shares; (iv) the planned sale of the Company's tax-exempt mortgage revenue bond portfolio to Freddie Mac would be a transformational transaction that would completely change Centerline's business model from a tax-exempt bond fund to a pure asset management company; (v) the transformation of the Company's business model to a pure asset management company would change the risk profile of investing in the Centerline securities and make

32

Centerline a significantly riskier investment; (vi) the Company was in the process of engineering a related party transaction with TRCLP that would divert a significant portion of the Company's future income to insiders, including Defendants Ross and Blau who own and control TRCLP, by providing them approximately 12.2 million new convertible preferred shares at $10.75 per share that will pay an 11 percent annual dividend and, through the convertible feature of the shares, effectively provide Defendants Ross and Blau a call option on 20 percent of the Company with no equity risk, in exchange for TRCLP's $131 million "investment" in Centerline; and (vii) the Company lacked adequate disclosure controls and procedures.

## THE TRUTH BEGINS TO EMERGE

68.     On December 28, 2007, Centerline issued a press release and concurrently filed with the SEC a current report on Form 8-K signed by Defendant Levy that included as an exhibit the full text of the press release, revealing that the Company had sold its $2.77 billion tax-exempt and $30 million taxable affordable housing bond portfolio to Freddie Mac pursuant to Freddie Mac's Tax-Exempt Bond Securitization program, also known as the "TEBS" program. The December 28, 2007 press release, *inter alia*, stated:

> Centerline Holding Company (NYSE: CHC), the parent company of Centerline Capital Group Inc. ("Centerline" or the "Company"), *today announced the completion of a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac. For accounting purposes, most of the securitization will be treated as a sale. The transaction represents a major step in Centerline's plan to transform itself into an alternative asset management company. Centerline also announced a $131 million equity investment commitment from an affiliate of Related Companies, its largest shareholder.*
>
> "Over the past several years, the strategic vision embraced by Centerline's Board of Trustees and management has been to transform Centerline into an alternative asset management company," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. *"With the securitization of our bond portfolio with Freddie Mac, we have accelerated our progress toward that goal.* The transaction has materially improved our risk profile by reducing the funding and interest rate risk inherent in our liability structure. Centerline now has a leaner balance sheet, improved credit metrics and an increased percentage of revenues derived from asset management services. *As an alternative asset manager with $11.6 billion*

*of assets under management, we aim to produce returns and growth comparable to other publicly-traded alternative asset managers*."

"Centerline's goals are to increase assets under management and to create greater earnings power. With Related's investment, we have the resources to achieve our goals," continued Mr. Schnitzer. "Greater liquidity will enable us to capitalize on opportunities arising from the volatility in the capital markets. Our growth plans adhere to our core investment strategy of Buy-Watch-Fix: invest prudently, monitor performance diligently and manage investments aggressively."

Stephen M. Ross, Chairman of Related Companies and Centerline, added, *"Centerline has undergone an amazing evolution from the affordable housing firm I started 35 years ago to an industry leader in real estate investment and finance*. Centerline has a premier, seasoned management team and a compelling growth story as an alternative asset manager. This equity investment in Centerline will help the Company implement its new initiatives and build the foundation for future expansion. I strongly endorse Centerline's growth strategy and the ability of the management team to execute it."

**Freddie Mac Transaction**
*Centerline completed a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac*. The bond portfolio is secured by mortgages on approximately 59,000 units of affordable multifamily properties in 31 states. *For accounting purposes, most of the securitization will be treated as a sale*. Centerline retained a high-yielding first-loss position (the "B-Piece") in the portfolio and will remain the primary and special servicer.

"We are thrilled to partner with Freddie Mac on this innovative transaction," said Mr. Schnitzer. "Retaining the B-Piece and our ongoing servicing arrangement creates a fund management structure for the bond portfolio similar to our other funds. Through our partnership with Freddie Mac, as their first Targeted Affordable Housing Lender, we will improve the competitiveness of our affordable housing business and assist in the expansion of assets under management."

Centerline used the proceeds from the Freddie Mac bond securitization to redeem its existing financing arrangements, retire corporate debt and pay the costs and expenses associated with the transaction.

