UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CENTERLINE HOLDING COMPANY SECURITIES LITIGATION | Case No. 08 Civ. 00505 (SAS) |
| BRIAN QUILL, Individually And On Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>    vs.<br><br>CENTERLINE HOLDING CO. INC., MARC D. SCHNITZER, ROBERT L. LEVY, STEPHEN M. ROSS, JEFF T. BLAU, and LEONARD W. COTTON<br><br>           Defendants. | Case No. 08 Civ. 01902 (SAS) |

**SUPPLEMENTAL DECLARATION OF LEWIS S. KAHN IN FURTHER SUPPORT OF THE BURNS GROUP'S MOTION FOR CONSOLIDATION OF ALL RELATED ACTIONS; APPOINTMENT AS LEAD PLAINTIFF; AND APPROVAL OF ITS SELECTION OF CO-LEAD COUNSEL AND IN OPPOSITION TO ALL COMPETING MOTIONS**

**DREIER LLP**
Bruce D. Bernstein
Rebecca Tingey
499 Park Avenue
New York, New York 10022
Telephone: (212) 328-6100

**KAHN GAUTHIER SWICK, LLC**
Kim E. Miller
12 East 41st Street, 12th Floor
New York, NY 10017
Telephone: (212) 696-3730

**KAHN GAUTHIER SWICK, LLC**
Lewis Kahn
Poydras Center
650 Poydras Street, Suite 2150
New Orleans, Louisiana 70130
Telephone: (504) 455-1400

*Counsel for the Burns Group and*
*Proposed Co-Lead Counsel for the Class*

I, Lewis S. Kahn, hereby declare as follows:

1.    I am a partner of the firm Kahn Gauthier Swick, LLC ("KGS").

2.    I submit this Declaration, together with the attached exhibits, in support of the Burns Group's Motion for consolidation of the above-mentioned related actions, appointment of the Burns Group, or, in the alternative, any of its members, as Lead Plaintiff in the above-referenced actions, and approval of its selection of Dreier LLP and Kahn Gauthier as co-Lead Counsel.

4.    Attached hereto as exhibits are true and correct copies of the following:

Exhibit A       Transcript of oral argument of competing lead plaintiff motions in *Star Gas*, No. 04-CV-1766 (D. Conn.);

Exhibit B       Transcript of Defendants' statements at Company investor luncheon;

Exhibit C       Follow-up notice of Labaton Sucharow, dated February 4, 2008;

Exhibit D       Order of Judge Lewis Kaplan dated November 20, 2007 in *In re Optionable Sec. Litig.*, 07 Civ. 3753 (LAK), appointing presumptive lead plaintiff KLD Investment Management, Inc. as lead plaintiff and ratifying its choice of lead counsel KGS; and

Exhibit E       April 07, 2008 certification of Stephen Landau with updated trade data.

I declare under penalty of perjury under the laws of the state of New York that the foregoing facts are true and correct.  Executed this 14th day of April, 2008, at New Orleans, Louisiana.



            /s/ Lewis S. Kahn_____
                 Lewis S. Kahn

1

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF CONNECTICUT

 3    *    *    *    *    *    *    *

 4    RICHARD CARTER, ET AL          *

 5                                   * Case No 04CV1766(JBA)

 6            VS.                    *

 7    STAR GAS PARTNERS L.P., ET AL * FEBRUARY 23, 2005

 8    *    *    *    *    *    *    *    *

 9

10           TRANSCRIPT OF THE ORAL ARUGMENT ON

11      APPOINTMENT OF LEAD PLAINTIFF AND LEAD COUNSEL

12         AND MOTION FOR PARTICULARIZED DISCOVERY

13

14    B E F O R E:

15          THE HON. JANET BOND ARTERTON, U.S.D.J.

16

17    APPEARANCES:

18

           FOR THE PLAINTIFF RS HOLDINGS:
19           SCHIFFRIN & BARROWAY
             280 King of Prussia Road
20           Radnor, PA 19087
             BY:  STUART BERMAN, ESQ.
21
           GOODKIND LABATON RUDOFF & SUCHAROW
22         100 Park Avenue
           New York, NY 10017
23         BY:  CHRISTOPHER KELLER, ESQ.

24
                          Sharon Montini
25                   Official Court Reporter
```

2

```
 1

 2          SHEPHERD, FINKELMAN, MILLER & SHAH
            65 Main Street
 3          Chester, CT 06414
            BY:  JAMES MILLER, ESQ.
 4               PATRICK KLINGMAN, ESQ.

 5
            FOR THE PLAINTIFF STAR GAS GROUP:
 6          SCOTT & SCOTT
            108 Norwich Avenue
 7          Colchester, Ct. 06418
            BY:  DAVID SCOTT, ESQ.
 8               ERIN COMITE, ESQ

 9          LERACH COUGHLIN STOIA
            GELLER RUDMAN ROBBINS
10          200 Broadhollow Road
            Melville, NY 11747
11          BY: MARIO ALBA, ESQ.

12
            FOR THE PLAINTIFF VOISIN GROUP:
13          BERMAN DELVARIO PEASE TABACCO
            BURT & PUCILLO
14          One Liberty Square
            Boston, MA 02109
15          BY:  PATRICK EGAN, ESQ.

16          CLENDENEN & SHEA
            400 Orange Street
17          New Haven, Ct. 06511
            BY:  KEVIN SHEA, ESQ.
18

19          FOR THE PLAINTIFF JAMES ROSNER:
            GREEN, SCHAAF & JACOBSON
20          7733 Forsyth Blvd
            St. Louis, MO 63105
21          BY: JOB JACOBSON, ESQ.

22          JACOBS, GRUDBERG, BELT & DOW
            350 Orange Street
23          New Haven, Ct. 06503
            BY:  DAVID GRUDBERG, ESQ.
24

25
```

3

```
 1
            FOR THE PLAINTIFF DOMBROWSKY GROUP:
 2             HAUDEK, BLOCK, GROSSMAN, GROSS
               100 Park Avenue
 3             New York, NY 10017
               BY: ADAM PRUSSIN, ESQ.
 4
               SCHATZ & NOBEL
 5             20 Church Street
               Hartford, Ct.
 6             BY: ANDREW SCHATZ, ESQ.

 7
            FOR THE PLAINTIFF BELL GROUP:
 8             BRENNER, SALTZMAN & WALLMAN
               271 Whitney Avenue
 9             New Haven, Ct. 06511
               BY:  BRIAN DANIELS, ESQ.
10                 ROWENA MOFFETT, ESQ.

11             BARRAK, RODOS & BACINE
               3300 Two Commerce Square
12             2001 Market Street
               Philadelphia, PA 19103
13             BY: SHELDON ALBERT, ESQ.

14
            FOR THE DEFENDANT:
15             SKADDEN, ARPS, SLATE,
               MEAGHER & FLOM
16             4 Times Square
               New York, NY 10036
17             BY:  JONATHAN LERNER, ESQ.

18             DAY, BERRY & HOWARD
               One Canterbury Green
19             Stamford, Ct.  06901
               BY:  THOMAS GOLDBERG, ESQ.
20                 TERRENCE GALLAGHER, ESQ.