In connection with the transaction, Centerline expects to record net, one-time charges of $45 million to $55 million in the fourth quarter of 2007. Net of minority interest allocations, the Company expects these charges to reduce net income by $30 million to $40 million. Gains incorporated in the net charge include a gain on the sale of the bonds, previously deferred revenues and recovery of impairment charges. Losses incorporated in the net charge include writing off deferred costs associated with the bonds and securitization trusts, recognizing fair value losses on certain interest rate swaps, costs to terminate existing financing arrangements and transaction related costs. These transaction-related costs of approximately $95 million will impact the Company's 2007 Cash Available for Distribution ("CAD"). Centerline has reduced the Company's previous CAD per share

guidance for 2007 from $1.89 to a range of $1.70 to $1.75, exclusive of the transaction related costs associated with the securitization.

(Emphasis added.)

69.    In addition, the December 28, 2007 press release revealed that the Company had entered into a sweetheart deal with TRCLP, the related company owned and controlled by Defendants Ross and Blau, in which TRCLP agreed to make a $131 million equity investment in Centerline in exchange for 12.2 million shares of newly-issued convertible preferred stock that will pay these insiders an 11% dividend, as follows:

> **$131 Million Investment from An Affiliate of Related Companies**
> An affiliate of Related Companies has committed to invest $131,250,000 in Centerline Holding Company through a newly-issued convertible preferred stock. *The preferred stock will pay dividends at an 11% annual distribution rate and will be convertible at a $10.75 per share conversion rate for an aggregate of approximately 12.2 million common shares of Centerline Holding Company.* The transaction, which is subject to completion of definitive documentation, is expected to close in January 2008. Centerline will use the net proceeds to reduce corporate debt and fund the Company's growth plans.

(Emphasis added.)

70.    Finally, the December 28, 2007 press release revealed that the Company would be slashing its dividend from $1.68 per share to $0.60 per share, as follows:

> Change Dividend Policy: Effective in the first quarter of 2008, *Centerline's dividend on an annualized basis is expected to be $0.60 per share ($0.15 on a quarterly basis)*, subject to approval by our Board of Trustees. The Company will deploy its retained cash flows to fund growth and reduce debt. Centerline anticipates 30% to 35% of the Company's income will be federally tax-exempt in 2008.

(Emphasis added.)

71.    During an analyst conference call on December 28, 2007 – immediately after the stunning announcement that the Company had sold its tax-exempt bond portfolio to Freddie Mac and had abruptly changed its business model from a tax-exempt bond fund to an asset manager – Defendant Schnitzer, in his prepared remarks at beginning of the call, revealed that the Company had been planning this institutional metamorphosis for nearly a year, stating: "This morning, *we announced the closing of a*

*transformational transaction that has been in the works for close to a year* and a significant strategic investment in our firm by our larger shareholder." (Emphasis added.)

72.    Defendant Schnitzer also revealed additional information about the Freddie Mac transaction, including the fact that Centerline was retaining a $140 million "first loss" piece of the portfolio, *i.e.*, Centerline would remain on the hook for the first $140 million in defaults and principal losses on the entire tax-exempt bond portfolio. Specifically, Schnitzer, *inter alia*, stated:

> The Freddie Mac transaction is a fixed-rate securitization of our bond portfolio, slightly over $2.8 billion. That securitization has an all-in cost of approximately 5.39%. The portfolio's current coupon is somewhere between 6.5% and 6.6%. The transaction will give us sale treatment for accounting purposes with respect to the majority of the portfolio and *Centerline will retain a $140 million high-yielding B-Piece, top loss piece*, and we will remain the primary and special servicer for the portfolio.

> *    *    *
>
> **Tony Howard - J.J.B. Hilliard, W.L. Lyons, Inc. - Analyst**
>
> When you say first loss, does that mean you take the hit before Freddie Mac takes the hit on the entire portfolio, or just the 140 million part?
>
> **Marc Schnitzer - Centerline Holding Company - President and CEO**
>
> The $140 million, Tony, is a top loss for the entire portfolio. *So the first $140 million of losses in the portfolio comes out of that $140 million.*

(Emphasis added.)

73.    Analysts and private investors were appalled by Centerline's announcement and, during a December 28, 2007 analyst conference call, vented their anger and frustration at Defendants' move to radically change the Company's business model by selling its tax-exempt mortgage revenue bond portfolio and slashing its dividend. For instance, Tony Howard of J.J.B. Hilliard, W.L. Lyons, Inc., observed that this transaction changed the entire basis for investing in Centerline and characterized this transaction as "punishing" Centerline's shareholders, stating:

Final question, Marc. Was it considered as far this transformation as far as why not take the Company the private, since basically our shareholders and a lot of *shareholders have owned your stock over the years for the dividend and for the tax-free status*. So in some way, *you're basically not only transforming the Company, but you are changing the shareholder base. So you are basically punishing the income ... shareholders* for a more growth-oriented shareholders that may want to buy your stock in the future.