21

22

23

24
```

16    fraud, so why did it drop that much?  Well, we're

17    going to have to find out if this becomes their case.

18              So, I think there is good reasons.  I

19    mean, there is no -- I don't think there is any

20    categorical rule that says that the class -- the

21    class period has to be this or has to be that, but

22    you have to have is a good reason for why it should

23    be whatever it is.  They have to -- if you have a

24    complaint, there has to be some fraud pleaded that

25    starts the class period.  I haven't seen it.  I

99

1    haven't seen it.  And they're asking the Court to

2    assume a lot when they say that, look, well, you

3    should just consider everybody's losses, these

4    people, they chose to submit what their losses were

5    during a short period, we're going to submit what our

6    losses were for a much longer period.  It's like

7    comparing apples and oranges.

8              THE COURT: Does the function of

9    subclasses get at this?  In other words, if a class

10   is certified with subcategories, which might be from

11   your telling a longer class period, a shorter class

12   period, so forth, is that a way around what you are

13   saying could end out being an appointed plaintiff

14   class that actually doesn't have any claims versus a

15  shorter, smaller time period that has less

16  plaintiffs?

17          MR. PRUSSIN: Well, if the Court sees fit

18  to appoint my client to represent the class during

19  the shorter period, whatever you do with respect to

20  the other people is fine with us.

21          THE COURT: So that's what is going --

22          MR. PRUSSIN: Does it completely resolve

23  the matter if we're working together?  I mean, their

24  efforts to try to prove something for this longer

25  period will obviously be a drag on the entire case .

100

1   Whether I could stop them or whether it's appropriate

2   for the Court to try to stop these people from trying

3   to do that now, good question, I don't know the

4   answer to that, but there is really no basis in the

5   record for having this longer class, and yes, if you

6   want, if the Court feels, for whatever reason, that

7   at this early stage a possibility should be

8   entertained that there could be some claim that goes

9   all the way back to July 200, if you let them, those

10  people who are interested in that claim, have control

11  over it, but let them not have control over the real

12  claim, which is the original claim that was brought,

13  and let's not have strategizing be the moving force

14    in determining what the class period is and who the

15    lead plaintiff is.

16              It is very easy, as the Court can see,

17    to affect who the lead plaintiff will be by simply

18    expanding or contracting the class period at will.  I

19    mean, you can go back as far as the statute of

20    limitations will allow.  That seems to be what

21    they've tried to do.  But why?  Why did they do that

22    other than simply to bring themselves into the game?

23    Without some demonstration that there is a bona fide

24    basis for doing it, I don't think the Court should

25    take at face value the raw submission that, well, we

101

1    lost a million seven.  You know, as I said, in the

2    shorter period it seems almost self-evident that the

3    closer you get to the revelation, the more likely it

4    was that the fraud is ongoing; the further back you

5    get, the less likely it's ongoing absent some

6    evidence or allegation to the contrary.  We don't

7    have that.

8              So, the stronger claims are going to be

9    the people who bought within the last 10 months,

10    which was the scope of the claims originally filed,

11    and certainly the claims that were brought during the

12    period when they were trying to implement this new

1 of 1 DOCUMENT

Copyright 2007 Voxant, Inc.
All Rights Reserved.
Copyright 2007 CCBN, Inc.
All Rights Reserved.
FD (Fair Disclosure) Wire

December 28, 2007 Friday

**TRANSCRIPT:** 122807ar.719

**LENGTH:** 10567  words

**HEADLINE:** Centerline Holding Company Conference Call - Final

**BODY:**

OPERATOR: Good day and welcome to the Centerline Holding Company's investor conference call. Today's call is being recorded. The Company's press release and investor presentation were issued this morning.

We would like to remind you that certain statements in this morning's press release, investor presentation and to-day's conference call may constitute forward-looking statements within the meaning of the Safe Harbor provisions of the Private Securities Litigation Reform Act of 1995. These statements are based on management's current expectations and beliefs and are subject to a number of factors and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. Such forward-looking statements speak only as of the date of the press release, investor presentation and today's conference call. Centerline Holding Company urges you to review the press release and investor presentation which were posted to its web site today and its Form 10-K and 10-Q on file with the Securities and Exchange Commission for a discussion of such factors and uncertainties and the risks related to an investment in the Company. Centerline Holding Company expressly disclaims any obligation or undertaking to re-lease publicly any updates or revisions to any forward-looking statements contained in the press release, investor pres-entation or today's call to reflect any changes in the Company's expectation with regard thereto or change in events, conditions or circumstances on which any statement is based.

With us today from the Company are Marc Schnitzer, Chief Executive Officer and President; Lee Cotton, Vice Chairman; and Rob Levy, Chief Financial Officer. At this time, I would like to turn the call over to Marc Schnitzer. Please go ahead, sir.

MARC SCHNITZER, PRESIDENT AND CEO, CENTERLINE HOLDING COMPANY: Good morning. We ap-preciate everyone calling in on short notice. This morning, we announced the closing of a transformational transaction that has been in the works for close to a year and a significant strategic investment in our firm by our larger shareholder. We also posted on our website an investor presentation that will be the program for this call, and after we run through it, we will answer any questions that you may have.

If everyone would please turn to page 3 of the presentation, we will begin to go through it. The outline of the pres-entation is a background for the transaction that we announced today and the strategic evolution that was leading up to it. Then, we will discuss the specifics of the transaction with Freddie Mac that we announced, then more specifics about the investment from the Related Companies. We will discuss our evolution as an alternative asset manager, then we will discuss our growth strategy and our 2008 adjusted earnings per share guidance, and then we will summarize.

So first for the background, over the past several years, Centerline has been evolving from its original roots as a tax-exempt fund to an alternative asset manager. This evolution has really been in place for about a 10-year period as you can see the graphic on the chart. The reasons why Centerline, our Board and management has wanted to evolve into an asset manager is to have a leaner balance sheet, higher value income streams, more dependable income streams, sig-nificantly higher return on equity and a much easier story to understand and compare to other publicly traded compa-

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

nies. As you can see on the chart, beginning in 1997 when Charter Mac, as we were called back then was listed on the American Exchange, we were a tax-exempt bond fund at that time comped really as a mortgage REIT. And really, all of our growth since that time outside of just the organic growth in that business has really been focused on the asset management area into the area of servicing loans for Fannie Mae and Freddie Mac, pension fund advisory business. Finally, our acquisition of ARCap commercial real estate fund manager last year. And then earlier this year our rebranding of the Company as Centerline Capital Group and our new business structure, our four business group structure, which was our attempt to try and simplify the story.

Turn the page, please, to page 6. Currently, or prior to this transaction, the feedback that we have received from the investor community is that Centerline is a platform of attractive real estate-focused businesses that have a lot of very attractive synergies. The problem, though, is that our strategy and the business mix has not been fully appreciated by the market. And in part, this is because the Company has been viewed as -- partly as a mortgage REIT, based on the legacy structure of the Company, and partly as an asset manager based on the direction in which we were going. So in many ways, we were neither fish nor fowl. Without much coverage in the marketplace, a lot of people looked at the Company and said they don't really look like a mortgage REIT, it's a confusing story, and they don't really look like an asset manager. So, it's really our goal to simplify that.

So we believe that the market currently compares Centerline to mortgage REITs, which is our legacy format, and we've really had the worst of both worlds. We feel that there has not been a sufficient value given to the growth potential in our asset management business. We also feel that the valuation that has been placed on our tax-exempt income stream has been significantly below the valuation that we're able to attain in the Freddie Mac transaction, and really the driving reason for the Freddie Mac transaction is to put that tax exempt income stream in the hands of the most appropriate investor base.

We have traditionally used non-GAAP metrics. CAD has been the metrics that we have used that has been very confusing to people since it was not a GAAP-based earnings metric, and we feel that we can simplify the story by using a GAAP-based metric. And our structure prior to this transaction, the financing and the liabilities underlying our bond portfolio, were almost all floating-rate and they were generally securitized in short-term five- to 14-day securitization facilities which left us open to significant interest rate exposure as well as funding risk, which based on the current market conditions has been magnified significantly.

We will talk briefly now, turning the page about the Freddie Mac transaction, beginning on page 8. The Freddie Mac transaction is a fixed-rate securitization of our bond portfolio, slightly over $2.8 billion. That securitization has an all-in cost of approximately 5.39%. The portfolio's current coupon is somewhere between 6.5% and 6.6%. The transaction will give us sale treatment for accounting purposes with respect to the majority of the portfolio and Centerline will retain a $140 million high-yielding B-Piece, top loss piece, and we will remain the primary and special servicer for the portfolio. Now the major benefit of this structure is that this now looks like all of our other businesses where we are managing a portfolio for a third party, where we can take a level of risk and by using our buy, watch and fix strategy, deploy our asset management and special servicing skills to increase the income streams coming off of that fund investment. So the income stream we'll be receiving from the portfolio on a go-forward basis will no longer be a spread-based income stream that would be susceptible to the risks I mentioned before, interest rate risk and facility risk. It will be an income stream that will only be susceptible to credit loss, which is really what we do best, and that's managing and mitigating credit loss.