(Emphasis added.)

74.    In addition, investors expressed their disgust with the related party transaction with TRCLP that Defendants Ross and Blau were using to enrich themselves at the expense of the Company's outside investors, as follows:

Matt West Private Investor

This capital raise makes no sense to me. *If Related wants to participate in and fund the growth of the Company, they should be taking the same equity risk as the rest of common shareholders. They're getting an 11% coupon and a call option on 20% of the Company with no equity risk. It speaks of an affiliated entity getting a sweetheart deal.* You said there were other parties to talk to. If you want to raise capital and you want to fund growth, you owe it to your investors to get on the road and do a marketed deal. How is this an acceptable way to raise capital?

*        *        *

Patrick Collins Private Investor

I have to agree with the prior two callers. *I'm actually disgusted by this transaction. How could insiders to reach such a favorable deal for themselves?* If you really feel like they are being -- attempting to support all shareholders, then we should open this up to a rights issue and they backstop it with a preferred, right? So open up the -- for capital raise as a rights issue, and then whatever is not taken up, then they can put in the preferreds. *But this is too favorable of a deal. And I will also agree that you're completely alienating your shareholders here. Your shareholders are looking for dividend yields*, and now you're saying, will if that didn't, we're going to change it. *You're running this like it's a private company.* I would be disgusted if I were you at what you've done – I'm just disgusted. I would be ashamed at what I did.

Marc Schnitzer - Centerline Holding Company - President and CEO

There are really two issues there again. As we said before, the critical issues on the preferred were testing it in the marketplace, which it was; the timing of the investment and the market conditions. And based on the terms that were available from third parties in the marketplace, the need for the timing of the capital and an extremely unstable market, we feel that this is an attractive transaction.

Patrick Collins Private Investor

***Well, your shareholders are clearly not agreeing with you.*** Your equities hit a brand-new load [sic] today on meaningful volume on even a slow day. So you're wrong. So I really kind of question your thinking on this, and ***I am just disgusted by it***. What shareholder consent is going to be required to get this through?

\*    \*    \*

Parker Phillips Private Investor

I would just like to -- ***I would echo the disgust and frustration of previous shareholders who have spoken on this call.*** I think this is a -- ***I think this transaction is contemptuous of your existing shareholders.*** But in any event, I would like to ask about the timing of this announcement where it's a Friday morning, two days before the end of the year. Why announce this transaction today? Why not wait until the first part of next year, and why not wait at least until a day when people are in the office by and large, particularly your shareholders, who are probably on vacation, most of them? ***It just seems strange that you would choose today to announce this transaction.*** Could you address that?

\*    \*    \*

Matt West Private Investor

Just a closing remark related to the investor by Related. It says that the transaction is expected to close in January 2008. If it hasn't closed, I would suggest not closing it, especially not on the terms that you have put forth. ***When investors are using words like disgusted, egregious and disingenuous on a call, I think it's evident that this is a bad transaction.*** The right thing to do might be to do, if you really need capital now, which is arguable, you could do a rights offering and let Related backstop it. And finally, if you are this out of step with institutional shareholders, maybe the right thing to do is just put this company up for sale.

(Emphasis added.)

75.    Defendants' disclosure that Centerline had sold its tax-exempt mortgage revenue bond portfolio to Freddie Mac and had changed its business model overnight from a tax-exempt bond fund that paid dividends with yields as high as 13.9%, to a riskier asset management company that would be unsuitable for investors seeking income from dividends, as well as the revelations regarding the sweetheart deal with an entity owned and controlled by insiders Ross and Blau -- TRCLP -- revealed to the market the falsity of the Company's Class Period statements (and material omissions) and caused real economic harm to Plaintiff and the class. Indeed, these revelations caused the price

of Centerline stock to plummet from $10.27 per share on December 27, 2007, to close at $7.70 per share on Friday, December 28, 2007, representing a 25% single-day decline, on unusually heavy trading volume of 4,152,688 shares.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS PROXIMATELY CAUSED ECONOMIC LOSS TO CENTERLINE'S INVESTORS

76.    On March 12, 2007 the first day of the Class Period, Centerline announced its financial results for the fourth quarter and full year 2006, including revenues derived for its $2.397 billion mortgage revenue bond portfolio and the year-over-year growth in revenues from and assets held in the mortgage revenue bond portfolio. Following this news, the price of Centerline shares closed relatively flat at $19.75 per share.