We're working with Freddie Mac and others on structures for our tax-exempt bond business on a go-forward basis that will give us a much more competitive structure to provide bond financing to our developer and borrower customers, far better than what we have in place today. The proceeds from the Freddie Mac transaction will be used to redeem all of the debt underlying the portfolio and to defease a portion of it. We will repay a significant amount of our corporate debt, we will pay the cost of the transaction and we will fund some reserves that are associated with the transaction as well.

Please turn the page. We will talk briefly about what we see as the strategic and financial benefits immediately for the transaction. This transaction, which is essentially the spin-off of our bond portfolio into a third-party fund management type structure, really repositions Centerline as an alternative asset manager. So now, all of the portfolios that we manage, all of the assets that we manage, are now in third-party type vehicles, not managing on a go-forward basis any funds for our balance sheet, other than our normal fund co-investments and short-term capital investments to seed new business and to warehouse some assets for our third-party funds.

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

So the strategic benefits, we believe this transaction clarifies our strategy, simplifies the story of the Company as alternative asset manager. The strategy is simple. We want to build the assets under management and drive the fee revenues that we can earn for the Company. The bonds have been transitioned mostly off-balance sheet. Our balance sheet will be leaner, simpler, easier to understand, and we will have now an efficient ongoing financing for our ongoing mortgage revenue bonds by having the portfolio in the hands of the optimal investor base; that is, an investor like Freddie Mac that has valued this portfolio at what we feel is a very attractive market-based level. This will allow us now to attract an investor base for the Company that will focus more on the growth potential for the Company versus being focused on the dividend that we would pay. And as an alternative asset manager, we would hope that with a more reliable fee stream that we will be realizing a better valuation for our common equity with a far more dependable revenue stream.

The financial benefits will immediately reduce our interest rate exposure and our securitization execution risk. And as I stated before, most of the debt underlying portfolio was floating-rate with our debt facilities maturing between five and 14 days each. This will allow a far more efficient use of capital, a significantly improved return on equity for the mortgage revenue bond business. And as I stated, we will replace the spread income with stable, ongoing fee streams. The transition immediately and then over time improves the credit profile of the Company and it is our belief that on a go-forward basis, our credit metrics will begin to look more and more like an investment-grade company. And, simply, this will give us, this transaction and the transition that we're discussing, will give us the capital to grow and to be able to seize opportunities rather than being reactive to events in the environment.

We will turn now to the next section -- strategic investment from the Related Companies. On page 11, we have received a $131 million commitment from Related Companies, and Related is our largest shareholder. Steve Ross is the Chairman of Related, the Nonexecutive Chairman of Centerline; And Jeff Blau, Related's President, is a member of Centerline's Board. We view this as a strong endorsement of our growth strategy and of our management team. This investment will provide us with financial flexibility to immediately begin to execute our business plan, to fund future growth and to reduce our debt. The specifics of the investment is a convertible preferred stock that's going to pay an 11% coupon. It will be convertible at $10.75 per share, which will amount to approximately 12.2 million common shares, and the convertibility will be subject to shareholder approval in connection with our proxy. We expect to close this in early January 2008.

And we will move now to the next section, please -- repositioning as an alternative asset manager. One of the major goals of the transaction and this transition is to reduce our leverage. So as a result of the transaction, we retired our existing term loan and our corporate revolver, which was an aggregate $570 million of debt. We ventured into new facilities, a $150 million term loan and a $300 million revolving line of credit, with the lead banks being Banc of America and Citibank. So this has been a reduction of $120 million in our corporate debt and -- including the liabilities associated with the transaction that were specifically tied to the bond portfolio. And, again, Banc of America and Citibank were the lead arrangers. By reducing our corporate leverage, we will reduce our interest rate and liquidity risk. We will be able to fund growth and improve our credit metrics.

Page 14, we will be changing our dividend policy to be more reflective of the alternative asset manager comps in the marketplace. Beginning in the first quarter of 2008, we would expect our annual dividend to be $0.60 per share, which would be $0.15 on a quarterly basis, subject to Board approval. We believe that this level is in line or slightly higher than the alternative asset managers and will allow us to have sufficient capital to execute on our business plan to delever and to grow. So the dividend yield, based on last night's closing price, is somewhere between 5.5% and 6%. And, in 2008, we expect approximately 30% to 35% of the Company's income to be federally tax-exempt.

The change to the dividend policy overall provides us with the financial flexibility and a much lower reliance on the capital markets to fund our growth and enables us not to continue to lever the Company to try and execute our growth plans.

Page 15, the new metrics that we will use to track our success. As I mentioned, we will not be using CAD as a metric. Beginning in January of 2008, we will be using a GAAP-based metric, adjusted earnings per share. So we will follow adjusted earnings per share, and then importantly, growth in assets under management as an alternative asset manager. And then when looking at our four business groups, the metrics that we want to focus on, the capital raised, capital deployed, our fund returns, our investment fund fee structure, our servicing metrics, asset fees, escrows and delinquencies.

Growth strategy and our guidance for 2008, beginning on page 17. So our growth strategy relies, again, on what we believe describes best how we operate our business, and that is buy, watch and fix. We can use buy, watch and fix to

drive the growth in our assets under management and to increase our stable ongoing fee streams. Of course, buying or acquiring investments on behalf of our funds, generating transaction fees and base management fees, and then our ability to watch or asset manage, and then to fix, if necessary, really driving the incentive fees to promote income over time, to servicing fees and our capability as a servicer and as an asset manager is really the fundamental reason why Freddie Mac entered into this transaction with Centerline. We're very proud of the low default rate, both in our commercial portfolio and our affordable portfolio, and by staying ahead of the industry trends, we will be able to drive incentive fees from those areas.

Guidance, on page 18. For 2008, our adjusted earnings per share, we're guiding between $1 and $1.10 per share. We're projecting an increase in assets under management in 2008 of between 3.3 and $4 billion, and that is broken down for commercial real estate, 1.7 to $2 billion; affordable housing, $1 billion to $1.2 billion; and then commercial loan investments, between 600 and $800 million.

Page 19, perhaps most importantly is our revenue composition and the way that that will evolve to look much more like an asset manager and really over time deploying less and less assets to drive greater and greater fees. So you can see on the left, for 2007 we believe that investment income will be between 55% and 60% of our revenues with investment management comprising 30% to 35%, and then transactional 5% to 7%. What is really one of the key results of this transaction is the significant increase in investment management revenues that we forecast for 2008 increasing from 30% to 35% to 50% to 55%, with investment income now 25% to 30% and transactional 10% to 15%. And over time, what you will see is investment income declining as a share of revenues and investment management continuing to increase to a greater and greater share of the overall pie.

And to summarize on page 21, the transaction really is transformational in nature. It really is the culmination of an evolution that we embarked on several years ago to really focus on becoming an alternative asset manager. Significant reduction of risk, inherent risk in the Company, our funding risk; significant reduction of our corporate leverage. There is a material increase in the percentage of our revenues now derived from investment management, a shift to a GAAP-based earnings per share earning metric that we feel will make us more easily understood and the strategic equity investment from Related Companies to fund future growth. And really, we believe that having a better liquidity position, lower risk and less leverage will enable us to really capitalize on opportunities, rather than being reactive to the next headline or the next crisis in the credit markets.

At this point, we would be happy to answer any questions.

OPERATOR: (OPERATOR INSTRUCTIONS) Tony Howard.

TONY HOWARD, ANALYST, J.J.B. HILLIARD, W.L. LYONS, INC.: Marc, I'm not sure I understand the big piece of the bond portfolio, the $140 million. Can you kind of go over what that really actually is, how that is reflected on the balance sheet, and why (technical difficulty) anyway?

MARC SCHNITZER: Well, let me give you sort of the business reason for doing it this way, and then I will ask Rob to give you some of the specifics.

Most of the businesses or most of the funds that we manage today, many of our commercial real estate funds, we have a co-investment of approximately 5% in those funds, or in our business where we service loans for Fannie Mae and Freddie Mac, we typically will take a top loss in exchange for a higher fee. What was so attractive about this transaction and being able to retain that top loss is that it keeps us really in control of the first loss position on the portfolio, which is consistent with the way we operate our other businesses. The economics, as Rob will describe, are very attractive. It gives us an investment in the portfolio that will generate a very high return on equity. And, given the fact that most of these bonds are mortgages on properties that are also in our tax credit equity funds, it's very important for us to retain the control on the portfolio and to continue to be able to service the portfolio and special service if properties run into trouble. Rob, maybe you want to give some of the specifics?