77.    During the Class Period, Defendants maintained the artificial inflation in Centerline's stock prices by continuing to make false and misleading statements regarding the Company's business model and ongoing business strategy, including statements concerning its mortgage revenue bond portfolio, which generated a large proportion of the Company's total revenues and enabled Centerline to pay annual dividends of as much as $1.68 per share (providing dividend yields as high as 13.9%). The income from these dividends and relatively low risk profile served as the basis for risk-averse value oriented investors to purchase Centerline shares. The Defendants' misstatements and omissions, as alleged herein, created the false impression that Centerline would retain its mortgage revenue bond portfolio (which had been a core holding since the Company's founding) and continue paying out large annual dividends for the indefinite future. But for Defendants' material misstatements and omissions, as alleged herein, Centerline's stock would not have traded at the elevated levels it did during the Class Period.

78.    The artificial inflation in Centerline's stock price was eliminated when, on the last day of the Class Period (December 28, 2007), the market learned that, contrary to

Defendants' statements during the Class Period, that: (i) the Company had sold its $2.8 billion mortgage revenue bond portfolio to Freddie Mac, thereby transforming the Company overnight into a pure asset management firm; (ii) the Company was slashing its annual dividend from $1.68 per share to $0.60 per share; and (iii) the Company had cut a sweetheart deal with a related entity – TRCLP – owned and controlled by Defendants Ross and Blau, in which TRCLP agreed to provide $131 million in financing to Centerline in exchange for 12.2 million shares of newly-issued convertible preferred stock that will pay these insiders an 11% dividend, thereby diverting a material portion of the Company's income to insiders at the expense and to the great detriment of Centerline shareholders.

79.    As a direct and proximate result of the December 28, 2007 disclosures, Centerline's stock price fell from $10.27 per share on December 27, 2007, to close at $7.70 per share on Friday, December 28, 2007, representing a 25% single-day decline, on unusually heavy trading volume of 4,152,688 shares. By comparison, the stock market, as reflected in by Dow Jones Industrial Average, went up on December 28, 2007, closing at 13,365.87 on modest holiday volume of 2,420,510,000 shares traded, as compared to its close on the previous trading day of 13,359.61.

80.    The foregoing allegations describe Plaintiff's general theory of damages, demonstrate that Plaintiff's damages were caused by the scheme to defraud as alleged herein, and negate any negative inference that Plaintiff's losses were the result of general market conditions or other factors wholly unrelated to the false and misleading information complained of herein. Upon further investigation and expert analysis, Plaintiff may assert that there were additional inflationary or corrective events that caused or contributed to the damages Plaintiff incurred.

## ADDITIONAL SCIENTER ALLEGATIONS

81.    As alleged herein, Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the

name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Centerline, their control over, and/or receipt and/or modification of Centerline's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Centerline, participated in the fraudulent scheme alleged herein.

82.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

83.     In particular, Defendants' scienter is demonstrated by, among other things: (i) their knowledge, at all times during the Class Period, that the Company had been in negotiations to sell its tax-exempt bond portfolio to Freddie Mac "for close to a year" before disclosing this transformational transaction to investors as a *fait accompli* on December 28, 2007; (ii) that the sale of the Company's tax-exempt mortgage revenue bond portfolio and consequent slashing of the Company's annual dividend from $1.68 per share to $0.60 per share, completely changed the investor profile for Centerline from risk averse value investors seeking income to more risk tolerant growth investors, *i.e.*, changing the investment thesis over night; (iii) the Individual Defendants were highly motivated to commit fraud so that they could engineer the Related transaction (which masqueraded as a $131 million investment in Centerline) but in reality effectively diverted the Company's income from shareholders to Company insiders (including

Defendants Ross and Blau). Defendants Ross and Blau, through their ownership interests in TRCLP, will receive approximately 12.2 million new convertible preferred shares at $10.75 per share that will pay an 11% annual dividend with no equity risk; (iv) the Company's mortgage revenue bond portfolio, which had assets of approximately $2.8 billion, and the income it generated, were core to Centerline's business and, therefore, the Individual Defendants, who were among the Company's most senior officers and trustees, had to know about the plan to sell this portfolio to Freddie Mac and know the impact of this transforming transaction on the Company and its shareholders, including slashing its annual dividend from $1.68 per share to $0.60 per share; and (v) with respect to Defendant Schnitzer, the Company's CEO, President and Managing Trustee, the Company's April 23, 2007 Proxy Statement states, "[Schnitzer] directs the day-to-day operations of the Company and is responsible for corporate development and strategic planning," and, therefore, he had actual knowledge of the Freddie Mac transaction at all times during the Class Period.