ROB LEVY, CFO, CENTERLINE HOLDING COMPANY: Tony, think of it as a residual in any sort of financing. In effect, we have, although this is done on an off-balance sheet basis in the most part, what we have done is resecuritized our bonds using a fixed-rate structure through Freddie Mac and we retain their first loss piece, so the residual. So this residual, which is the bottom 5% of the securitization, will produce for us an annual cash flow off of that residual, net of any defaults or principal losses within the portfolio. So it's really just a residual that we'll hold on balance sheet. What you will see on a balance sheet perspective and we'll put out pro forma is -- which I think in the next couple of days which will help you understand a little bit better. But from a balance sheet standpoint, you will see that we will have a valuation, a market valuation of that residual which will be on our balance sheet and on a quarterly basis, we will

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

be required to mark that residual position to market and you will see that reflected in changes in our balance sheet on a quarterly basis.

TONY HOWARD: When you say first loss, does that mean you take the hit before Freddie Mac takes the hit on the entire portfolio, or just the 140 million part?

MARC SCHNITZER: The $140 million, Tony, is a top loss for the entire portfolio. So the first $140 million of losses in the portfolio comes out of that $140 million.

TONY HOWARD: Okay, got you. Second question, regarding the related investment. One, it seems like a fairly expensive preferred that you have to offer in order to raise capital. And so my question mark is, why was there a need to raise capital? And second part is, were other firms considered since Related could be considered a conflict of interest?

MARC SCHNITZER: The need to raise capital first, we feel that it's very important to really drive growth now and give people a reason to buy our stock because of our capability to grow. We need capital to fund that growth. We don't need a lot of capital to fund that growth, but this is capital investment will enable us to execute the business plan that we have laid out for 2008 and go forward. It's also going to enable us to continue to delever the Company which we feel is critical. We don't want to be in a position where we are not able to access the capital markets which will render as un-able to capitalize on opportunities. So we don't want to find ourselves in that position. So the capital is very important for us to execute our business plan, which is really focused on growing assets under management. And we have laid out an ambitious business plan for 2008 that is capital will help fund.

As far as the preferred, we negotiated with three parties, two outside third parties and Related. We discussed terms with all three. Related's terms were the most attractive of the three.

TONY HOWARD: In other words, the other two were more expensive debt?

MARC SCHNITZER: The other two -- yes, the other two were less advantageous to the Company.

TONY HOWARD: Third question, as far as the guidance for 2007, the wording I guess is somewhat confusing in the press release. The $1.70, $1.75 new guidance, it says that it excludes the $95 million charge?

ROB LEVY: That is correct, Tony. So the $1.70 to $1.75 is how you would think of ongoing CAD. There will be some onetime charges for expenses associated specifically with the transaction, which we will include in CAD, but we wanted to give the audience and the readers a feel for what the ongoing CAD of the existing business is.

MARC SCHNITZER: And those charges are funded within the transaction.

TONY HOWARD: The $95 million charge, though, it basically comes closer to $1.60 or so, if my math is correct. So it basically wipes out CAD for the year.

MARC SCHNITZER: I guess the way to look at that is, is that it's -- to the extent that the costs of the transaction are considered a deduction to CAD, there is not an offsetting revenue because of the way the transaction is booked. But all the transaction costs are funded out of the proceeds of the transaction.

TONY HOWARD: As far as the dividend, I'm not sure what the change of the transformation of your company, how do you come with 30% will still be fairly tax-free?

MARC SCHNITZER: Rob, do you want to maybe handle that one, please?

ROB LEVY: Tony, as we said, we'll still be holding this residual interest on our balance sheet and receiving the tax-exempt income off of that residual. And so through the holding of that residual and the income off of that, that will in our estimates equate to between 30% and 35% of the income of the Company.

TONY HOWARD: So the $140 million first loss position basically gets you to the 30%?

ROB LEVY: Well, the income off of that position. We're going to -- we are holding this residual that's going to be creating income off of that residual that will create that income which will be in the range of 30% to 35% of total in-come of the Company in 2008.

TONY HOWARD: Final question, Marc. Was it considered as far this transformation as far as why not take the Company the private, since basically our shareholders and a lot of shareholders have owned your stock over the years for the dividend and for the tax-free status. So in some way, you're basically not only transforming the Company, but

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

you are changing the shareholder base. So you are basically punishing the income (inaudible) the shareholders for a more growth-oriented shareholders that may want to buy your stock in the future.

MARC SCHNITZER: Well, certainly nobody is seeing to punish anybody, and certainly not our shareholders, which all of us are as well. But really, the goal is to step back and look at the Company as its two major constituent parts -- the bond portfolio on one hand and the asset manager on the other hand. The key is to put the bond portfolio into the hands of the most suitable investor and the investor that will value that income stream from the bond portfolio in the highest possible fashion. We're confident that the Freddie Mac transaction has accomplished that goal. Now the next challenge that we have is to demonstrate to our shareholders that we can create growth within the Company and move forward as an alternative asset manager that has attractive growth opportunities and can capitalize on those opportunities. So that is what we are turning to, that is what we're going to be focused on.

TONY HOWARD: Part of the question was -- why not take the company private?

MARC SCHNITZER: I think that what we need to focus on, though, is the Company was neither a mortgage REIT nor an asset manager. So the first part was to put the bond portfolio into the hands of the people that will value it the highest. The next is to try and now go out and market the Company as an alternative asset manager. We like being a public company and we feel that we can be an attractive public company to people who can look at our story, find it easier to understand. And if we can provide the results, then hopefully people will be pleased to invest in the Company as a growth story. So I think that, rather than thinking about taking the company private, we are focused on really trying to do the best job that we can for our current and future shareholders.

TONY HOWARD: Okay, thank you.

OPERATOR: [Matt West]

MATT WEST, PRIVATE INVESTOR: This capital raise makes no sense to me. If Related wants to participate in and fund the growth of the Company, they should be taking the same equity risk as the rest of common shareholders. They're getting an 11% coupon and a call option on 20% of the Company with no equity risk. It speaks of an affiliated entity getting a sweetheart deal. You said there were other parties to talk to. If you want to raise capital and you want to fund growth, you owe it to your investors to get on the road and do a marketed deal. How is this an acceptable way to raise capital?

MARC SCHNITZER: Well, just for the first part, as I said, we actually negotiated with two other third parties. We had terms from two other third parties and the investment from Related was frankly significantly more attractive than those other two parties. The way the transaction was structured as a convertible preferred was to provide us with the ability to access the capital as soon as possible which we need to begin to grow our business next year. This capital is needed immediately. So we didn't have the luxury to continue to test a very unstable market and we needed the capital. We quoted it with other third parties in the marketplace. We had advice from investment bankers unaffiliated to either party and we're very comfortable with the transaction. The capital is critical to our growth plans.

MATT WEST: I think this is excessive cost of capital, and if this is the deal that's out there you owe it to your shareholders to make this same deal available to all shareholders.

MARC SCHNITZER: Well, as I said, this with a market tested deal. It was a deal that was reviewed by us and our bankers and we are comfortable with where the terms are and it's capital that we needed today to really grow the business.

MATT WEST: You cannot argue that the Company is undervalued and say that this is a good way to raise capital in the same breath. It's disingenuous.

MARC SCHNITZER: Again, as I said, we believe that this reflects a market transaction and we're very pleased that they've decided to do it.

MATT WEST: Thanks.

OPERATOR: Patrick Collins.

PATRICK COLLINS, PRIVATE INVESTOR: I have to agree with the prior two callers. I'm actually disgusted by this transaction. How could insiders to reach such a favorable deal for themselves? If you really feel like they are being -- attempting to support all shareholders, then we should open this up to a rights issue and they backstop it with a pre-ferred, right? So open up the -- for capital raise as a rights issue, and then whatever is not taken up, then they can put in

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

the preferreds. But this is too favorable of a deal. And I will also agree that you're completely alienating your shareholders here. Your shareholders are looking for dividend yields, and now you're saying, will if that didn't, we're going to change it. You're running this like it's a private company. I would be disgusted if I were you at what you've done -- I'm just disgusted. I would be ashamed at what I did.

MARC SCHNITZER: There are really two issues there again. As we said before, the critical issues on the preferred were testing it in the marketplace, which it was; the timing of the investment and the market conditions. And based on the terms that were available from third parties in the marketplace, the need for the timing of the capital and an extremely unstable market, we feel that this is an attractive transaction.

PATRICK COLLINS: Well, your shareholders are clearly not agreeing with you. Your equities hit a brand-new load today on meaningful volume on even a slow day. So you're wrong. So I really kind of question your thinking on this, and I am just disgusted by it. What shareholder consent is going to be required to get this through?

MARC SCHNITZER: There is no shareholder consent required.

PATRICK COLLINS: So you can issue new shares without getting -- 20% dilution without getting new -- without?

MARC SCHNITZER: I'm sorry, I misspoke. The convertible preferred -- convertible preferred shareholder approval is required for the conversion option.

PATRICK COLLINS: So you're going to go out to the shareholder and you're going to request their approval of [this solution]?

MARC SCHNITZER: That's correct.

PATRICK COLLINS: Okay, well I trust that they will not approve that.

OPERATOR: [Nicole Jacoby].