### Applicability of Presumption of Reliance: Fraud-On-The-Market Doctrine

84.    At all relevant times, the market for Centerline securities was an efficient market for the following reasons, among others:

a)    Centerline securities met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)    As a regulated issuer, Centerline filed periodic public reports with the SEC and the NYSE;

c)    Centerline regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) Centerline was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

85.     As a result of the foregoing, the market for Centerline securities promptly digested current information regarding Centerline from all publicly available sources and reflected such information in Centerline's stock price. Under these circumstances, all purchasers of Centerline securities during the Class Period suffered similar injury through their purchase of Centerline securities at artificially inflated prices, and a presumption of reliance applies.

## NO STATUTORY SAFE HARBOR

86.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Centerline who knew that those statements were false when made.

## CLASS ALLEGATIONS

87.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who

purchased or otherwise acquired the securities of Centerline during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and trustees of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

88.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Centerline's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Centerline or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

89.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

90.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

91.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)     Whether the documents, reports, filings, releases and statements disseminated to the Class by Defendants during the Class Period misrepresented material facts about the business, performance and financial condition of Centerline;

c) Whether Defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

d) Whether Defendants acted knowingly or with deliberate recklessness in misrepresenting material facts;

e) Whether the market price of Centerline securities during the Class Period was artificially inflated due to the misrepresentations complained of herein; and

f) To what extent the members of the Class have sustained damages and the proper measure of damages.

92.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

93.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Centerline securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

95.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to

make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Centerline securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

96.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Centerline as specified herein.

97.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Centerline value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Centerline and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Centerline securities during the Class Period.

98.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or trustees at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or trustee of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these

Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

99.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Centerline's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

100.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Centerline securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Centerline publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Centerline securities during the Class Period at artificially high prices and were damaged thereby.

101.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Centerline was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Centerline securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

102.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

103.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

104.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

105.    The Individual Defendants acted as controlling persons of Centerline within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had

unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

106.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

107.    As set forth above, Centerline and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

a) Determining that this action is a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d) Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: January 18, 2008

Respectfully submitted,

**LABATON SUCHAROW LLP**

By: _____
Christopher J. Keller (CK-2347)
Andrei V. Rado (AR-3724)
Alan I. Ellman (AE-7347)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477


**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett, Esq.
Barbara A. Podell, Esq.
Eric Lechtzin, Esq.
1622 Locust Street
Philadelphia, Pennsylvania 19103
Phone: (215) 875-3000
Fax: (215) 875-4604

Counsel for Plaintiff

**Exhibit A**

# CENTERLINE HOLDING COMPANY
## CERTIFICATION PURSUANT TO THE FEDERAL SECURITIES LAWS

Mark K. Goldstein ("Plaintiff"), duly swears and says, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed a complaint against certain officers of Centerline Holding Company, and Plaintiff approves of its contents, and authorizes the filing of a similar Complaint on his behalf.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of his counsel or in order to participate in this private action.

3.    Plaintiff is willing to serve as representative plaintiff on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has full authority to enter into transactions for the following accounts: Mark Goldstein and Jamie Goldstein Natour, my daughter Jamie D. Goldstein's individual account, and my daughter Jessica Goldstein Littell's account for which I am the trustee; and Plaintiff has authority to sign this certification, file this complaint and bring this action.

5.    Plaintiff's transactions in the accounts mentioned above in the securities of Centerline Holding Company between and including March 12, 2007 through December 28, 2007, inclusive (the "Class Period"), are as follows:

| Shares Purchased | Date of Purchase | Price per Share |
|---|---|---|
| 1,000 | July 20, 2007 | $14.63 |
| 1,000 | July 20, 2007 | $14.65 |
| 1,000 | July 30, 2007 | $12.19 |
| 1,000 | July 30, 2007 | $12.1824 |
| 1,000 | December 18, 2007 | $10.28 |

6.    Plaintiff has not sought to serve as class representatives in any actions filed under the United States federal securities laws in the past three (3) years preceding the date on which this certification is signed.

7.    Plaintiff has not accepted and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond his pro rata share of any recovery, except for reimbursement of reasonable costs and expenses (including lost wages) directly relating to the representation of the class, to the extent ordered by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 18th day of January, 2008.

By: _____
MARK K. GOLDSTEIN

Goldstein Certification.wpd