NICOLE JACOBY, ANALYST: I have a few questions about thinking this through going forward. Can you give us a little bit more guidance on the Freddie bond -- now that the Freddie bond portfolio, how we can think about modeling out the revenues -- the cash revenues that will come from that?

MARC SCHNITZER: Sure. Rob, do you want to handle that, please?

ROB LEVY: Sure. Nicole, basically probably the best way to look at it is that on a monthly basis net of costs of the freight transaction, the coupon paid to them and the interest expense and any fees included in that securitization, it would net to the Company somewhere around 2.5, $2.6 million of cash flow monthly, tax exempt. Of course, that is not inclusive of any defaults or principal loss on the portfolio.

NICOLE JACOBY: Okay. And then, with the new assets under management that you described in the press release and in the presentation you put online, for each of those, the commercial real estate, the affordable housing and the commercial loan pieces, how do we think about either origination fees and/or management fees associated with those?

ROB LEVY: Marc, you want me to take that?

MARC SCHNITZER: Yes, please.

ROB LEVY: Okay. The commercial real estate funds should be very similar to the existing funds. Really, I guess all of the funds, the structure should be somewhat similar to the existing funds. So on the existing commercial real estate funds, we typically get paid a base management fee between 1.5 points and 2 points on an annual basis, and then promotes, which are typically 20% or so above hurdle rates. And those rates are typically in the 9% or range, IRR hurdle rates. On the affordable housing side, kind of standard, the same exact -- we don't think that the fund fee structure should change dramatically from where we had been historically. So upfront origination acquisition and payments to us, fees to us, and then a small amount of ongoing asset management fees on those funds over the first three to five years of their lives. So it's somewhat standard, on the commercial real estate side, standard fund fee format in the private equity space in the tax credit business, pretty standard for the affordable housing business.

NICOLE JACOBY: And how about the commercial loan investments?

ROB LEVY: Well, in 2008, kind of early on in that, in those transactions, we would anticipate doing a portion of that on balance sheet as we build up that business before going into more of a fund management format. And then, our projections show what we're targeting is that in 2009, converting that more into a fund management format, and those

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

fees should be somewhat similar to the commercial real estate fees where there would be base management fees and promotes and incentive management fees beyond that.

NICOLE JACOBY: Okay, thank you. I think my other questions are -- other than actually eliminating the interest expense associated with the bond portfolio, are there other -- any further changes to the Company's cost structure?

ROB LEVY: Well, certainly, the reduction in the corporate debt also. As we noted, our corporate debt is going from today about 500 -- or yesterday, $570 million of corporate debt to about $450 million today to a $120 million reduction in corporate debt, and that is as of today, a snapshot. Certainly as one of the benefits that we believe through the change in the dividend policy is the significant amount of retained earnings that the Company will be able to retain over the next few years, and so that cash will be used to fund future growth businesses and the retirement of existing debt, of the corporate debt. We would anticipate over the next couple of years that our corporate debt, certainly on our term loan and a significant portion of a revolver, gets paid down to close to zero.

NICOLE JACOBY: Okay, great.

MARC SCHNITZER: Rob -- sorry, Nicole -- you may want to, Rob, note the escrow in connection with the Freddie transaction that will generate interest earnings perhaps.

ROB LEVY: Sure, Marc's right. As part of this transaction, we are putting in place a $126 million escrow that will be used to support bonds that are currently in lease-up or construction. As our bonds hit construction completion and stabilization, that escrow will be released upon the agreement with Freddie Mac. And in the interim, that $126 million of escrow will produce earnings that will be invested in AAA highly-rated securities. And after that, that cash will be released to us, and that will be additional cash that we could use to fund our businesses going forward, or to pay down corporate debt.

NICOLE JACOBY: And what is the expected timeframe on that?

MARC SCHNITZER: It's somewhat of a five-year timeframe, although it should be front-end weighted. A significant portion of those [escrows] get released upon construction completion, and certainly a significant amount of that portfolio that we have securitized through Freddie Mac we believe will reach construction completion over the next 18 to 24 months, so that a majority or I guess certainly greater than 50% of that escrow should be released within that timeframe.

NICOLE JACOBY: Okay, great. So, the next question is -- the monies that the investment from Related, as well as the basic cash flows that you are expecting and retained earnings that you have described, can you give us a little bit more color about specifically, other than just generally increasing, sort of taking advantage of growth opportunities for the business, can you tell us a little bit more specifically, are you going to be making more principal investments, are you going to be co-investing in your managed funds? How -- can you give us some of the big buckets of how you're going to be deploying this capital?

MARC SCHNITZER: Yes. The major growth areas that we see certainly over 2008, number one, is to provide capital to significantly ramp up our commercial loan origination business, which requires a sort of warehouse short-term revolving capital. That will enable us to increase the deployment of capital in our special situations fund as we can purchase subordinate debt, B-Pieces and mezz loans from those loans that are originated, as well as selling those loans into conduit programs that will then create investment opportunities for our CMBS funds. So that's one piece.

We are currently in the market with an opportunity fund that is a $1 billion fund that will require a co-investment, as well as our other commercial real estate funds in 2008. Typically, those funds all require about a 5% co-investment, as well as continuing to build out our affordable equity business. The part of that that touches our credit risk products business with Centerline Financial, which is our AAA-rated credit enhancement entity, as we originate new business capital has to be funded into that company to support the guarantees as well as the new CLO business that we began earlier this year and our ability to grow that into 2008 requires some additional co-investment type capital. So those are the main areas that we, at least in 2008, see as growth.

NICOLE JACOBY: Okay. Have you talked yet about what your balance sheet is going to look like at the end of '08? Will there be cash on the balance sheet?

MARC SCHNITZER: Rob can give you an idea of that.

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

ROB LEVY: Yes, there certainly will be cash on the balance sheet. There will be liquidity. We've built liquidity into this transaction to ensure that we have liquidity for the businesses going forward. To be specific, we will be able to -- we're going to be putting out a pro forma balance sheet and income statement over the next couple of days publicly, so that I think will answer all of your questions as far as what the pro forma balance sheet and income statement will look like post-transaction.

NICOLE JACOBY: Okay. Can you give us anything a little bit more specific now, or do we have to wait for the --?

ROB LEVY: If you don't mind, I would rather wait over -- it will be out in the next couple of days, and that way, we can just make sure that all of those numbers are fully vetted and make sure that everybody has the exact same numbers to look at.

NICOLE JACOBY: Okay. Going back to the projected increase in assets under management, can you tell us where that could puts you at the end of '08? Do we just take the September assets under management and add the 3.3 to $4 billion?

MARC SCHNITZER: That will be an increase based on where we expect to be at the end of this year. I'm just turning to that page in the presentation.

ROB LEVY: We are currently at $11.6 million, Marc, to give you an exact number. And so, yes, Nicole, you just add the 3.3 to $4 billion above that 11.6.

NICOLE JACOBY: Okay. Thank you.

OPERATOR: [Parker Phillips].

PARKER PHILLIPS, PRIVATE INVESTOR: I would just like to -- I would echo the disgust and frustration of previous shareholders who have spoken on this call. I think this is a -- I think this transaction is contemptuous of your existing shareholders. But in any event, I would like to ask about the timing of this announcement where it's a Friday morning, two days before the end of the year. Why announce this transaction today? Why not wait until the first part of next year, and why not wait at least until a day when people are in the office by and large, particularly your shareholders, who are probably on vacation, most of them? It just seems strange that you would choose today to announce this transaction. Could you address that?

MARC SCHNITZER: Of course. The announcement was completely driven by the timing of the Freddie Mac transaction, and when we began working on this transaction with Freddie Mac, it was their strong desire to close that transaction this year. It was an extraordinarily complicated transaction that we had actually hoped to close even just a couple of days sooner, but that transaction closed yesterday so we felt it was important to announce it the first thing this morning. But there was absolutely no -- the announcement was completely driven by the timing of the closing.

PARKER PHILLIPS: Do you have to announce it immediately after the closing? Can't it close, and then you're going to discuss it next week, like presumably the middle of next week when people are in the office again?

MARC SCHNITZER: Well, we just felt that because of the nature of the transaction that there would be a significant number of people who would know about it, and we felt it was important to disseminate the information. We're happy to answer questions about it next week as well.

PARKER PHILLIPS: Right. A lot of my questions have been asked, but this just seems like a grand bit of financial engineering riddled with conflicts of interest. It doesn't sound like an arm's length transaction regardless of what you guys say and it's all masking massive dilution and a dividend cut. That is the perception that I have and I think it's the perception that the market's having as well based on how the stock price is doing today. You guys have done a terrible job the last two years and this just sort of caps it off. So, thanks a lot.

MARC SCHNITZER: I'm sorry you feel that way.

OPERATOR: [Simms Oliphant].

SIMMS OLIPHANT, PRIVATE INVESTOR: Just a couple of quick questions. I too have been a longtime shareholder, and I won't necessarily echo what you have already heard at all. Do you anticipate being followed in research going forward? And to that end, you mentioned that you want to be treated as an asset management company, alternative asset management company. Are there any companies that you would consider comparable as far as asset mix that

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

we could look at in an effort to try to get a handle on the multiple going forward that you anticipate for the Company? And I did have one other quick question after.

MARC SCHNITZER: Well, part of trying to simplify the story and to put ourselves finally into a category with legitimate comps is to hopefully generate more research coverage. As the Company evolved over time away from being the bond fund it originally was, we lost coverage as opposed to increasing coverage. So it's our hope that being clearly in a category will help us to increase coverage. Firms out there that are alternative asset managers really as an alternative asset manager managing a fairly diverse range of investments, real estate, private equity, public debt, structured finance products, companies out there today like Fortress, [Blackstone], [Cone and Steers], [Oxif], all managing different types of assets but similar companies in the alternative asset manager group.

SIMMS OLIPHANT: Okay. How does this at all jibe with your ongoing investment that you have been making a little bit with the American Capital Management, AMC?

MARC SCHNITZER: AMC is American Mortgage Acceptance Company. American Mortgage Acceptance Company, our role in that firm is as its adviser, and our investment in that Company was really in the form of a co-investment. So it's fairly consistent with our other funds that we manage, most of which we also take a co-investment.

SIMMS OLIPHANT: Okay. And in order to otherwise grow, are there other pools of assets out there that you could simply assume management over, as opposed to going out and raising cash and assets? Are there other asset managers or pension fund assets that you would just assume asset over as part of -- as utilizing your expertise to manage existing mortgage securities? There seems to be a crying need for that going forward, at least in the current environment.

MARC SCHNITZER: Yes, I'm sorry to interrupt you, absolutely, and that is why we're in the market right now with this opportunity fund where we are seeking to raise $1 billion of institutional capital to go out and acquire real estate structured finance product, whether it's CMBS or CDOs that are trading at significantly mispriced levels because of the market conditions, or where people who are holding classes who have now become the controlling class don't have the expertise that we have to specialty service the assets or to asset manage them. And that is really the strategic game plan for that fund which will produce for us base management fees and promotes. Clearly, our growth strategy and the benefits of this transaction and having the capital available will put us in a position where we can use that capital to help grow assets under management, not only organically but to find opportunities where we could have the potential to look at an acquisition to acquire a pool of assets. But over time, we want to lessen the amount of capital that we need to deploy for each dollar of assets that we're going to manage. This transaction takes a big step in that direction, but we're not done with that transformation yet.

SIMMS OLIPHANT: Do you anticipate needing additional capital beyond this point, throughout the year?

MARC SCHNITZER: We had no plans to raise any additional capital at this point. So I would suspect that at this time, that would only be driven by some significant opportunity that we don't know about yet.

SIMMS OLIPHANT: And approximately what does this do net-net-net to your book value -- per share, taking into account the current -- the anticipated capital raise -- or I guess this de facto capital raise that you have now?

MARC SCHNITZER: Rob, do you want to comment on that? I don't know if we know that answer until the financials are out.

ROB LEVY: I have some estimates. I'd rather, if you would not mind, again, vet those numbers with our auditors, etc., to make sure that we're putting out appropriate numbers, and we will have those to you in a day or two. So before I misspeak, I'd rather just put it off for a day.

SIMMS OLIPHANT: Okay, guys, thanks so much.

OPERATOR: [Adam Berger].

ADAM BERGER, PRIVATE INVESTOR: An easy question. I see on the release today that you have assets under management of $11.6 billion. If I remember correctly, at the end of last quarter, and I just want to make sure I'm comparing apples to apples, it was $18 billion.

MARC SCHNITZER: Correct. We have clarified the way that we are quoting assets under management to more closely match the base upon which the fees are computed. The way we had been doing that in the past and as we brought together two different companies that had different types of pools of real estate assets under management, there was sort of a mixture of some of the funds reporting assets based on capital deployed and others that were reporting

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

based on the base equity raise, which is the number upon which fees are calculated. So as an asset manager, we feel that it's important to make it easier for people to understand how we're generating our fees. So we went back and changed everything to the basis so that it's just based on the equity raise on which we make our fees, and that is the difference that you see.

ADAM BERGER: Okay, thank you.

OPERATOR: Omotayo Okusanya.

OMOTAYO OKUSANYA, ANALYST, UBS: Just a couple of quick questions. In regards to the bond business, going forward as you're originating bonds, is the idea to continue selling them through this off-balance sheet securitization, both to any of the [GSEs] that might be interested in the bonds?

MARC SCHNITZER: That's correct. This would be the go-forward format for our bond business.

OMOTAYO OKUSANYA: Could you remind again just how much in bond originations you have done so far this year?

MARC SCHNITZER: Well this year, in fact, we forecast to do somewhere around 200 million or so of bond originations, which is below the level that we had hoped, and really that's reflective of a number of issues. But one of the more critical issues was that the structure we had in place to finance the bonds didn't enable us to have a low enough cost of capital to be competitive with the GSEs and with the large banks who were competing to invest in those bonds. So we believe that having this new structure going forward where we will go out and originate bonds and then after originating, say, 150 million or so of bonds, we will go ahead and do another similar static securitization with a GSE partner, is going to enable us to increase the bond originations. So next year, I think our goal would be to do significantly better than we did this year on bond originations.

OMOTAYO OKUSANYA: What's the cost of funding on the new revolver versus the old revolver?

MARC SCHNITZER: Rob, can you quote that, please?

ROB LEVY: Sure. On the corporate revolver, we are -- the corporate revolver and term loan are both priced at LIBOR plus 300.

OMOTAYO OKUSANYA: And what about the old revolver -- what was the cost of funding on that?

ROB LEVY: The old revolver depended on leverage. The most recent was at 187.5, I believe, and the term loan was at 250.

OMOTAYO OKUSANYA: So the new line, it is costing you much more?

ROB LEVY: Absolutely, yes (MULTIPLE SPEAKERS) it's a much different market today than it was 18 months ago when we put the previous facility in place.

OMOTAYO OKUSANYA: Okay, that's helpful. And then the second thing is the adjusted EPS outlook for 2008, is it possible to give us a sense of what that same metric was in the past two prior years so we can get a sense of what kind of growth is going on with adjusted EPS?

ROB LEVY: Yes. We are struggling with that a little bit because of the change in the business model with the bonds. We can work through that. We're going to continue to work that and give you that for '07, but we do not have a great number for '07 for that number right now. We have EPS, of course, which will put us shortly in our 10-K, but as far as adjusted EPS, we can work on that for you and make that a public number.

OMOTAYO OKUSANYA: That's helpful. And then the net charge in the fourth quarter of '07, could you give us a breakout of how much of that is transaction fees, you know, fees from defeasance, the gain on sale, on the actual sale of the bond portfolio?

ROB LEVY: Sure. The gain on sales from the bond portfolio is actually around $70 million, just under $70 million. And then, there is an unrealized loss on some swaps of about $19 million, and then transaction costs all-in of $95 million. And the largest pieces to that are of course fees that we paid to the various banks. We had to pay some breakage cost on the existing securitizations and some gain share and premiums on the existing securitizations, and then legal and accounting fees and things like that, but that total of $95 million. So that brings you to the overall loss of [about] $50 million.

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

OMOTAYO OKUSANYA: Net loss. Alright, that's helpful. Thank you.

OPERATOR: (OPERATOR INSTRUCTIONS). [Manny Perlman].

MANNY PERLMAN, ANALYST: Sorry, Nicole and I are in separate offices, I'm on vacation. First off, I want to congratulate you. I do think this is a transformational -- and I know you've getting a little grief on the call -- but it's something that we think is really positive for the Company. I think it would be helpful a little bit if you could walk us through, and maybe this is leading to some of the questions that are coming up -- exactly the cash flows that are coming from the securitization with Freddie of how much money is coming in. Walk us through, of that, how much debt is being paid down and what [spot] so that people can get a better understanding. I've been trying to read through the press release and your presentation and having difficulty sort of walking through how the cash is coming in.

MARC SCHNITZER: Sure. Let me give you, Manny, just kind of a pretty simple overview of it. On the sources side, you have approximately $2.7 billion coming from Freddie Mac. On the uses side, you are repaying or defeasing approximately $2.3 billion of floating-rate securitizations, fixed-rate securitizations and preferred that were all specifically underlying the bond portfolio.

MANNY PERLMAN: Got it. So that leaves about $400 million.

MARC SCHNITZER: Correct. So that $400 million breaks down as follows. $180 million of that is cash that we have to put in escrow. Rob mentioned before, there's approximately a $125 million escrow that's released over time with that, that is our cash, but it's there to support the bonds that have not yet completed their lease up. And we anticipate receiving a release of that cash over the next three to five years. Then, there is a $55 million escrow that is posted in connection with a series of guaranteed tax credit equity transactions we had done with Merrill Lynch that previously we had other bond collateral posted with. And that is collateral, or that is cash that we can access once we replace Merrill in those transactions which we would undertake to do as soon as possible. Then, there's $120 million of corporate debt being retired, and then there's approximately the $95 million of transaction costs. So you have the $120 million of debt being repaid, the $180 million of restricted cash and then around $95 million of transaction cost adding up to approximately $2.7 million.

MANNY PERLMAN: And the debt on the Company post this transaction will be a $150 million term loan. Is that correct?

MARC SCHNITZER: Correct.

MANNY PERLMAN: And a $300 million revolver?

MARC SCHNITZER: That's correct.

MANNY PERLMAN: Is that revolver fully drawn day one?

MARC SCHNITZER: I don't believe it's fully drawn. Rob, do you want to refer to that?

ROB LEVY: No, it will not be fully drawn.

MANNY PERLMAN: Well, can you give us a sense of how much of a draw will be on that revolver day one?

ROB LEVY: We will probably have about $20 million of liquidity on the revolver at closing, and then we anticipate that increasing over the next few weeks as we close various tax credit funds and get the cash from the release of those transactions.

MANNY PERLMAN: And then, in regard to Morgan Stanley and Bear Stearns, they advised the Board and the Company on this transaction?

MARC SCHNITZER: They were both retained by the Company.

MANNY PERLMAN: Okay. When they made a presentation to the Board, clearly they must have made a presentation to talk about why this transaction was better for the Company and its shareholders than keeping yourself in the form you were prior to this. Can you give us a sense for the valuation ranges they thought that the Company could attain in the market, given this new format?

MARC SCHNITZER: Rob, do you want to speak to that, sort of the conceptual way that that was looked at, maybe?

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

ROB LEVY: Sure. Obviously we could just talk to the current comps in the marketplace, and then you can make your valuation decisions or adjustments off of that. As we looked at the alternative asset managers in the marketplace, they are trading in the 12 to 13 times the projected earnings of the Company, or EPS of the Company. That is certainly off of today's market and today's valuations, and so that was the immediate metric that we were looking at.

MANNY PERLMAN: Do the comps pay out similar dividend yields that you were paying out?

ROB LEVY: Our dividend yield at this time would be superior to those comps. Those yields are more typically in the 3 to 4, well maybe up to about 5%, and I guess we will be at closing just under 6%. We're as of today just under 6%, so we are slightly above the comps are on a dividend yield standpoint.

MANNY PERLMAN: Just a technical question -- your stock went ex-dividend I think either yesterday or the day before. I assume that that $0.42 dividend is being paid to the shareholders?

MARC SCHNITZER: That's correct.

MANNY PERLMAN: Can we talk a look at about -- I know people have expressed some concern about the related transaction. Can you talk about what's going to happen with -- they have like these units in the Company also I believe, and talk about how those are going to work on a going forward basis?

MARC SCHNITZER: Well, a couple of things. As we said, we had extensive discussions with two other major international investment banks about making this investment, negotiated terms with them as well as Related, and Related's terms were the best of the three.

MANNY PERLMAN: No, no, I'm not asking -- I've heard that -- I'm asking a different question. I believe prior to the transaction, and maybe I'm misunderstanding, certain -- it's either Related or certain executives of Related, have I think some kind of units that were convertible (MULTIPLE SPEAKERS).

MARC SCHNITZER: I'm sorry -- I misunderstood your question.

MANNY PERLMAN: I'm trying to understand what happened to those units.

MARC SCHNITZER: The Related as well as certain executives whole special common units in a subsidiary of the company that were issued in connection with the acquisition of Related Capital Company by what was then known as Charter Mac. Those are staying in place, and really there is no change to them other than the fact that the dividend is adjusted commensurately with the common dividend.

MANNY PERLMAN: Right, that's why I wanted to make sure. So their dividend will be commensurate with the dividend that the rest of the shareholders are getting?

MARC SCHNITZER: That's correct.

MANNY PERLMAN: Okay. And then, I guess my last question comes in that -- do you have any restrictions in your credit agreement at all, or is there a tax restriction that would prevent you from using your, instead of a dividend, using money to repurchase your stock, given that, at least as of today, the market doesn't appreciate what you may be doing? Clearly in the past, that has been an impediment, trying to find out what that impediment would be or continue to be going forward?

MARC SCHNITZER: Rob, do you want to comment on the loan documents, please?

ROB LEVY: Manny, we do have a restriction from stock buybacks within this credit agreement. So we will be prohibited from stock buybacks while this agreement is in place.

MANNY PERLMAN: There is no restricted payment test, or anything like that?

ROB LEVY: You mean, that would allow us to do stock buybacks?

MANNY PERLMAN: Right. Well, here is my question. Do they actually care whether you use it as -- my question is -- do they actually care whether you use your money as a dividend? Could the Board make a decision to use capital rather than as a dividend as a stock repurchase if they thought it was in the best interest of shareholders?

MARC SCHNITZER: So, you mean the same dollars, in other words?

MANNY PERLMAN: Yes, I'm saying let's assume -- right now, you're paying, I think you had projected, what was it, $0.60, correct?

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

MARC SCHNITZER: Yes.

MANNY PERLMAN: And there were approximately 80 or 90 -- 80 million, including the special units. You're talking about $50 million a year. My question is -- could the Board make a decision to use those dollars in a different way?

ROB LEVY: It cannot.

MANNY PERLMAN: They have to pay it as a dividend?

ROB LEVY: It has to be paid as a cash dividend. We're allowed to make cash dividend payments, of course, in the normal course of running the business, but we're not allowed to use that cash to buy back stock.

MANNY PERLMAN: Okay. And are you allowed to, with those cash dividends as the business increases, is there some payout ratio that you need to stick with?

ROB LEVY: Yes. We have standard covenants within the facility, but no restrictions on the payout ratio of the distributions to the common shareholders.

MANNY PERLMAN: My last question was, I think someone did make the point, this is sort of -- and I understand why it was made today, not necessarily the best day to have made a call like this. Perhaps it would make sense to schedule an investor day sometime in January for your holders so that we could have a little bit more background and understanding of what happened today.

MARC SCHNITZER: Yes I believe -- Hilary?

HILARY GINSBERG, CORPORATE COMMUNICATIONS, CENTERLINE HOLDING COMPANY: Yes, we're planning to do it at the end of January, beginning of February. Invitations will go out after the first of the year.

MANNY PERLMAN: Yes. I'm just thinking, especially once the pro forma financials are put out. Alright, thank you very much, have a nice holiday, guys.

OPERATOR: Matt West.

MATT WEST: Just a closing remark related to the investor by Related. It says that the transaction is expected to close in January 2008. If it hasn't closed, I would suggest not closing it, especially not on the terms that you have put forth. When investors are using words like disgusted, egregious and disingenuous on a call, I think it's evident that this is a bad transaction. The right thing to do might be to do, if you really need capital now, which is arguable, you could do a rights offering and let Related backstop it. And finally, if you are this out of step with institutional shareholders, maybe the right thing to do is just put this company up for sale.

OPERATOR: Omotayo Okusanya.

OMOTAYO OKUSANYA: Actually, my question has already been answered. Thank you.

OPERATOR: It appears there are no further questions at this time. Mr. Schnitzer, I would like to turn the conference back over to you for any additional or closing remarks.

MARC SCHNITZER: We just thank everyone for their time and wish everyone a happy new year and we look forward to speaking with everyone in the first quarter of next year. Thank you.

OPERATOR: That does conclude today's conference. Thank you for your participation and have a great day.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

Centerline Holding Company Conference Call - Final FD (Fair Disclosure) Wire December 28, 2007 Friday

    THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

**LOAD-DATE:** January 12, 2008

# Labaton Sucharow Files Class Action Lawsuit Against Centerline Holding Company -- CHC

NEW YORK, Feb 4, 2008 (PrimeNewswire via COMTEX) -- By Staff

**Company:** CharterMac (CHC)

Labaton Sucharow filed a class action lawsuit on January 18, 2008 in the United States District Court for the Southern District of New York, on behalf of purchasers of Centerline Holding Company ("Centerline" or the "Company") (NYSE:CHC) common stock between March 12, 2007 and December 28, 2007, inclusive (the "Class Period"). The complaint alleges that during the Class Period, Defendants violated the Securities Exchange Act of 1934 by issuing various materially false and misleading statements about Centerline's business model that had the effect of artificially inflating the market price of the Company's common stock.

If you are a member of this class you can view a copy of the complaint and join this class action online at http://www.labaton.com/en/cases/centerline.cfm

The complaint alleges that Defendants failed to disclose that they were in the process of restructuring a sale of Centerline's mortgage revenue bond portfolio to a third party. On December 28, 2007, the Company stunned the investment public by announcing that Centerline had sold its "$2.8 billion tax-exempt affordable housing bond portfolio" to a third party, and in the process, altered the Company's business model to a sole asset management company. In addition, the Defendants also revealed that Centerline had agreed to deal with The Related Companies, L.P. ("TRCLP"), a company owned and controlled by certain of the Defendants. According to the deal terms, TRCLP promised to invest $131 million in Centerline in exchange for newly-issued convertible preferred stock that will pay Company insiders an 11% dividend. Lastly, Defendants said that Centerline would be cutting its annual dividend from $1.68 per share to only $0.60 per share. As a result of the news, Centerline stock fell from $10.27 per share on December 27, 2007 to $7.70 per share on December 28, 2007, representing a 25% one-day decline, on unusually high trading volume of more than 4 million shares.

Plaintiff is represented by the law firm of Labaton Sucharow. Labaton Sucharow is one of the country's premier national law firms that represent individual and institutional investors in class action, complex securities and corporate governance litigation. The firm has been a champion of investor rights for over 40 years and has been recognized for its reputation for excellence by the courts.

If you bought Centerline common stock between March 12, 2007 and December 28, 2007, inclusive, you may qualify to serve as Lead Plaintiff. Lead Plaintiff papers must be filed with the court no later than March 18, 2008. If you would like to consider serving as lead plaintiff or have any questions about the lawsuit, please contact one of our representatives or Andrei Rado, Esq. at 800-321-0476.

More information on this and other class actions can be found on the Class Action Newsline at www.primenewswire.com/ca

This news release was distributed by PrimeNewswire, www.primenewswire.com

SOURCE: Labaton Sucharow LLP

```
Labaton Sucharow LLP
        Andrei Rado, Esq.
        800-321-0476
```

Copyright (C) 2008 PrimeNewswire. All rights reserved

News Provided by COMTEX

**Company:** CharterMac (CHC)

## Related Articles

Judge Approves Class Action Lawsuit Against Charter
Mar 17, 2008

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/20/07

In re OPTIONABLE SECURITIES LITIGATION

This Paper Applies to:                    All Cases                    07 Civ. 3753 (LAK)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## ORDER

LEWIS A. KAPLAN, *District Judge.*

These are consolidated class actions alleging, generally, securities violations in connection with trading in the securities of Optionable, Inc. Now before the Court are competing motions for appointment of a lead plaintiff or plaintiffs and for approval of lead plaintiff's choice of counsel.

Under the Private Securities Litigation Reform Act ("PSLRA"), the Court is obliged to appoint as Lead Plaintiff the movant it determines to be the most capable of representing the interests of the class members. 15 U.S.C. §§ 78u-4(a)(3)(B)(I), 77z-1(a)(3)(B)(I). In making that determination, the moving plaintiff with the largest financial interest in the relief sought by the class is entitled to a presumption in its favor.

In this case, KLD Investment Management, Inc. ("KLD") claims a loss of over $3.7 million, which is more than three times greater than the loss claimed by any other movant. It therefore is entitled to the presumption unless those opposing its appointment in some material way have undermined that claim.

The principal argument against KLD is that KLD is a money manager that never owned any shares. While it appears to be the case that KLD is a money manager, its papers represent

that it had sole discretion to invest on behalf of its clients, that it purchased all of the shares that gave rise to the claimed loss for individual clients, and that the shares then were allocated to the individual client accounts. Moreover, it maintains that it "has the sole discretion and attorney-in-fact authority to make investments and related investment decisions for its clients and to bring litigation on their behalf to recover for investment losses." KLD Certification ¶ 7.

KLD's allegations, if accurate, would be sufficient to establish that it acted as a single person and thus that the aggregation of the purchases ultimately allocated among its advisees would be appropriate. *See Smith v. Suprema Specialties, Inc.*, 206 F. Supp.2d 627, 634 (D. N.J. 2002) (citing cases). Reliance on its certification, however, might have been inadequate. *Weisz v. Calpine Corp.*, 2002 WL 32818827, at *6 (N.D. Cal. Aug. 19, 2002). Accordingly, the Court directed KLD to submit evidence establishing that (a) it had unconstrained investment discretion over the accounts to which the Optionable shares were allocated at the time the shares were purchased and allocated, and (b) it is the attorney-in-fact of each account owner for the purpose of bringing and maintaining this action. It has done so. Accordingly, it is entitled to the presumption that it is the most capable of representing the interests of the putative class members. None of the competing candidates has rebutted this presumption.

The Court is satisfied also that KLD satisfies the requirements of Rule 23. The PSLRA inquiry in this regard focuses principally on the typicality and adequacy requirements. *See, e.g., Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Labranche & Co.*, 229 F.R.D. 395, 411 (S.D.N.Y. 2004).

"Typicality exists if claims 'arise from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Id.* at 412. The

suggestion that KLD's decisions were influenced by inside information is conclusory and unsubstantiated. Hence, its claims appear to be typical of those of the class in general.

In order to satisfy the adequacy requirement, "(1) there should be no conflict between the interests of the class and the named plaintiff nor should there be collusion among the litigants; and (2) the parties' attorney must be qualified, experienced, and generally able to conduct the proposed litigation." *Id.* There is no conflict here, and KLD's counsel appear to be able to handle this case appropriately.

Accordingly, the motion of KLD Investment Management, LLC to serve as Lead Plaintiff and to approve its choice of counsel [docket item 38] is granted. The competing motions by others [docket items 23, 26, 32, 35 and 41] all are denied.

SO ORDERED.

Dated:     November 20, 2007

Lewis A. Kaplan
United States District Judge

## CERTIFICATION IN SUPPORT OF APPLICATION FOR LEAD PLAINTIFF

I, _John Landau_ (name) ("plaintiff") declares, as to the claims asserted under the federal securities law, that:

1.     Plaintiff has fully reviewed the facts of the complaint(s) filed in this action alleging violations of the securities laws and plaintiff is willing to serve as a lead plaintiff in this case and all other related cases that may be consolidated with it.

2.     Plaintiff did not purchase securities of Centerline Holding Company at the direction of counsel or in order to participate in a private action under the federal securities laws.

3.     Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.     During the Class Period, plaintiff has executed transactions in the securities of Centerline Holding Company as follows. See Attached Schedule.

5.     In the last three years, plaintiff has not sought to serve as a representative party on behalf of a class in an action filed under the federal securities laws, except as indicated herein.

6.     Plaintiff will not accept payment for serving as a lead plaintiff beyond its pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: _____ 4 / 7 ____, 2008

_____
Plaintiff

**SCHEDULE A**

**Common Stock**

**Stephen Landau**

| Date | Transaction (Purchase or Sale) | No. Shares | Price Per Share |
|---|---|---|---|
| 12/20/06 | Sale | 3,700 | $21.47 |
| 12/20/06 | Sale | 5,900 | $21.47 |
| 12/21/06 | Sale | 9,300 | $21.50 |
| 2/27/07 | Purchase | 5,000 | $19.87 |
| 4/24/07 | Purchase | 6,800 | $18.13 |
| 4/24/07 | Purchase | 1,600 | $18.13 |
| 5/8/07 | Purchase | 3 | $17.95 |
| 5/9/07 | Purchase | 2,900 | $17.95 |
| 5/10/07 | Purchase | 2,797 | $17.95 |
| 6/29/07 | Purchase | 4,000 | $18.17 |
| 7/5/07 | Purchase | 2,500 | $18.15 |