UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                                      )
IN RE CENTERLINE HOLDING COMPANY )        Consolidated C.A.
SECURITIES LITIGATION                          )        No. 08-CV-00505 (SAS)
                                                      )
                                                      )
------------------------------------------------------x

JUL 0 7 2008
U.S.D.C. S.D. N.Y.
CASHIERS

CONSOLIDATED CLASS ACTION COMPLAINT
FOR VIOLATION OF FEDERAL SECURITIES LAWS

**BERGER & MONTAGUE, P.C.**
Sherrie R. Savett
ssavett@bm.net
Barbara A. Podell
bpodell@bm.net
Eric Lechtzin
elechtzin@bm.net
1622 Locust Street
Philadelphia, PA 19103
Tel. (215) 875-3000
Fax (215) 875-4604

**LABATON SUCHAROW LLP**
Lawrence A. Sucharow (LS-1726)
lsucharow@labaton.com
Joseph Sternberg (JS-0144)
jsternberg@labaton.com
Ann E. Gittleman (AG-8367)
agittieman@labaton.com
140 Broadway
New York, NY 10005
Tel. (212) 907-0700
Fax: (212) 818-0477

*Co-Lead Counsel for Lead Plaintiff*
*Centerline Investor Group and the Class*

**TABLE OF CONTENTS**

I.     SUMMARY OF THE ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.   THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

IV.    CONFIDENTIAL WITNESSES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

V.     SUBSTANTIVE ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

       A.    Defendants Viewed the Sale of Centerline's Tax-Exempt Bond Portfolio
             as a "Transformational Transaction" Designed to Discourage Income-
             Oriented Investors and Attract a Growth-Oriented Investor Base. . . . . . . . . . . . . 17

       B.    Centerline's Tax-Exempt Bond Portfolio Was Leveraged to Create
             Additional Capital and to Produce Tax-Exempt Income . . . . . . . . . . . . . . . . . . . 18

       C.    The Preparation of Centerline's $2.8 Billion Tax-Exempt Bond Portfolio
             for Delivery to Freddie Mac Was a Complex and Time-Consuming Process . . . 19

       D.    In Order to Sell the Tax-Exempt Bond Portfolio to Freddie Mac,
             Centerline Had to Terminate the Securitization Trusts Which Held
             Tax-Exempt Bonds as Collateral . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

       E.    Freddie Mac Conducted Intense Due Diligence of Centerline's Tax-
             Exempt Bond Portfolio . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

       F.    The Lengthy and Costly Process of "Unwinding" the Credit Enhancements
             on Centerline's Tax-Exempt Instruments and Freddie Mac's Due Diligence
             of the Properties Underlying Centerline's Tax-Exempt Bond Portfolio Could
             Not Have Been Initiated Without An Agreement or Firm Understanding
             Between Centerline and Freddie Mac to Sell the Portfolio . . . . . . . . . . . . . . . . 21

       G.    There Were $89 Million in Transaction Costs Relating to the Securitization
             of Centerline's Tax-Exempt Bond Portfolio, Reflecting the Complexity of
             the Deal and Devouring Almost All Cash Available for Distribution (CAD)
             to Shareholders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

H.    A Transformational Transaction of This Magnitude and Cost Would Have Been Engineered and Approved By Centerline's Top Executives, Including Defendants, Who Would Be Continually Apprised of the Status of the Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

I.    Defendants Knew That Announcement of the Sale of the Tax-Exempt Bond Portfolio Would Cause a Dramatic Drop in the Price of Centerline Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

J.    Defendant Ross Had a Compelling Personal, Financial Motivation for Concealing the Sale of the Tax-Exempt Bond Portfolio in Order to Drive Down the Price of Centerline Stock So That He Could Take Centerline Private at a Much Lower Price Than He Would Have Paid Prior to the Announcement of the Sale . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VI.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD . . . . . . . . . . . . . . . . . . . . . 26

A.    The March 12 and 13, 2007 Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    1.    March 12, 2007 Press Release and Form 8-K . . . . . . . . . . . . . . . . . . . . . . 26

    2.    2006 Form 10-K Filed With the SEC on March 12, 2007 . . . . . . . . . . . 28

    3.    March 13, 2007 Conference Call. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

B.    The May 10, 2007 Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

    1.    May 10, 2007 Press Release and Form 8-K . . . . . . . . . . . . . . . . . . . . . . . 35

    2.    First Quarter Form 10-Q Filed With the SEC on May 10, 2007 .. . . . . . 35

    3.    May 10, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

C.    The August 9, 2007 Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    1.    August 9, 2007 Press Release and Form 8-K . . . . . . . . . . . . . . . . . . . . . . 38

    2.    Second Quarter Form 10-Q Filed With the SEC on August 9, 2007 . . . . 39

    3.    August 9, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

D.    The November 8 and 9, 2007 Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

|   |   | 1. | November 8, 2007 Press Release and Form 8-K . . . . . . . . . . . . . . . . . . . 46 |
|---|---|---|---|

1.    November 8, 2007 Press Release and Form 8-K . . . . . . . . . . . . . . . . . . . 46

2.    November 8, 2007 Conference Call . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

3.    Third Quarter Form 10-Q Filed With the SEC on November 9, 2007. . . 48

VII.    THE TRUTH SUDDENLY EMERGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

A.    The December 28, 2007 Press Release and Conference Call . . . . . . . . . . . . . . . 51

B.    The Rights Offering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

1.    Background Regarding TRCLP's and Defendant Ross' and Blau's Dominance and Control Over Centerline . . . . . . . . . . . . . . . . . . . . . . . . . 58

2.    Defendants Ross and Blau Materially Increased Their Control of Centerline Through TRCLP's Sweetheart Deal With Centerline. . . . . . . 59

3.    The Terms of the Conversion Price of the 11% Cumulative Preferred Shares Discouraged Other Potential Investors . . . . . . . . . . . . 60

VIII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS PROXIMATELY CAUSED ECONOMIC LOSS TO CENTERLINE'S INVESTORS . . . . . . . . . . . . . . . 62

IX.    ADDITIONAL SCIENTER ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

1.    Facts Which Give Rise to a Strong Inference of Scienter. . . . . . . . . . . . 64

2.    Defendants Schnitzer and Levy, Who Were Beholden to Defendant Ross for Their Lucrative Employment, Had Compelling Personal Motivations to Serve Defendant Ross' Interests, Even if His Interests Conflicted With Those of Public Investors. . . . . . . . . . . . . . . . 66

X.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

XI.    NO STATUTORY SAFE HARBOR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

XII.    CLASS ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

XIII.    BASIS OF ALLEGATIONS .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

COUNT I    Against All Defendants for Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

COUNT II   Against the Individual Defendants for Violations of Section 20(a)
of the Exchange Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

JURY TRIAL DEMANDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

## I. SUMMARY OF THE ACTION

1.      Lead Plaintiff Centerline Investor Group ("Lead Plaintiff"), comprised of J. Michael

Fried, Joseph A. Braddock, Norman Millman and Ed Friedlander, as Trustee for the Ed Friedlander

Trust, brings this securities fraud class action on behalf of all persons or entities that purchased the

common stock of Centerline Holding Company ("Centerline" or "the Company") during the period

from March 12, 2007 through December 28, 2007 (the "Class Period"), seeking to pursue remedies

under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and

Rule 10b-5 promulgated thereunder. The Defendants are Centerline and four of the Company's most

senior officers and trustees: Chief Executive Officer Marc D. Schnitzer ("Schnitzer"), Chief

Financial Officer Robert L. Levy ("Levy"), Chairman of the Board of Trustees Stephen M. Ross

("Ross"), and Managing Trustee Jeff T. Blau ("Blau") (collectively, the "Individual Defendants" and

together with Centerline, "Defendants").

2.      Centerline, formerly CharterMac, is a statutory trust that conducts substantially all

of its business through its subsidiaries.[1] At the start of the Class Period, Centerline described its

business as "a full service investing and finance company with a core focus on real estate." Through

its subsidiaries and the funds managed by them, the Company operated as a full service real estate

finance and investing company.

3.      During the Class Period, the Company operated in four business segments: (1)

Affordable Housing, (2) Commercial Real Estate, (3) Asset Management, and (4) Credit Risk

Products. The Affordable Housing segment was responsible for managing Centerline's tax-exempt

---

[1]  According to the Form 8-K filed with the SEC on April 6, 2007, the Company changed its name from
CharterMac to Centerline Holding Company effective April 2, 2007. The Company's trading symbol
"CHC" was not changed.

affordable housing bond portfolio, which was comprised primarily of tax-exempt first mortgage bonds. During the Class Period, the Affordable Housing segment generated the major part of the Company's total revenues. For example, in the first quarter of 2007, this segment accounted for $60.5 million in revenue, representing 51.7% of the Company's total revenue for the quarter. In the second quarter of 2007, this segment accounted for $65.5 million in revenue, representing 48.5% of the Company's revenue for the quarter. During the third quarter of 2007, this segment brought in $70.2 million in revenue, representing approximately 44.3% of the Company's total revenue for the quarter.

4.      Based upon the revenue earned from the tax-exempt bond portfolio, Centerline historically paid large, primarily tax-exempt dividends. For example, in 2004 the Company paid a dividend of $1.57 per share, representing a 6.4% yield, of which 90.6% was tax-exempt. In 2005, the Company paid a dividend of $1.63 per share, representing a 7.8% yield, of which 88.4% was tax-exempt, and in 2006, it paid a dividend of $1.68, representing a 7.8% yield, of which 74% was federally tax-exempt. This high tax-exempt dividend, coupled with relatively little price volatility, attracted risk-averse investors seeking tax-exempt income. To such investors, Centerline's tax-exempt bond portfolio and the revenue it generated were the basis for their investment in Centerline.

5.      Unbeknownst to the Class, in early 2007, Defendants put into action their strategic plan to transform Centerline into an alternative asset management company, claiming a need to "simplify the story" of the Company and a desire to be viewed by the market like alternative asset managers, such as The Blackstone Group, and entered into an agreement with The Federal Home Loan Mortgage Corporation ("Freddie Mac") to securitize Centerline's tax-exempt bond portfolio. For accounting purposes, the transaction was treated as a sale. The sale removed the tax-exempt

bonds from Centerline's balance sheet and eliminated much of Centerline's tax-exempt revenue stream, leaving the Company with revenue derived from fees earned from the Company's asset management services. According to Confidential Witness No. 2 ("CW 2"), a former asset manager with Centerline, the transaction was referred to as Project Spinnaker within the Company.

6.    Defendants were well aware that the sale of Centerline's tax-exempt bond portfolio changed the nature of Centerline's business. Indeed, according to Centerline's December 28, 2007 Investor Presentation, Defendants viewed the sale as a *"transformational transaction that positions Centerline as an alternative asset manager."* (Emphasis added.)

7.    Defendants knew that the sale of the tax-exempt bond portfolio would greatly decrease the Company's ability to pay high, primarily tax-exempt dividends. They also knew that changing the essential investment premise of the Company would be contrary to the long-standing expectations of Centerline's risk-averse, income-oriented investors. Defendants were well aware that the sale of the bond portfolio would cause the price of Centerline's common stock to plummet and would punish and drive away its income-oriented investor base. Indeed, in their December 28, 2007 Investor Presentation, Defendants touted as one of the strategic benefits of the sale the ability to *"[a]ttract [an] investor base with growth versus income focus."*

8.    Neither the sale, nor the intentional abandonment of Centerline's historic investor base, were disclosed to shareholders until they were a *fait accompli*. Instead, throughout the Class Period, Defendants repeatedly assured investors that Centerline would retain its tax-exempt bond portfolio and would continue paying substantial dividends which were substantially tax-exempt for the foreseeable future. The sale of the bond portfolio and the dividend cut from $1.68 to $0.60 per share were not announced until December 28, 2007, after the deal had *"been in the works for close*

mslts437870-01c.wpd                3

*to a year," as defendant Schnitzer admitted during Centerline's analyst conference call on December 28, 2007.*

9.    Prior to and during the Class Period, defendant Ross, Chairman of the Board of Trustees, controlled Centerline. As of April 2007, he had beneficial ownership of 11,070,430 common shares or 13.9% and controlled, along with defendant Blau, Related Special Assets LLC ("Related"), and Related General II, L.P. ("Related General"), affiliates of The Related Companies, L.P. ("TRCLP"), which gave him almost 18% of the voting shares of Centerline. Prior to the Class Period, defendant Ross had explored with investment banks the concept of taking Centerline private, but had not proceeded with any transaction at that time. Defendant Ross knew that the sale of the tax-exempt bond portfolio and the dramatic change in the basic nature of Centerline's business would cause Centerline's stock price to drop precipitously and remain low, thus paving the way for him to take the Company private at a much lower price than he would have had to pay prior to the sale of the tax-exempt bond portfolio. Further, the sweetheart deal which he and defendant Blau engineered to invest $131 million in Centerline in exchange for 11% Cumulative Preferred Stock increased his voting control of Centerline from almost 18% to almost 30%.

10.    Now that the tax-exempt portfolio has been sold and the price of Centerline stock is languishing at less than $2 per share, compared with the price of $19.75 per share at the beginning of the Class Period on March 12, 2007, defendant Ross has again spoken with investment banks about the possibility of taking Centerline private. Defendant Ross, unlike Lead Plaintiff and the Class, foresaw a direct and immediate benefit from the change in Centerline's business and the predictable drop in the price of Centerline stock. Thus, defendant Ross had a compelling personal and financial motivation for causing and/or acquiescing in the sale of the tax-exempt bond portfolio,

engineering a sweetheart deal to increase his voting control of Centerline and concealing the sale and sweetheart deal from the public and Centerline's income-oriented investor base in order to profit personally from the surprising announcement of the sale on December 28, 2007, which caused Centerline's stock price to plummet. This scheme and course of conduct has paved the way for defendant Ross to take the Company private at a "bargain basement" price.

11.    The sale of the tax-exempt bond portfolio to Freddie Mac was a highly complex, costly and time consuming transaction which could not be accomplished in less than nine months after the parties reached an agreement. Indeed, defendant Schnitzer admitted on December 28, 2007 that the transaction had been "in the works for close to a year." Moreover, according to CW2, a former asset manager of Centerline who worked at the Company from 2003 until April 2008 and worked on the transaction in the fall of 2007, the sale of the tax-exempt bond portfolio, known internally as "Project Spinnaker," would have had to have been in the works for at least one year. During that entire year-long period when Centerline and Freddie Mac were engaged in intensive, costly activity to accomplish the sale, perform due diligence on the properties underlying the bond portfolio and obtain the necessary consents and waivers, Defendants, who were the top executives of Centerline, either had actual knowledge or were reckless in not knowing that this material "transformational" transaction, which would change the very nature of Centerline's business, was "in the works," yet they concealed it from shareholders and misrepresented the future of the tax-exempt bond portfolio, the dividend and the Company's need for capital.

12.    For example, when asked specifically by an analyst on November 8, 2007 if Defendants had considered removing the tax-exempt bonds from Centerline's balance sheet, defendant Schnitzer said "it's something that we've thought of from time to time," when, in fact, he

concealed the material fact that Defendants were then nearing the end of a year-long process to sell

the tax-exempt bond portfolio. Defendant Schnitzer also explicitly denied any plans to change the

dividend, yet a reduction of the dividend was an integral part of the strategic plan which Defendants

were then executing.

13.    The Class Period begins on March 12, 2007, when Centerline issued a press release

announcing the Company's financial results for the fourth quarter and full year ended December 31,

2006, in which Defendants touted the growth in the Company's tax-exempt bond portfolio, which,

at the time, had a fair value of $2.397 billion, as compared to $2.294 billion at the end of 2005.

14.    Although the March 12, 2007 press release highlighted the Company's long-term

evolution from a pure tax-exempt bond fund to a "full service real estate finance and investment

company," this press release – and all of the Defendants' subsequent Class Period statements – gave

no hint that Defendants had an agreement to sell the Company's tax-exempt bond portfolio to

Freddie Mac, thereby radically transforming the Company's business and investor profile. On the

contrary, Defendants' public statements and material omissions throughout the Class Period created

the false impression that the Company would retain its tax-exempt bond portfolio and that investors

would continue to benefit from the substantial and primarily federally tax-exempt dividends

generated by the portfolio's income (with yields as high as 7.8%) for the foreseeable future.

15.    Even as the subprime mortgage crisis gathered momentum in August 2007, dragging

down the price of Centerline's shares, Defendants were steadfast that the Company's tax-exempt

bond portfolio – which did not have single-family or subprime exposure – was continuing to perform

well as a core business of the Company. For instance, during an August 9, 2007 analyst conference

call, Defendant Schnitzer reassured the market that Centerline had sufficient resources to execute

its "business plan," without disclosing that the "business plan" being executed at that time involved

a "transformational transaction" to sell the tax-exempt bond portfolio and change the very nature of

Centerline's business:

> In spite of the instability in the financial markets, operating fundamentals in the commercial real estate and affordable housing sectors are healthy. *We have sufficient capital resources to execute our business plan and are not experiencing any liquidity problems.*
>
> *   *   *
>
> The recent market dislocation has created numerous opportunities to make investments that offer attractive returns and strong credit quality. In times of market instability, we would expect to see a flight to quality that benefits firms like Centerline...
>
> *   *   *
>
> *The market instability has had little or no impact on our Affordable Housing group, which includes our tax-exempt bond and tax credit equity fund businesses.* Affordable Housing represents approximately 65% of our annual CAD revenues.
>
> *   *   *
>
> The credit quality of our bond portfolio remains very strong. As of June 30th, delinquencies totaled just $70.1 million or approximately 2.5% of our $2.8 billion portfolio.

(Emphasis added.)

        16.    Moreover, during an analyst conference call on November 8, 2007 (less than 2

months before the Freddie Mac deal closed), Defendant Schnitzer was questioned as to whether

Centerline had considered selling its tax-exempt bond portfolio, but, instead of revealing that a deal

had been in the works for many months and was nearing completion, he deliberately concealed this

fact from investors, as follows:

> Nicole Jacoby - Liberation Investments - Analyst
>
> Well, I understand. I think we've had some of these discussions before about turning into a fund manager. There are two further issues. One is, you are obviously executing along that track. But the market still doesn't seem to either recognize it or be rewarding it. And, sort of related to that, *have you ever considered putting --*

*taking the bonds off your balance sheet or letting them roll off into some other sort of vehicle?*

Marc Schnitzer - Centerline Holding Company - President and CEO

***Well, clearly a strategy like that plays into the overall evolution of the Company. So, clearly it's something that we've thought of from time to time.*** We're not yet in a position where we can make the case in a very compelling way that we are a pure fund manager when we have $2.9 billion of bonds on our balance sheet which is reminiscent of the bond fund that we were. So, I think that complicates the story and our goals are really to try to simplify the story as much as we can.

Nicole Jacoby - Liberation Investments - Analyst

And is there anything -- *so you generally thought about the bond issue but I guess you're not commenting right now on the specifics of it?*

Marc Schnitzer - Centerline Holding Company - President and CEO

***We've thought about that and many other options. But, clearly that's one that would come to mind right away.***

(Emphasis added.)

17.    On December 28, 2007, Centerline shocked the financial markets with a press release announcing that the Company had sold its "$2.8 billion tax-exempt affordable housing bond portfolio" to Freddie Mac and, in the process, completely changed the Company's business model to a pure asset management firm.  As a result of this transaction, the Company disclosed that it would be slashing its annual dividend from $1.68 per share to only $0.60 per share.  Defendants also announced that Centerline was entering into a related party transaction with Related, an affiliate of TRCLP, owned by defendants Ross and Blau, whereby TRCLP would provide Centerline with $131 million in financing, in exchange for 12.2 million shares of newly-issued convertible preferred stock that would pay these insiders an 11% dividend.  Specifically, the December 28, 2007 press release, *inter alia*, stated:

> Centerline ... ***today announced the completion of a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac***. *For accounting purposes, most of the securitization will be treated as a sale. The transaction represents a major step in Centerline's plan to transform itself into an alternative asset management company.  Centerline also announced a $131 million equity investment commitment from an affiliate of Related Companies, its largest shareholder.*

"Over the past several years, the strategic vision embraced by Centerline's Board of Trustees and management has been to transform Centerline into an alternative asset management company," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "*With the securitization of our bond portfolio with Freddie Mac, we have accelerated our progress toward that goal*. The transaction has materially improved our risk profile by reducing the funding and interest rate risk inherent in our liability structure. Centerline now has a leaner balance sheet, improved credit metrics and an increased percentage of revenues derived from asset management services. *As an alternative asset manager with $11.6 billion of assets under management, we aim to produce returns and growth comparable to other publicly-traded alternative asset managers*."

"Centerline's goals are to increase assets under management and to create greater earnings power. With Related's investment, we have the resources to achieve our goals," continued Mr. Schnitzer. "Greater liquidity will enable us to capitalize on opportunities arising from the volatility in the capital markets. Our growth plans adhere to our core investment strategy of Buy-Watch-Fix: invest prudently, monitor performance diligently and manage investments aggressively."

\* \* \*

Change Dividend Policy: Effective in the first quarter of 2008, *Centerline's dividend on an annualized basis is expected to be $0.60 per share ($0.15 on a quarterly basis)*, subject to approval by our Board of Trustees. The Company will deploy its retained cash flows to fund growth and reduce debt. Centerline anticipates 30% to 35% of the Company's income will be federally tax-exempt in 2008.

(Emphasis added.)

18.    With respect to the sweetheart deal with TRCLP, the December 28, 2007 press release, *inter alia*, stated:

**$131 Million Investment from An Affiliate of Related Companies**

An affiliate of Related Companies has committed to invest $131,250,000 in Centerline Holding Company through a newly-issued convertible preferred stock. *The preferred stock will pay dividends at an 11% annual distribution rate and will be convertible at a $10.75 per share conversion rate for an aggregate of approximately 12.2 million common shares of Centerline Holding Company.* The transaction, which is subject to completion of definitive documentation, is expected to close in January 2008. Centerline will use the net proceeds to reduce corporate debt and fund the Company's growth plans.

(Emphasis added.)

19.    During a December 28, 2007 analyst conference call, Defendant Schnitzer admitted that the Company had been planning this institutional metamorphosis for nearly a year, stating: "This morning, *we announced the closing of a transformational transaction that has been in the works*

*for close to a year* and a significant strategic investment in our firm by our largest shareholder."
(Emphasis added.)

20.    During the December 28, 2007 analyst conference call, securities analysts like Tony
Howard of J.J.B. Hilliard, W.L. Lyons, Inc., observed that this transaction had changed the entire
basis for investing in Centerline and characterized it as "punishing" Centerline's shareholders,
stating:

> Final question, Marc. *Was it considered as far this transformation as far as why not
> take the Company the private,* since basically our shareholders and a lot of
> *shareholders have owned your stock over the years for the dividend and for the
> tax-free status.* So in some way, *you're basically not only transforming the
> Company, but you are changing the shareholder base. So you are basically
> punishing the income ... shareholders* for a more growth-oriented shareholders that
> may want to buy your stock in the future.

(Emphasis added.)

21.    In addition, investors expressed disgust with the related party transaction with
TRCLP, as follows:

> Matt West Private Investor
>
> This capital raise makes no sense to me. *If Related wants to participate in and fund
> the growth of the Company, they should be taking the same equity risk as the rest
> of common shareholders. They're getting an 11% coupon and a call option on
> 20% of the Company with no equity risk. It speaks of an affiliated entity getting a
> sweetheart deal.* You said there were other parties to talk to. If you want to raise
> capital and you want to fund growth, you owe it to your investors to get on the road
> and do a marketed deal. How is this an acceptable way to raise capital?

> \*   \*   \*

> Patrick Collins Private Investor
>
> I have to agree with the prior two callers. *I'm actually disgusted by this transaction.
> How could insiders reach such a favorable deal for themselves?* If you really feel
> like they are being -- attempting to support all shareholders, then we should open this
> up to a rights issue and they backstop it with a preferred, right? So open up the -- for
> capital raise as a rights issue, and then whatever is not taken up, then they can put in
> the preferreds. *But this is too favorable of a deal. And I will also agree that you're
> completely alienating your shareholders here. Your shareholders are looking for
> dividend yields,* and now you're saying, will if that didn't, we're going to change it.
> *You're running this like it's a private company.* I would be disgusted if I were you
> at what you've done – I'm just disgusted. I would be ashamed at what I did.

(Emphasis added.)

22.     Defendants' disclosure that Centerline had sold its tax-exempt bond portfolio to Freddie Mac and had changed its business model overnight to an asset management company that would be unsuitable for risk-averse investors seeking largely tax-exempt income from dividends, as well as the revelations regarding the sweetheart deal with TRCLP, revealed to the market the falsity of the Company's Class Period statements and caused the price of Centerline stock to plummet from $10.27 per share on December 27, 2007, to close at $7.70 per share on Friday, December 28, 2007, representing a 25% single-day decline, on unusually heavy trading volume of 4,152,688 shares.

23.     Throughout the Class Period, Defendants misrepresented and omitted the material facts that:

a.     Defendants had entered into a plan and agreement to change the basic nature of Centerline's business to an alternative asset manager and entered into a "transformational transaction" -- the sale of the tax-exempt bond portfolio – with Freddie Mac to accomplish that plan.

b.     Defendants had agreed to sell the tax-exempt bond portfolio to Freddie Mac and were in the midst of engaging in the complex, costly and time consuming tasks necessary to close the deal.

c.     Centerline was in desperate need of capital due to the unstable capital markets and had a liquidity problem, contrary to their repeated denials.

d.     As part of the "transformational transaction" and their plan to change the business of Centerline, Defendants intended to slash the dividend, contrary to their repeated representations that they planned to continue paying large, primarily tax-exempt dividends.

e.     As a major part of their strategic plan, Defendants had decided to abandon Centerline's historic risk-averse income-oriented investor base, which invested primarily on the basis of the substantial dividend, which was in large part tax-exempt, and replace them with a growth-oriented investor base.

malta437870-01c.wpd                          11

## II.  JURISDICTION AND VENUE

24.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1337 and 1367.

25.    The claims alleged herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. § 240.10b-5).

26.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) and (c).  Substantial acts in furtherance of the alleged fraud and/or its effects, including the preparation and dissemination to the investing public of materially false and misleading financial statements, occurred in this District.  Additionally, the Company maintains a principal executive office in this Judicial District.

27.    In connection with the acts, omissions and other wrongs complained of herein, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities markets.

## III.  THE PARTIES

28.    Lead Plaintiff purchased the publicly traded common stock of Centerline at artificially inflated prices during the Class Period, as set forth in the certifications attached to Lead Plaintiff's motion to be appointed lead plaintiff, and has suffered economic harm as a result of the disclosure of the wrongful acts of Defendants as alleged herein.

29.    Defendant Centerline, a Delaware corporation that maintains is principal executive offices at 625 Madison Avenue, New York, New York 10022, is an investing and finance company with a core focus on real estate.  Centerline's common stock is listed on the New York Stock Exchange ("NYSE") and trades under the symbol "CHC."

30.    Defendant Schnitzer was, at all times relevant to this action, a Managing Trustee, Chief Executive Officer and President of Centerline.  According to the Company's Definitive Proxy

Statement filed with the SEC on Form DEF 14A, on April 23, 2007, Defendant Schnitzer "directs the day-to-day operations of the Company and is responsible for corporate development and strategic planning." Schnitzer reviewed, approved and signed certain of Centerline's false and misleading SEC filings during the Class Period, including the 2006 Form 10-K filed with the SEC on March 12, 2007 (including certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX")), the first quarter Form 10-Q filed with the SEC on May 10, 2007 (including certifications pursuant to SOX) and the third quarter Form 10-Q filed with the SEC on November 9, 2007 (including certifications pursuant to SOX).

31.     Defendant Levy was, at all times relevant to this action, the Chief Financial Officer of Centerline. Levy reviewed, approved and signed certain of Centerline's false and misleading SEC filings during the Class Period, including the 2006 Form 10-K filed with the SEC on March 12, 2007 (including certifications pursuant to SOX); the first quarter Form 10-Q filed with the SEC on May 10, 2007 (including certifications pursuant to SOX); the second quarter Form 10-Q filed with the SEC on August 9, 2007 (including certifications pursuant to SOX); the third quarter Form 10-Q filed with the SEC on November 9, 2007 (including certifications pursuant to SOX); and the Form 8-Ks filed on March 12, 2007, May 10, 2007, August 9, 2007 and November 9, 2007.

32.     Defendant Ross was, at times relevant to this action, the Chairman of the Board of Trustees (the "Board") of Centerline. As of March 31, 2007, defendant Ross directly or beneficially owned 11,070,430 shares of the Company's common stock representing a 13.9% stake in the Company. Defendant Ross is also the founder, Chairman, Chief Executive Officer and Managing General Partner of TRCLP. According to the Company's Definitive Proxy Statement filed with the SEC on Form DEF 14A on April 23, 2007, defendants Ross and Blau are the principal owners of TRCLP. Defendant Ross owns approximately 92% of TRCLP and defendant Blau owns approximately 8%. Defendants Ross, Blau and another affiliate of TRCLP control Related. In addition, TRCLP, through its affiliates, is a significant shareholder of Centerline. A TRCLP affiliate, Related General II, L.P., beneficially owned 10,195,085 common shares of Centerline or

12.8% as of March 31, 2007. Ross reviewed, approved and signed certain of Centerline's false and misleading SEC filings during the Class Period, including the 2006 Form 10-K filed with the SEC on March 12, 2007.

33.    Defendant Blau was, at times relevant to this action, a Managing Trustee of Centerline. As of March 31, 2007, defendant Blau directly or beneficially owned 10,295,085 shares of the Company's common stock representing a 13% stake in the Company. At all times relevant to this action, defendant Blau also served as Managing Trustee and the President of TRCLP. According to the Company's Definitive Proxy Statement filed with the SEC on Form DEF 14A on April 23, 2007, defendant Blau owns 8% of TRCLP. Blau reviewed, approved and signed certain of Centerline's false and misleading SEC filings during the Class Period, including the 2006 Form 10-K filed with the SEC on March 12, 2007.

34.    The Individual Defendants held monthly meetings during the Class Period, at which they discussed the Company's business and made decisions that controlled the Company's operations, including the sale of the tax-exempt bond portfolio and the transaction with Freddie Mac. Defendants were aware of the deal with Freddie Mac and that investors were not being told about it. During the Class Period, each of the Individual Defendants, as senior executive officers and/or trustees of Centerline, was privy to non-public information concerning the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with other corporate officers and employees, attendance at management and Board of Trustees meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, were being concealed from and were misrepresented to the investing public.

35.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein is the collective product of the

narrowly defined group of Defendants identified above. Each of the above officers of Centerline, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

36.     As officers and controlling persons of a publicly-held company whose securities were and are registered with the SEC pursuant to the Exchange Act, and were traded on the NYSE and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

37.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. As alleged herein, defendants Schnitzer and Levy personally misled investors during conference calls by failing to disclose the deal with Freddie Mac when they were asked direct questions about the future of the tax-exempt bond portfolio. Because of their Board membership, stock ownership and/or executive

and managerial positions with Centerline, the Individual Defendants had access to the undisclosed information about Centerline's agreement with Freddie Mac to sell the tax-exempt bond portfolio, slash the dividend and transform Centerline into an alternative asset manager, as particularized herein and knew (or recklessly disregarded) and failed to timely disclose the drastic change in Centerline's business that Defendants were implementing and the negative effect that it would have on Centerline's dividends and its income-oriented investor base.

38.    The Individual Defendants, because of their positions of control and authority as officers and/or trustees of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was actively involved in the transaction with Freddie Mac and was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and the failure to disclose the transaction with Freddie Mac and is primarily liable for the representations contained therein.

39.    Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Centerline's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme (i) deceived the investing public regarding Centerline's business, operations, dividends and the intrinsic value of Centerline's common stock; and (ii) caused Lead Plaintiff and other members of the Class to purchase Centerline's common stock at artificially inflated prices.

## IV.    CONFIDENTIAL WITNESSES

40.    The allegations of Defendants' improper conduct alleged in this Complaint are made upon information and belief, based upon the investigation of counsel, including a review of SEC filings by Centerline, news articles, securities analyst reports, analyst conference calls, press releases

and other public statements issued by Centerline or its representatives, media reports and the first-hand accounts of two confidential witnesses, including the following:

41.     Confidential witness No. 1 ("CW 1") was a financial controller for Centerline's Fund Accounting Group from 2004 to April 2008. CW 1 reported directly to defendant Levy. CW 1 was involved extensively in activities supporting the sale of the tax-exempt bond portfolio, including preparing quarterly analyses of every property in the tax-exempt bond portfolio in order to determine that none of the properties needed extensive cash infusions. CW 1 began working on the transaction in June 2007.

42.     Confidential witness No. 2 ("CW 2") was an asset manager with Centerline Capital Group from 2003 until April 2008. CW 2 began working on activities supporting the sale of tax-exempt bond portfolio, referred to within the Company as Project Spinnaker, in the fall of 2007 and it appeared to CW 2 that everyone at Centerline was working on Project Spinnaker.

## V.  SUBSTANTIVE ALLEGATIONS

**A.     Defendants Viewed the Sale of Centerline's Tax-Exempt Bond Portfolio as a "Transformational Transaction" Designed to Discourage Income-Oriented Investors and Attract a Growth-Oriented Investor Base**

43.     As described above, Centerline's entire existence as a publicly traded company was geared to attract income-oriented investors by paying high-yielding (*e.g.*, 7.8%), primarily tax-exempt dividends generated by the Company's portfolio of tax-exempt bonds – a portfolio that was the lifeblood of the Company. Unbeknownst to the investing public, Defendants embarked on a plan to discourage Centerline's investor base and transform the Company into an alternate asset manager. Defendants admitted that they viewed the sale of the tax-exempt bond portfolio as a "[t]ransformational transaction that positions Centerline as an alternative asset manager" and that one of the strategic benefits which the transformational transaction was designed to accomplish was to "[a]ttract [an] investor base with growth versus income focus." Therefore, Defendants recognized

malta437870-01c.wpd                                    17

that the sale of the tax-exempt bond portfolio was of such magnitude that it would transform Centerline's business and identity and would discourage the Company's long-standing income-oriented investors in favor of growth-oriented investors.

**B.    Centerline's Tax-Exempt Bond Portfolio Was Leveraged to Create Additional Capital and to Produce Tax-Exempt Income**

44.    Centerline used its tax-exempt bond portfolio as a sophisticated financial device to leverage tax-exempt bonds in order to create additional capital and to earn tax-exempt income from the spread between the interest rate on the tax-exempt bonds which it held in its portfolio and the interest rate which it paid on the financial instruments it sold. Basically, Centerline borrowed money and/or sold financial instruments using the tax-exempt bonds as collateral.

45.    Centerline placed tax-exempt bonds in a trust and sold trust certificates backed by the collateral in the trust. In order to sell the trust certificates, Centerline had to obtain a credit enhancement certificate on the bonds, which, in essence, insured and rated the bonds. Since Centerline was not a rated company, it would pay a fee to Merrill Lynch, Freddie Mac, Fannie Mae, MBIA, FGIC, or other companies with a AAA rating to examine the underlying bonds in the trust, perform the underwriting and place the credit enhancement on the bonds. Therefore, the bonds were rated or guaranteed based on the credit of the credit enhancer, such as Merrill Lynch or MBIA, rather than on the credit of Centerline. Once a bond was "wrapped" with a credit enhancement, Centerline was able to sell financial instruments backed by the bonds and/or borrow against the bonds.

46.    For example, if Centerline had a $100 tax-exempt bond earning 6% interest and it sold AAA tax-exempt paper on which it paid 3% interest, using the bond as collateral, Centerline retained the spread of 3% between the 6% interest rate it received on the bond and the 3% interest rate it paid on the financial instrument it sold. Alternatively, Centerline could leverage its tax-

exempt bond portfolio to raise capital by selling, for example, 80% of a bond to obtain $80, which it would use for the purchase of additional bonds, while keeping the 6% interest for 20% of the bond which it retained.

47.    Another device used by Centerline to leverage its bond portfolio was to issue tax-credit investments using its tax-exempt bonds as collateral. Centerline also turned to Merrill Lynch and other rated companies to guarantee or put a "wrap" on its tax credit investments. Since Merrill Lynch wanted collateral for the "wrap" which it issued, Centerline would use its tax-exempt bonds as collateral. If the tax credit investment failed, the investor would look to Merrill Lynch, rather than Centerline, for recourse. Centerline also entered into indemnification agreements with credit enhancers such as Merrill Lynch in order to indemnify the credit enhancers if they had to pay investors' claims.

48.    Centerline's entire $2.8 billion tax-exempt bond portfolio was leveraged in this and other ways to raise capital and generate tax-exempt income.

**C.    The Preparation of Centerline's $2.8 Billion Tax-Exempt Bond Portfolio for Delivery to Freddie Mac Was a Complex and Time-Consuming Process**

49.    Freddie Mac, as a rated entity itself, did not need the credit enhancements placed on the bonds it was receiving from Centerline. Therefore, in order for Centerline to deliver its tax-exempt bonds to Freddie Mac, all of the credit enhancements issued by Merrill Lynch and others on the bonds sold by Centerline had to be "unwound," or removed, either individually by each bond or in packages of bonds, depending on the particular credit enhancing company. Similarly, all credit enhancements on tax credit investments issued by Centerline had to be "unwound" and different collateral, in compliance with the terms of the instruments or as agreed to by the holders, had to be substituted for the tax-exempt bond collateral which would be sold to Freddie Mac.

50. Centerline had to embark upon the time-consuming process of negotiating an "unwinding" or removal of the credit enhancements with the credit enhancers of each tax-exempt bond and tax credit investment which Centerline issued, as well as the substitution of collateral to replace the tax-exempt bond collateral. The credit enhancers charged a substantial fee to "unwind" the credit enhancements and this fee was the subject of negotiations.

51. Centerline would not have begun the lengthy and costly process of unwinding the credit enhancements and substituting collateral until it had a firm agreement with Freddie Mac to acquire the tax-exempt bond portfolio. The process of "unwinding" all of the credit enhancements on more than 300 bonds and substituting collateral would require at least 6 to 9 months. In fact, defendant Schnitzer admitted on December 28, 2007 that the "transformational transaction ... [had] been in the works for close to a year ...." Thus, Centerline would have had a firm agreement with Freddie Mac for almost one year before the end of the Class Period.

**D.    In Order to Sell the Tax-Exempt Bond Portfolio to Freddie Mac, Centerline Had to Terminate the Securitization Trusts Which Held Tax-Exempt Bonds as Collateral**

52. One of Centerline's methods of leveraging its tax-exempt bond portfolio to raise capital was to deposit its tax-exempt bonds into securitization trusts and then sell trust certificates using the tax-exempt bonds as collateral for those certificates. In order to sell the tax-exempt bonds to Freddie Mac, Centerline had to terminate the securitization trusts and unwind these transactions so that the tax-exempt bonds could be released for sale.

53. Since the investors in the trust certificates generally anticipated that the trust certificates would be long-term investments, Centerline had to pay a fee to these investors to terminate the trusts and release the collateral. In essence, Centerline had to compensate these

malta437870-01c.wpd                                    20

investors for the premature transformation of their long term investments into short-term investments, somewhat like a pre-payment penalty. Accordingly, Centerline had to negotiate a fee with these trust certificate investors in order to proceed with the sale of the tax-exempt bonds to Freddie Mac.

**E.    Freddie Mac Conducted Intense Due Diligence of Centerline's Tax-Exempt Bond Portfolio**

54.    Before accepting Centerline's tax-free bond portfolio consisting of 383 bonds secured by 275 multi-family low-income housing tax credit programs in 31 states and the District of Columbia, representing approximately 52,000 occupied apartment units with an additional 5,500 units in construction or rehabilitation, Freddie Mac would have performed extensive due diligence on each of the properties underlying the bond portfolio. Since Freddie Mac was receiving bonds without any Merrill Lynch or other credit enhancement, it would have made its own detailed analysis of every asset it was receiving.

55.    Among the numerous factors Freddie Mac would have investigated and analyzed on each property individually were the location of the property, the number of units, the vacancy and occupancy rates and any deferred maintenance. Such a due diligence analysis of 275 properties was a time-consuming task which could not have been completed in less than 9 months.

**F.    The Lengthy and Costly Process of "Unwinding" the Credit Enhancements on Centerline's Tax-Exempt Instruments and Freddie Mac's Due Diligence of the Properties Underlying Centerline's Tax-Exempt Bond Portfolio Could Not Have Been Initiated Without An Agreement or Firm Understanding Between Centerline and Freddie Mac to Sell the Portfolio**

56.    Since Freddie Mac would not have accepted Centerline's tax-exempt bonds until the credit enhancements had been unwound, a firm agreement with Freddie Mac that Centerline would

unwind the credit enhancements and that Freddie Mac would perform its due diligence on the underlying properties would have been necessary as the first step in accomplishing the sale of the bond portfolio. Neither party would have embarked upon these complex and costly tasks if an agreement to sell the portfolio had not been reached. A term sheet setting forth the terms of the agreement and an outline by Centerline's corporate and outside counsel of the steps that needed to be taken to unwind the credit enhancements on each bond specifically would normally be prepared as a road map for such a transaction.

57.    Centerline would also normally have prepared and analyzed as many as 40 different models of how to structure such a transaction for GAAP and tax purposes.

**G.    There Were $89 Million in Transaction Costs Relating to the Securitization of Centerline's Tax-Exempt Bond Portfolio, Reflecting the Complexity of the Deal and Devouring Almost All Cash Available for Distribution (CAD) to Shareholders**

58.    The complexity of the sale of the tax-exempt bond portfolio is reflected in the costs incurred by Centerline, which Centerline represented as follows in Centerline's Supplemental Financial Package (Fourth Quarter 2007):

| | |
|---|---|
| Costs to terminate securitization trusts | $36,707,000 |
| Advisory fees | $27,827,000 |
| Subsidiary equity modification fees | $18,850,000 |
| Professional Fees | $ 3,682,000 |
| Other costs | $ 1,964,000 |
| **Total:** | **$89,030,000** |

59.    Morgan Stanley & Co., Inc. and Bear, Stearns & Co., Inc. acted as financial advisors to Centerline for the transactions involved in the sale of the tax-exempt bond portfolio. These firms received fees of $27,827,000 for providing advisory services to the Company on the transactions.

60.    There were subsidiary equity modification fees of $18,850,000 on the $377.5 million of preferred stock outstanding held at a subsidiary level of the Company. Centerline raised capital through the issuance of preferred stock which was secured by the tax-exempt bonds as collateral. Since tax-exempt bonds were held as collateral for the preferred stock, it was necessary for Centerline to negotiate with the preferred stockholders to release the tax-exempt bond collateral, obtain their permission for the substitution of other collateral and to pay them for the release. All of the tax-exempt bonds were then removed from that subsidiary and $377.5 million of Freddie Mac rated certificates were substituted as collateral.

61.    Additionally, Centerline incurred a cost of $36,707,000 to terminate the securitization trust and release the tax-exempt bonds which were used as collateral in order to sell them to Freddie Mac.

62.    The exorbitant cost of the Freddie Mac transaction is evident when the costs are allocated on a per share basis. The transaction-related costs of approximately $89 million amount to more than $1.50 per share and would almost eliminate all of Centerline's Cash Available for Distribution ("CAD") for 2007 of approximately $94 million, leaving only approximately $5 million available for distribution to shareholders.

**H.    A Transformational Transaction of This Magnitude and Cost Would Have Been Engineered and Approved By Centerline's Top Executives, Including Defendants, Who Would Be Continually Apprised of the Status of the Transaction**

63.    A transformational transaction of this magnitude and cost, which involved changing the basic nature of Centerline's business, could not have been initiated without the knowledge and approval of Centerline's top executives, including all of the Defendants. The Capital Markets Group, headed by defendant Levy, would normally have been primarily responsible for unwinding

malta437870-01c.wpd                                23

the credit enhancements. This was a time-consuming process involving, among others, the Capital

Markets Group, accountants, in-house counsel and outside law firms.

64.    Management committee meetings occurred at Centerline at least monthly and usually

twice per month. Management meetings were typically attended by the top 10 to 12 senior managers

at Centerline, including defendants Schnitzer and Levy, Leonard W. Cotton (Managing Trustee and

Vice Chairman), James L. Duggins (Executive Managing Director of a subsidiary), Paul G. Symthe

(Senior Managing Director of a Subsidiary), Andrew J. Weil (Executive Managing Director of

Centerline Advisors and the Head of the Affordable Housing Group), James Spound (Executive Vice

President), Patrick Martin (Senior Managing Director), Daryl Carter, (Executive Managing Director

of a Subsidiary and Co-Head of the Commercial Real Estate Group), Hilary Ginsburg (Head of

Public Relations), the head of asset management in the Dallas office and the heads of every major

group in the Company. Defendant Schnitzer and Leonard Cotton also met regularly with defendant

Ross, usually many times per month, and also at Board meetings.

65.    Major transactions such as this "transformational" transaction, were the subject of

regular reports at Management Committee and Board meetings. As required by SOX, written

minutes of formal Management Meetings were kept by Centerline. Defendant Ross regularly

received e-mails from top management on material transactions.

66.    Since approximately $89 million was spent in various costs of the transformational

transaction, and these costs were substantial enough to virtually eliminate Centerline's CAD for

2007, the transaction could not have been initiated, let alone completed, without each Defendant's

knowledge and approval.

I.    **Defendants Knew That Announcement of the Sale of the Tax-Exempt Bond Portfolio Would Cause a Dramatic Drop in the Price of Centerline Stock**

67.    According to the Prospectus Supplement dated March 7, 2008 for the Rights Offering, negotiations with two investment bank affiliates about the terms on which they would be willing to purchase the newly issued Centerline convertible preferred stock and the conversion price of the new convertible preferred shares to be issued as part of the Freddie Mac transaction revealed that both of these interested parties were adamant that the conversion price must float without a floor for a specified period after the announcement of the sale of the tax-exempt bond portfolio.  This negotiating position by both investment bank affiliates was based on their recognition that Centerline's common stock price would plummet after the announcement of the sale of the tax-exempt bond portfolio and the drastic reduction in the dividend.  Thus, Defendants were well-aware of the ramifications to common stockholders of the sale of the tax-exempt bond portfolio and dividend cut, yet failed to disclose this "transformational transaction" to shareholders throughout the Class Period.

J.    **Defendant Ross Had a Compelling Personal, Financial Motivation for Concealing the Sale of the Tax-Exempt Bond Portfolio in Order to Drive Down the Price of Centerline Stock So That He Could Take Centerline Private at a Much Lower Price Than He Would Have Paid Prior to the Announcement of the Sale**

68.    Prior to the December 28, 2007 announcement of the sale of the tax-exempt bond portfolio, the closing price of Centerline stock was $10.27 per share on December 27, 2007.  At the beginning of the Class Period on March 12, 2007, the price of Centerline stock was $19.75.  During the Class Period, the price of Centerline stock was as high as $17.39 on June 5, 2007.  However, on

malta437870-01c.wpd                                   25

December 28, 2007, after the announcement, the price dropped 25% to close at $7.70 per share. Since then, the price of Centerline stock has dropped steadily, closing at $1.70 on July 3, 2008.

69.    Prior to the sale of the tax-exempt bond portfolio, defendant Ross had spoken to investment bankers about the possibility of taking Centerline private. He controlled almost 18% of the voting shares of Centerline before the sweetheart deal with TRCLP and almost 30% after the deal. As alleged above, his partner in TRCLP, defendant Blau, controlled an additional 13% of Centerline. With the price of Centerline stock vastly diminished and his control of Centerline vastly enhanced, defendant Ross has resumed his contacts with investment bankers about taking Centerline private, but at a much lower price than he would have had to pay prior to the announcement of the sale of the tax-exempt bond portfolio.

70.    Therefore, defendant Ross had a compelling personal and financial motivation for concealing the sale of the tax-exempt bond portfolio so that the price of Centerline stock would be driven down by the market's surprise and the flight of Centerline's income-oriented investors upon learning of this startling "transformational transaction." Defendant Ross stands to benefit directly from these events.

## VI.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS DURING THE CLASS PERIOD

### A.    The March 12 and 13, 2007 Statements

#### 1.    March 12, 2007 Press Release and Form 8-K

71.    On March 12, 2007, Centerline issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2006, and concurrently filed with the SEC a current report on Form 8-K, signed by defendant Levy, that included as an exhibit the full text of the press release. The March 12, 2007 press release and Form 8-K reported revenues of $127.9 million

for the fourth quarter of 2006, as compared to $79.8 million for the fourth quarter of 2005 (representing a 60.3% increase year-over-year), and revenue of $387.25 million for the full year 2006, as compared to $295 million for 2005 (representing a 31.2% increase year-over-year). Centerline reported the fair value of its mortgage revenue bond portfolio as $2.397 billion as of December 31, 2006, as compared to $2.294 billion at the end of 2005. Additionally, the Company reported "Cash Available for Distribution ("CAD"), CharterMac's primary performance measure," of $28.4 million and $111 million for the fourth quarter and full year 2006, respectively, as compared to $27.2 million and $114.7 million for the fourth quarter and full year 2005, respectively.

72.    The March 12, 2007 press release and Form 8-K also highlighted the Company's ongoing evolution from a tax-exempt bond fund to a full service real estate finance and investment company, *inter alia*, stating:

> "***We completed several major initiatives in 2006 that significantly changed our Company and transformed CharterMac from a firm focused mainly on affordable and multifamily housing to a full-service real estate finance and investment company***," said Marc D. Schnitzer, Chief Executive Officer and President of CharterMac. "Our accomplishments included the acquisition of ARCap, one of the nation's leading high-yield CMBS fund managers, the launch of Centerbrook Financial, our credit risk products company, the rollout of a new credit approval process, the divestiture of two non-core investments and ***the completion of a corporate re-engineering***. We believe that all of these initiatives will help create a more efficient operating structure and provide us with a best-in-class platform to grow and compete in a very competitive industry. ***Today we can provide a broad array of debt and equity products for any type of real estate property***."

(Emphasis added.)    The assertion that Centerline had achieved "the completion of a corporate re-engineering" served to reassure investors who sought the continuation of Centerline's conservative, predictable, largely tax-exempt revenue and concealed the agreement and "transformational" transaction to dispose of the tax-exempt bond portfolio and the ongoing, costly efforts to do so.

73.    Defendant Schnitzer's statement concerning the completion of several major

initiatives and the evolution of the Centerline to a "full-service real estate and investment company,"

was also materially false and misleading because it concealed the fact that Centerline was then in the

process of a "transformational" initiative – *i.e.*, the sale of Centerline's bond portfolio to Freddie

Mac. Moreover, Defendant Schnitzer's statement failed to disclose that Defendants planned to close

this transformational transaction before the end of 2007. Defendants' statements created the false

impression that the Company would retain its tax-exempt bond portfolio (and continue paying

substantial tax-exempt dividends out of the income generated by this portfolio) for the foreseeable

future.

### 2.    2006 Form 10-K Filed With the SEC on March 12, 2007

74.    On March 12, 2007, Centerline filed with the SEC its 2006 annual report on Form

10-K. The 2006 Form 10-K was signed by each of the Individual Defendants and certified by

defendants Schnitzer and Levy pursuant to the requirements of SOX. The 2006 Form 10-K

reiterated the financial results reported in the Company's March 12, 2007 press release and Form 8-

K. In addition, the 2006 Form 10-K described the Company's business model as a full-service real

estate finance and investing company that maintained a portfolio of "tax-exempt first mortgage

revenue bonds," *inter alia*, as follows:

Operating Segments

We operate in four business segments:

1.    ***PORTFOLIO INVESTING, which includes subsidiaries that invest
primarily in tax-exempt first mortgage revenue bonds issued by various
state or local governments, agencies or authorities and other investments.***
The proceeds of mortgage revenue bonds are used by the borrowers to
finance the new construction, substantial rehabilitation, acquisition, or
refinancing of affordable multifamily housing throughout the United States.

> This segment may also include loans to and other investments in other
> business or funds involved in real estate or real estate finance. Such
> investments have included our pre-acquisition investment in ARCap
> Investors, LLC ("ARCap").

(Emphasis added.) Although the discussion in the Form 10-K listed investing in tax-exempt bonds

as one of Centerline's operating segments, it failed to disclose that Centerline had entered into an

agreement with Freddie Mac to sell the tax-exempt bond portfolio and was in the midst of the costly,

time-consuming process of doing so.

      75.     With respect to the Company's tax-exempt bond portfolio, the 2006 Form 10-K, *inter*

*alia*, stated:

> 1.    PORTFOLIO INVESTING
>
> We conduct most of our portfolio investing through our CharterMac Equity Issuer
> Trust I and CharterMac Equity Issuer Trust II subsidiaries. Throughout this
> document, we will refer to both of these subsidiaries collectively as "Equity Issuer."
>
> *As of December 31, 2006, our revenue bond portfolio includes direct and indirect
> interests in mortgage revenue bonds with an aggregate fair value of approximately
> $2.8 billion (prior to $397.3 million of eliminations related to bonds issued by
> partnerships we consolidate), secured by affordable multifamily properties
> containing 56,048 units located in 30 states and the District of Columbia.* While
> most of these mortgage revenue bonds generate tax-exempt income, certain of them
> generate taxable income. The taxable mortgage revenue bonds are held at the parent
> trust.
>
> *Our Portfolio Investing business generates most of its income and cash flow from
> a positive spread between the interest earned from our mortgage revenue bond
> portfolio and the cost of capital we use to purchase the bonds.* We occasionally
> receive participating interest on certain mortgage revenue bonds which is equal to a
> percentage of net property cash flow of the net sale or refinancing proceeds. We also
> receive fees from borrowers for the acquisition of new mortgage revenue bonds.
>
> The acquisition of mortgage revenue bonds requires capital. In addition to using a
> portion of our operating cash flows, we obtain such capital by securitizing most of
> the bonds we purchase and by issuing equity securities.

(Emphasis added.)

      76.     Furthermore, the 2006 Form 10-K reported that Centerline had increased the size of

its mortgage revenue bond portfolio during 2005 and 2006 and gave no indication that the Company

was planning to do an about-face on this business strategy. Specifically, the 2006 Form 10-K, *inter*

*alia*, stated:

The increase in mortgage revenue bond interest income is primarily due to **expanding our revenue bond portfolio in 2005 and 2006**, although the rate of investment has slowed due to challenging market conditions we have experienced since 2004.

(Emphasis added.)

77.    With respect to dividends, the 2006 Form 10-K reported that the Company had paid investors a dividend of $1.68 per share in 2006, as compared to a dividend of $1.65 per share in 2005.

78.    The statements in Centerline's 2006 Form 10-K concerning the Company's business model, the expansion of its tax-exempt bond portfolio, and dividends were materially false and misleading for the reasons set forth in paragraph 23 and because they concealed from the investing public the fact that Centerline had agreed to sell its tax-exempt bond portfolio to Freddie Mac and was in the process of doing so, and that this transformational transaction was expected to close before the end of 2007. Defendants' statements created the false impression that the Company would retain its bond portfolio (and continue paying substantial dividends and maintain its substantial tax-exempt status out of the income generated by this portfolio) for the foreseeable future.

79.    Under the heading "Risk Factors," Centerline's 2006 Form 10-K stated, "[W]e derive a large portion of our earnings by ... investing in mortgage revenue bonds;" and listed numerous factors that could materially affect the Company's financial performance, including, a general boilerplate statement that the Company could change its business plan without prior shareholder approval, as follows:

**OUR BOARD OF TRUSTEES CAN CHANGE OUR BUSINESS POLICIES UNILATERALLY**
Our board of trustees may amend or revise our business plan and certain other policies without shareholder approval. Therefore, our shareholders have no control over changes in our policies, including our business policies with respect to acquisitions, financing, growth, debt, capitalization and distributions, which are determined by our board of trustees.

80.    Defendants' boilerplate risk disclosures in the 2006 Form 10-K regarding the possibility of the Company changing its business plan were materially false and misleading for the reasons set froth in paragraph 23 and because they failed to disclose that at the time they caused the

Company to publish this purported risk disclosure, Defendants had already agreed with Freddie Mac

to sell off the Company's tax-exempt bond portfolio and were in the process of doing so and, as a

result, Centerline would slash its dividend. Once Defendants chose to speak on this topic, they had

a duty to do so completely and in a non-misleading manner. Moreover, the 2006 Form 10-K failed

to disclose the material risk that the Company was having liquidity problems which would be

compounded once the bond portfolio was gone and no longer available to be used as collateral.

81.     With respect to the Company's disclosure controls, the 2006 Form 10-K, *inter alia*,

stated:

> Evaluation of Disclosure Controls and Procedures. Our Chief Executive Officer and
> Chief Financial Officer have evaluated the effectiveness of our disclosure controls
> and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) under the Securities
> Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period
> covered by this annual report. Based on such evaluation, such officers have
> concluded that our disclosure controls and procedures as of the end of the period
> covered by this annual report were effective to ensure that information required to be
> disclosed by the Company in the reports that the Company files or submits under the
> Exchange Act is recorded, processed, summarized and reported, within the time
> periods specified in the SEC rules and forms, and to ensure that such information is
> accumulated and communicated to the Company's management, including the Chief
> Executive Officer and Chief Financial Officer, as appropriate, to allow timely
> decisions regarding required disclosure.

### 3.     March 13, 2007 Conference Call

82.     On March 13, 2007, Centerline held an analyst conference call during which

Defendants reiterated the financial results reported in the March 12, 2007 press release and Form 8-

K, as well as the 2006 Form 10-K. Defendants Schnitzer and Levy participated in the call on behalf

of Centerline. Defendant Schnitzer commented on the upcoming change in the Company's name

and the corporate "reengineering" completed in 2005-2006, *inter alia*, stating:

> The final initiative that I would like to discuss is our corporate reengineering.
> Following our management change in November of 2005, we began a complete
> reengineering of our organization, the goal of which was to create a more efficient
> operating platform while maintaining our high level of service. We examined several
> areas of our Company and found redundancies and inefficient procedures. Following
> the ARCap acquisition, we took another look at our structure in the context of our
> growth plans and the desire to broaden our asset classes. As a result of these efforts,
> we have created a new credit approval process and strengthened our asset
> management platform. We also recognized that we were a difficult company to
> understand and explain to our many stakeholders. Beginning in 2001, we made a

series of acquisitions and as a result we operate through several subsidiaries, each of which has its own brand name. In connection with our reengineering, we launched a branding initiative that is nearly complete. We believe that it is critical to operate as one Company, with one brand name and all 530 employees aligned with and focused on the success of that single company.

Therefore, within the next 30 days, we will announce that we will change the name of our Company and eliminate our subsidiary structure and all existing other brand names. When our new brand is rolled out, we will introduce our new structure, which will consist of four business groups: Affordable Housing, Commercial Real Estate, Asset Management and Credit Risk Products. We have identified the leaders of each group and will announce their appointments at the time we announce our new name. The four business groups will be supported by our risk policy, legal, human resources, finance, corporate communications and information technology departments, which together will form our corporate group. We believe that this structure will enable to us reap even greater benefits from the integration of our past and future acquisitions and describe our business in a clearer fashion. Our first quarter 2007 financial reports will be modified to reflect our new structure and we will introduce new performance metrics for each of our business groups.

Defendant Schnitzer failed to include the material fact that Centerline was entering into a "transformational" transaction – *i.e.*, selling its tax-exempt bond portfolio.

83.    As to Centerline's Affordable Housing Group – the segment responsible for managing the Company's mortgage revenue bond portfolio – Defendant Schnitzer indicated that the Company's restructuring had not reduced its commitment to this business and expected it to continue growing, stating:

> *With respect to our Affordable Housing group, which includes our low-income housing tax credit and tax-exempt bond businesses, we expect to have another strong year.* We expect stability and modest growth from this business due to the statutory limitations on the availability of both tax credits and tax-exempt bonds. Since the inception of the tax credit program in 1986, we have been an industry leader with significant market share. *Our firm's significant growth and diversification has not reduced our commitment to the affordable housing business.* We will continue to represent the highest standard for this industry and seek innovative new products for financing affordable housing.
>
> At the end of 2006, investor demand in the tax-credit equity market was significantly reduced due to historic low rates of return. Since late 2006, yields have increased by more than 100 basis points and investors have shown renewed interest in early 2007. The increased yields have not yet allowed for an increase in margins. However, we believe that margins will be stable in 2007 after declining in 2006. *Our growth plans in affordable housing include the development of new complimentary [sic] — complimentary products, incremental tax credit equity market share gains, and in expense reductions.* The additional tax credits authorized by Congress after Hurricane Katrina in the Gulf opportunity zone -- which is comprised of Louisiana,

Mississippi and Alabama -- have provided us with several opportunities to finance large transactions in that area of the country.

***With respect to tax-exempt bonds, the current supply in the market is low and the demand is at an all-time high***. Many national and regional banks have entered the private placement business in order to diversify their product offerings and meet CRA needs. In addition, Fannie Mae and Freddy Mac have become more competitive and now offer longer amortization and more aggressive terms. Overall, we expect flat tax-exempt bond originations for 2007 compared to 2006.

(Emphasis added.)

84.    When asked about the amount and tax-free component of the dividend, defendant

Schnitzer failed to disclose that Centerline had an agreement to sell the tax-exempt bond portfolio,

which would result in the drastic reduction of the dividend and a drastic reduction in its tax-free

component:

**Tony Howard - Hilliard Lyons - Analyst**

Final question from me is regarding the dividend. Marc, obviously you've had a really nice history of raising the dividend. In 2006, you did not raise it, but the actual dividend was up for the year. What kind of expectations do you expect for the dividend?

**Marc Schnitzer - Charter Mac - CEO & President**

Well, I'm really focused on growing our CAD right now, and if we can grow our CAD in line with our expectations, then we'll sit down with the board and revisit the dividend. I'm truly focused on increasing the Company's CAD and increasing the Company's earnings velocity, and then we'll sit down with the board and discuss what the implication is for the dividend.

**Tony Howard - Hilliard Lyons - Analyst**

Rob, in regards to that, do you expect to – the 74% of that's fairly tax free, will that continue to decline for 2007?

**Rob Levy - Charter Mac - CFO**

No, we don't. As I said in the speech, the – that a good portion of that was because of the resecuritizations that occurred in 2006. I don't have an exact percentage or range of percentages in front of me at this time, but as of the next quarter's release, we'll give you better guidance for the tax implications of the dividend for '07.

85.    Defendant Schnitzer also confirmed that he expected Centerline's tax-exempt bond

activity to "be flat this year," without disclosing the material fact that Centerline was in the process

mailt437870-01c.wpd                          33

of selling its tax-exempt bond portfolio to Freddie Mac and was in the midst of costly, time-consuming activities in furtherance of closing the deal.

86.    As with the March 12, 2007 press release and Form 8-K and the 2006 Form 10-K, Defendants' statements during the March 13, 2007 conference call were materially false and misleading for the reasons set forth in paragraph 23. These statements gave no hint that Defendants had already determined to sell the tax-exempt bond portfolio and were in the process of selling the Company's tax-exempt bond portfolio to Freddie Mac and that this transformational transaction was expected to close before the end of 2007. Defendants' statements created the false impression that the Company would retain its bond portfolio (and continue paying substantial dividends with substantial tax exempt status out of the income generated by this portfolio) for the foreseeable future.

87.    One of the most material factors supporting analysts' ratings of the Company was the existence of the substantial tax-exempt dividend income generated from the tax-exempt bond portfolio. In his report on March 14, 2007, analyst Tony Howard of J.J.B. Hilliard, W.L. Lyons, Inc., noted that bond acquisitions were projected to increase in 2007: "Management indicated a goal of $400 million to $450 million in new bond acquisitions in 2007, which has been the company's goal for the last couple of years. This compares to actual purchases of $379 million in 2006 and $388.5 million in 2005." Without knowing of the ongoing sale of the tax-exempt bond portfolio, he also viewed the Company's "on-going re-engineering favorably in that we have argued for some time that the company's overly complex structure made the company difficult to analyze." With respect to the amount of the dividend that is federally tax-free, Howard wrote: "We would expect this percentage [74%] to stabilize at the current level in 2007." Price Target Research also noted in a March 19, 2007 report that Centerline's (CharterMac) "appeal is likely to be to investors heavily oriented toward income. CHC is of very low investment quality." On May 2, 2007, Value Engine issued a Buy recommendation for Centerline, stating that "we believe that CHC should be trading at $19.42. This makes CHC 6.9% undervalued."

**B.    The May 10, 2007 Statements**

    **1.    May 10, 2007 Press Release and Form 8-K**

88.    On May 10, 2007, Centerline issued a press release announcing its financial results

for the first quarter of 2007 and concurrently filed with the SEC a current report on Form 8-K, signed

by defendant Levy, that included as an exhibit the full text of the press release. The May 10, 2007

press release reported that the Company's tax-exempt bond portfolio was then valued at $2.46

billion. In addition, the May 10, 2007 press release, *inter alia*, stated:

> "Due to the seasonality of our business, our origination volume across our business
> lines tends to be the slowest in the first quarter and as a result, our earnings and Cash
> Available for Distribution are not earned evenly throughout the year," said Marc D.
> Schnitzer, Chief Executive Officer and President of Centerline. "In addition, our first
> quarter financial results were impacted by an impairment we recorded in connection
> with revenue bonds secured by mortgages on six properties and a charge to reserve
> against associated receivables. Therefore, while our dividend payout ratio is above
> 100% in this quarter, we are comfortable that our annual dividend will continue to
> have adequate coverage. *We have solid investment pipelines in both our*
> *Commercial Real Estate Group and Affordable Housing Group and we continue*
> *to see a tremendous amount of transaction volume.* In addition, we are working on
> several new growth initiatives we expect to launch in 2007. Based on the progress
> we have made executing our business plan to date, we remain confident that we will
> meet our investment and financial goals for the year and do not believe it is necessary
> to revise our guidance at this time."

(Emphasis added.)

    **2.    First Quarter Form 10-Q Filed With the SEC on May 10, 2007**

89.    Also on May 10, 2007, Centerline filed with the SEC its quarterly report on Form 10-

Q for the first quarter of 2007 (the "First Quarter 10-Q"), which was signed by defendants Schnitzer

and Levy. Defendants Schnitzer and Levy certified this filing pursuant to Sections 302 and 906 of

SOX, stating that "[t]he information contained in the Report fairly presents, in all material respects,

the financial condition and results of operations of Centerline." The First Quarter 10-Q reiterated

the financial results reported in the Company's May 10, 2007 press release and Form 8-K, including

that the fair value of the Company's tax-exempt bond portfolio was then $2.46 billion as compared

to $2.39 billion at the end of 2006. In addition, revenue from interest income (revenue bonds and

other interest income) amounted to 63.0% of the Company's total revenue, as compared to 57.6%

in first quarter of 2006.

      90.      With respect to the Company's disclosure controls, the First Quarter 10-Q, *inter alia*,

stated:

> Evaluation of Disclosure Controls and Procedures. Our Chief Executive Officer and
> Chief Financial Officer have evaluated the effectiveness of our disclosure controls
> and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities
> Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period
> covered by this quarterly report. Based on such evaluation, such officers have
> concluded that our disclosure controls and procedures as of the end of the period
> covered by this quarterly report were effective to ensure that information required to
> be disclosed by the Company in the reports that the Company files or submits under
> the Exchange Act is recorded, processed, summarized and reported within the time
> periods specified in the SEC rules and forms, and to ensure that such information is
> accumulated and communicated to the Company's management, including the Chief
> Executive Officer and Chief Financial Officer, as appropriate, to allow timely
> decisions regarding required disclosurc.

            3.      May 10, 2007 Conference Call

      91.      On May 10, 2007, Centerline held an analyst conference call during which Defendants

reiterated the financial results reported in the May10, 2007 press release and Form 8-K, as well as

the First Quarter 10-Q. Defendants Schnitzer and Levy participated in the call on behalf of

Centerline. In addition, Defendant Schnitzer stated:

> As we stated in this morning's press release, due to the seasonality of our business
> our origination volume across business lines tends to be the slowest in the first
> quarter. As a result, our earnings and cash availablc for distribution are not earned
> evenly throughout the year. In addition, our first quarter financial results were
> impacted by an impairment we recorded in connection with six revenue bonds we
> hold on our balance sheet and a charge to reserve against associated receivables.
> *Although our dividend payout ratio is above 100% in this quarter we are*
> *comfortable that our annual dividend will continue to have adequate coverage. We*
> *have solid investment pipelines in both our Commercial Real Estate Group and*
> *our Affordable Housing Group, and we continue to see a tremendous amount of*
> *transaction volume.*
>
>                     \*   \*   \*
>
> With respect to our tax-exempt bond business the current supply in the market is low
> and the demand is at an all time high.
>
>                     \*   \*   \*

> *We have received some questions about the percentage of the anticipated 2007 dividend that we would expect to be federally tax exempt in nature. There are many variables that go into this calculation so it is difficult to give an exact answer, but based on our current projections for the Company and for our various business segments we anticipate 70% to 80% of our 2007 dividend to be exempt from federal income taxes.*

(Emphasis added.)

92.    Defendant Schnitzer discussed Centerline's tax-exempt bond business and Freddie Mac's role in that market without disclosing the material fact that Centerline had agreed to sell its tax-exempt bond portfolio to Freddie Mac:

> With respect to our tax-exempt bond business the current supply in the market is low and the demand is at an all time high. Many national and regional banks have entered the private placement business in order to diversify their product offerings and meet community reinvestment act needs.
>
> In addition, Fannie Mae and Freddie Mac have become more competitive and now offer a longer amortization period and more aggressive terms. While our direct purchase volume was low in the first quarter we have seen a strong increase in the bond volume we originate and service on behalf of Freddie Mac. This execution offers us the ability to retain the business while generating an attractive, ongoing servicing fee.

93.    Based on Centerline's May 10, 2007 disclosures, analysts' expectations for 2007 remained largely unchanged, as did their primary focus on the amount and tax-free nature of the dividend. For example, Tony Howard of J.J.B. Hilliard, W.L. Lyons, Inc., in a report dated May 14, 2007, wrote:

> *Once again, we are adjusting our 2007 CAD [cash available for distribution] forecast from $1.96 to $1.90 a share, which would be basically flat with 2006's down performance compared to 2005.*
>
> However, we would note that despite the first quarter shortcomings, *management reiterated its guidance of a 3% to 5% improvement over 2006's down CAD results*. On the other hand, even to achieve our revised forecast, it would require a healthy increase in transactional businesses in the second half of the year. While this is clearly possible and management was right on target in its assessment that 2006 would be slightly down compared to the record 2005 performance, we would rather take a more conservative approach.

\* \* \*

...Centerline's shares would appear significantly undervalued.

\* \* \*

malta437870-01c.wpd                              37

Although the first quarter CAD results clearly did not cover the dividend, *management once again reiterated its commitment to the $1.68 dividend payment*. Even with our revised downward CAD forecast for 2007, we also believe the payout ratio will be well below 100%.

\* \* \*

*Management provided a preliminary range of 70% to 75% of the dividend being federally tax-free for 2007.*

(Emphasis added.)

94.    Value Engine issued a BUY recommendation on Centerline on June 12, 2007, stating that the stock is "6.05% undervalued." Price Target Research reiterated its opinion that Centerline's "appeal is likely to be to investors heavily oriented toward income." On July 5, 2007, Value Engine repeated its BUY recommendation, stating that Centerline stock was "11.62% undervalued" and again on August 2, 2007, stating that the stock was "46.70% undervalued."

95.    The May 10, 2007 press release and Form 8-K, First Quarter 10-Q, and Defendants' statements during the May 10, 2007 conference call were materially false and misleading for the reasons set forth in paragraph 23 and because they gave no hint that Defendants were then in the process of selling the Company's tax –exempt bond portfolio to Freddie Mac and that this transformational transaction was expected to close before the end of 2007. Defendants' statements created the false impression that the Company would retain its bond portfolio (and continue paying substantial dividends with substantial tax-exempt status out of the income generated by this portfolio) for the foreseeable future.

C.    **The August 9, 2007 Statements**

1.    **August 9, 2007 Press Release and Form 8-K**

96.    On August 9, 2007, Centerline issued a press release announcing its financial results for the second quarter and six months ended June 30, 2007 and concurrently filed with the SEC a current report on Form 8-K, signed by defendant Levy, that included the full text of the press release. The August 9, 2007 press release highlighted *"[s]table credit performance within $2.8 billion*

*revenue bond portfolio*; At June 30, 2007, thirteen bonds with an outstanding balance of $70.1 million were delinquent, representing 2.5% of the entire portfolio." (Emphasis added.)

**2.    Second Quarter Form 10-Q Filed With the SEC on August 9, 2007**

97.    Also on August 9, 2007, Centerline filed with the SEC its quarterly report on Form 10-Q for the second quarter of 2007 (the "Second Quarter 10-Q"), which was signed by defendants Schnitzer and Levy. Defendants Schnitzer and Levy certified this filing pursuant to Sections 302 and 906 of SOX, stating that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of [Centerline]." The Second Quarter 10-Q reiterated the financial results reported in the Company's May 10, 2007 press release and Form 8-K.

98.    With respect to the Company's disclosure controls, the Second Quarter 10-Q, *inter alia*, stated:

> EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES
> Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

**3.    August 9, 2007 Conference Call**

99.    Also on August 9, 2007, Centerline held an analyst conference call during which Defendants reiterated the financial results reported in the August 9, 2007 press release and Form 8-K, as well as the Second Quarter 10-Q. In addition, Defendant Schnitzer commented on the subprime mortgage crisis and the overall financial condition of Centerline, *inter alia*, stating:

> In the past few weeks, the financial markets have been impacted by a re-pricing of risk and withdrawal of liquidity due to the serious credit problems in the single-family sub-prime mortgage industry. *I would like to assure you that Centerline does not have any single-family or sub-prime exposure whatsoever. We are a*

*commercial real estate finance and investment company and we provide financing only for commercial and multi-family properties.* As evidenced by our CAD growth this quarter, *our core businesses continue to perform well* and the credit quality of the investments we manage remains strong.

In spite of the instability in the financial markets, *operating fundamentals in the commercial real estate and affordable housing sectors are healthy. We have sufficient capital resources to execute our business plan and are not experiencing any liquidity problems.* In fact, during the past 30 days, we have priced a collateralized debt obligation offering for one of our CMBS funds and closed on the expansion of our revolving credit facility. Both transactions demonstrate our ability to execute in a volatile market environment.

The recent market dislocation has created numerous opportunities to make investments that offer attractive returns and strong credit quality. *In times of market instability, we would expect to see a flight to quality that benefits firms like Centerline,* that have a proven ability to assess and manage real estate risk.

Our business is sound. Despite that, we have seen our stock price decline in recent weeks as concerns about mortgage or real estate-related businesses spread to the stock market. Many of our investors inquired as to why we did not make any public statements during this period. We felt that it was important to wait until we released our earnings so we could support the confidence we have in our business with solid facts.

As we reported in this morning's press release, we had a very strong quarter, with CAD per share of $0.46, which is a 12.2% increase over CAD per share in the second quarter of 2006. As of June 30th, our direct assets under management were $17.1 billion, an increase of 7% over the first quarter.

*The market instability has had little or no impact on our Affordable Housing group, which includes our tax-exempt bond and tax credit equity fund businesses. Affordable Housing represents approximately 65% of our annual CAD revenues.*

\* \* \*

In regard to our direct tax-exempt bond business, we continue to experience strong competition for originations, mostly from large banks that acquire bonds to satisfy their Community Reinvestment Act requirements. As a result we have lowered our budget for new bond originations in 2007 to $300 million from the $400 million we originally projected.

*The credit quality of our bond portfolio remains very strong.* As of June 30th, delinquencies totaled just $70.1 million or approximately 2.5% of our $2.8 billion portfolio. After the impairments we recorded in the first quarter, we performed a thorough re-underwriting of 122 bonds in our portfolio that were not performing as well as we expected out of our total of 376 bonds. In the second quarter, we recorded only an additional $3 million in permanent impairments with respect to these bonds. Since our inception as a public company in 1997, our bond portfolio has incurred less than $30 million or approximately 1% in cumulative permanent impairments.

(Emphasis added.)

100.    During the August 9, 2007 conference call, defendant Levy also commented on the

Company's financial condition in light of the subprime crisis, *inter alia*, stating:

> [W]e have almost no mark to market risk and we are fully compliant with all
> covenants on all of our facilities.  In the past few months, we have closed on $270
> million in new debt facilities as we expanded our corporate revolver and our agency
> facility, proving our access to capital in a very difficult environment. ***And our most
> significant funding source – our bond securitizations, are financed in what has
> proven to be a safe haven market.***

> Finally, we are being very careful to maintain our liquidity in the face of the recent
> market turbulence.  As of June 30, 2007, Centerline had $169 million in liquidity,
> including $111 million in cash and $58 million in availability on our corporate
> revolver.  I hope this description gives you some comfort as to the health of our
> balance sheet and our funding sources.

(Emphasis added.)

101.    In response to a question from Matt West of George Weiss Associates, defendant

Schnitzer confirmed modest growth in the tax exempt bond and tax credit equity funds business:

> MATT WEST:…I guess today, the revenue portfolio fund is 65% of CAD, If you
> look forward a year, or five years, what percentage of the portfolio do you see that
> – or the CAD you see that being, versus coming from asset management and fund
> management activities?

>                              * * *

> MARC SCHNITZER:  ***"And that is both our tax-exempt bonds and our tax credit
> equity funds.***  So that really contains two elements.

> ***We feel that while that business is one that we would expect modest growth, on a
> year-over-year basis,*** wc would cxpcct a higher growth rate out of our Commercial
> Real Estate and Credit Risk Products businesses…

(Emphasis Added)

102.    In response to a question from Steve Spence of the Stone Harbor Group, defendant

Schnitzer confirmed that Defendants ***"currently have no intention of suggesting any modification***

***to our dividend."***  (Emphasis added).  Defendant Levy also stated that with respect to the stock

buyback program, it was a good time to buy Centerline stock.  "… at the current stock price level,

we think it is an accretive investment for the Company to be buying the stock."

103.    Evan Marwell of Criterion asked about the Company's ability to grow the tax-exempt

bond business and defendant Levy explained that there were numerous ways to do so:

EVAN MARWELL: Okay, great.

Second question is, traditionally, one of the things that's been a business challenge, I guess, for you guys is that you've continually needed more capital in order to grow the business, in particular the affordable bonds business. So with the stock price down, I'm sure at levels that you think is unreasonable, what are your plans for being able to continue to sort of get the capital that you need, in order to grow the business? And which of the businesses do you feel may be impacted by that?

ROB LEVY: Well, Evan, as you well know, *most of the capital that we raise is off balance sheet in the funds that we manage. And as you can tell from our recent disclosure, we have certainly a lot of confidence that we can raise the capital there.*

*On balance sheet, again, most of what we are raising is in on the bond side, as you noted. And the key to that is figuring out more and effective ways to lever the bond portfolio, which we have.* And as Centerline Financial, our AAA-rated subsidiary, gets its entity-level AAA, the percentage of equity that we're going to have to put towards our bonds should continue to decline.

We have other options for capital today that we haven't tapped, because they are slightly more expensive in our securitizations. But they're certainly available to us. Number one is, the CRA type preferred offerings that we have done in the past – certainly the banks are still interested in that type of product, and like our story and like our platform, and like the CRA credit that they get from those investments. And that certainly is definitely available to us, and is still a relatively inexpensive source of capital for us.

104.    In response to another question from Evan Marwell, defendant Schnitzer stated that

the tax-exempt bond business was a cyclical business, rather than a shrinking one:

EVAN MARWELL: Okay, great.

And then, I guess my last question is, do you feel that the affordable business has sort of entered a new phase, and that it really is going to continue to be a shrinking business, the bond business, just because of where the banks are, in terms of what they need for their sort of nonfinancial obligations?

MARC SCHNITZER: I think that it's an evolving business. I guess the part that I didn't talk about is the fact that *while our direct bond business has fallen short of our expectations, we're doing more tax-exempt business with credit enhancement from Freddie Mac, for example.* So it's a business that's fluctuating. And as we grow, and as we diversify, changes in that business will have less of an impact.

And part of the reason why that business is going slower this year is due to the competition from banks. And that's certainly in very strong markets, like on the West Coast. But there are plenty of other markets where we've had opportunities to buy bonds, where we've decided not to do so because of credit issues. And many of those markets, such as markets in Texas, markets in the Atlanta area – those markets are getting better.

So I think that in the next couple of years, we'll again see opportunities in the markets where we've traditionally been active. We'll reenter those markets carefully. *But it's really a cyclical business rather than a business that's destined to shrink.*

(Emphasis added.)

105.    Mark Phillips of Bondurant Partners asked whether Defendants had considered separating the Affordable Housing business from the Asset Management business. Defendant Schnitzer's response omitted the material fact that, at the time, Defendants were in the midst of a "transformational" transaction to sell the bond portfolio:

MARK PHILLIPS: Good morning.

Can you guys discuss the structure – and just a general question – could you just discuss the structure and complexity of your business, and its appropriateness for the public equity markets – and also the cost and benefits, as you see them, of potentially separating the Affordable Housing business from the Asset Management business, broadly defined?

MARC SCHNITZER: Well, we have been on a nonstop campaign to simplify the story of our business. And we had made a series of acquisitions to diversify our company beginning in 2001, leading up to the acquisition of ARCap last year. And on the heels of that, we put together a reorganization. We created this new brand, Centerline Capital Group. And we divided the Company up into these four different business groups. We're very comfortable with the way that we've organized the Company. We've received very positive feedback about the simpler nature of that story.

We really think that over time, the Company needs to evolve and be viewed much more as an investment manager, as opposed to a mortgage REIT or a bond fund. So we see today a company with $17 billion of assets under management, only $2.8 billion of which reside on our balance sheet and are done with our own capital.

So we see this evolution into the firm as more of an investment manager. And our hope is that over time, the public markets will see us more in the way and assign a valuation to us that looks more like the valuation of an investment manager than the valuation of a mortgage REIT.

106.    John Woolway of Vantage Investment Advisors asked about the re-underwriting process of the bond portfolio to determine whether improvements existed. Defendant Schnitzer's response omitted the material fact that Defendants were in the midst of unwrapping the credit enhancements on the bond portfolio and substituting collateral for the tax-exempt bonds. Contrary to defendant Schnitzer's statement that "it's a living, breathing bond portfolio," it was a portfolio in the midst of being sold:

JOHN WOOLWAY, ANALYST, VANTAGE INVESTMENT ADVISORS: Good morning.

Was wondering if you could just talk a little bit more about the re-underwriting process that you went through. You said you went through about 120 bonds, out of 300-some, that caused the $2.9 million impairment. And have you done further re-underwriting on the remaining? Or are those other bonds not triggering your review right now, at this time?

MARC SCHNITZER: The ones that we did not review as part of that re-underwriting were ones that we were not concerned about.

JOHN WOOLWAY: Okay.

MARC SCHNITZER: So we had selected the 122 bonds, which actually relate to only about 90 actual real estate properties. And beginning after the impairment that we had in the first quarter, we deployed our Asset Management team, and they all – working with a number of our other groups – pretty much work seven days a week to just re-underwrite each one of those assets, just to make sure we're 100% comfortable with the projections, and to determine whether or not there needed to be any impairments.

We were obviously not happy about the impairments we had in the first quarter. And we wanted to be sure that, were there any other impairments that were appropriate, that they would be done in the second quarter.

***Obviously, it's a living, breathing bond portfolio. And nobody knows what's going to happen in the future.*** But we feel very comfortable, as of today, where we stand in terms of the impairments we've taken.

(Emphasis added.)

107.     Carlos Votello of Marathon Asset management asked about the percentage of CAD

that comes from the bond portfolio. Defendant Levy responded:

ROB LEVY: Well, that shifts, obviously, over time, as interest rate shifts. ***It's today probably about 40 to 50% that come just from the bond portfolio.***

* * *

We also have the continued opportunity to raise capital, like we have done at the level at which we hold our bonds. The preferred that we have sold off of the entity that owns the bonds—the equity assured trust preferred that we have sold in the past. And there's significant opportunity to sell that preferred, if and when we are ready.

So even with our common stock at its current levels – and we agree, we're not, certainly, ready to raise common stock at these levels, or comfortable with that – there are other preferred equity type of opportunities available to us.

(Emphasis added.)

108.   With respect to the Company's financial results for the second quarter of 2007,

defendant Levy highlighted the Company's 9.8% increase in revenue as compared to the second

quarter of 2006, which he attributed, in part, to an increase in the size of the Company's tax-exempt

bond portfolio, stating:

> [F]or the three months ended June 30, 2007, Centerline reported cash available for
> distribution, or CAD, of $26.9 million, or $0.46 per diluted share, compared with
> $23.9 million, or $0.41 per diluted share in the corresponding three-month period of
> 2006.
>
> \*   \*   \*
>
> Total revenues for the three months ended June 30, 2007 were $94.6 million, versus
> $86.2 million in the corresponding period last year. ***This year-over-year 9.8%
> increase is primarily due to the impact of the ARCap acquisition and the increased
> size of our tax-exempt bond portfolio.***
>
> ***Over the past four quarters our bond portfolio has grown by $230 million, while
> the average yield on the portfolio has held steady, at 6.6%.*** Year-to-date, we have
> had almost no repayments of bonds and do not expect a significant number. Our
> bond portfolio remains very healthy from a credit perspective, as we have recognized
> only $2.9 million in additional impairments in the second quarter, equating to 0.1%
> of the total principle outstanding.

(Emphasis added.)

109.   Defendants' Statements in the August 9, 2007 press release and Form 8-K, Second

Quarter 2007 10-Q, and the August 9, 2007 conference call were materially false and misleading for

the reasons set forth in paragraph 23 and because these statements and others gave no hint that

Defendants were in the process of selling the Company's tax-exempt bond portfolio to Freddie Mac,

that this transformational transaction was expected to close before the end of 2007, and that

Centerline was in critical need of capital to accomplish its plans. Defendants' statements created the

false impression that the Company was increasing the size of its bond portfolio through continued

investment, would retain its bond portfolio (and would continue paying substantial dividends with

substantial tax-exempt status out of the income generated by this portfolio) for the foreseeable future.

110.   In stark contrast to what the public was being told, CW 1 had started working on

activities supporting the sale of the tax-exempt bond portfolio in June 2007. CW 1 also explained

that Centerline imposed a blackout window which prohibited sales by insiders at virtually all times

during the year except for 10 days after a quarterly earnings announcement, unless an undisclosed material transaction would prevent the blackout window from opening at that time. Normally, there would have been a 10 day window after the August 9, 2007 second quarter earnings release during which company employees would be permitted to sell Centerline stock. However, the blackout window was not opened after the August 9, 2007 earnings announcement and CW 1 could not sell Centerline stock, thus establishing Defendants' knowledge that a material transaction – the sale of tax-exempt bond portfolio – was underway which would preclude insiders from selling Centerline stock. This blackout continued through the end of the Class Period.

**D.    The November 8 and 9, 2007 Statements**

**1.    November 8, 2007 Press Release and Form 8-K**

111.    On November 8, 2007, Centerline issued a press release announcing its financial results for the quarter and nine months ended September 30, 2007, and concurrently filed with the SEC a current report on Form 8-K, signed by defendant Levy, that included as an exhibit the full text of the press release. The November 8, 2007 press release reported the fair value of the Company's tax-exempt bond portfolio as $2.578 billion, as compared to $2.397 billion as of December 31, 2006. The November 8, 2007 press release also highlighted a 2.4% increase in quarterly revenue and stable performance of the Company's bond portfolio, *inter alia*, as follows:

- Revenues, adjusted to exclude Consolidated Partnerships of $104.8 million, an increase of 2.4% over the third quarter of 2006;

- Centerline's Affordable Housing Group ("Affordable Housing") raised $132.9 million of gross equity for various low income housing tax credit ("LIHTC") investment funds;

\*    \*    \*

- Stable credit performance within $2.9 billion revenue bond portfolio; At September 30, 2007, 15 bonds with an outstanding balance of $88.9 million were delinquent, representing 3.1% of the entire portfolio…

112.    Commenting on these results, Defendant Schnitzer stated, without disclosing Centerline's liquidity crisis and need for capital:

Despite the ongoing credit crisis, Centerline had another solid quarter of operations

… In very difficult market conditions, we closed a $585 million high-yield CMBS fund and priced and closed a $986 million CDO for one of our CMBS investment funds. We believe these accomplishments are evidence of the strength of the Centerline brand and are a strong endorsement of our ability to assess and manage real estate risk.

### 2.    November 8, 2007 Conference Call

113.    On November 8, 2007, Centerline held a conference call for investors and securities analysts to discuss the Company's financial results for the third quarter of 2007.  Defendants Schnitzer and Levy participated in the call on behalf of Centerline.  During this conference call, Nicole Jacoby, an analyst from Liberation Investments, asked defendant Schnitzer whether Centerline had considered selling its tax-exempt bond portfolio in order to transform the Company into a pure asset management firm.  As shown below, defendant Schnitzer admitted that Centerline had considered this possibility, but he deliberately concealed the fact that such a deal was in the works and was expected to close before the end of 2007 (*i.e.*, in less than two months).  Specifically, defendant Schnitzer, *inter alia*, stated:

**Nicole Jacoby - Liberation Investments - Analyst**

I just wanted to ask you guys, particularly in the current market environment you've been putting us [sic] out some really solid performance. However, ***it's obvious in your stock price that you're not being rewarded for that in the marketplace***. You addressed before a little bit about your -- you're thinking about stock buybacks. But more generally, ***can you walk us through your thinking about how you can help close that value gap or initiatives you might take to close that gap between where your stock price is and the true value of the Company?***

**Marc Schnitzer - Centerline Holding Company - President and CEO**

Well yes, ***we believe and we have believed for some time that the way to really increase the value of the Company is to continue to evolve the Company into a fund manager.*** And, many of you will recall that back in 1997, when we were called CharterMac and the company first went public, it had one line of business and that was really to be a tax-exempt bond fund that lent money long and borrowed short.

***Ever since that time, our growth has really focused on evolving into externally managed funds*** whether it's our tax credit funds, our CMBS funds, our high yield debt funds, our joint venture equity funds, the CLO business. All of these significant growth initiatives and others that we're thinking about, such as this debt opportunity fund are steering us toward an evolution into much more of a pure fund manager which is where we really see the growth for the Company and ***we believe that the marketplace rewards companies like that with a higher valuation*** on their income stream to a much greater extent than our Company realizes today.

*So, we've been going through this evolution. We will continue to go through this evolution and our goal will be to make the Company into much more of a pure fund manager* and then go out and tell the world about it in the most effective way that we can. And our thesis would be that our multiple should go up and that's what our advisors have suggested. So, that's more of a global approach. I don't know if that is as specific an answer as you wanted.

**Nicole Jacoby - Liberation Investments - Analyst**

Well, I understand. I think we've had some of these discussions before about turning into a fund manager. There are two further issues. One is, you are obviously executing along that track. But the market still doesn't seem to either recognize it or be rewarding it. And, sort of related to that, *have you ever considered putting -- taking the bonds off your balance sheet or letting them roll off into some other sort of vehicle?*

**Marc Schnitzer - Centerline Holding Company - President and CEO**

*Well, clearly a strategy like that plays into the overall evolution of the Company. So, clearly it's something that we've thought of from time to time.* We're not yet in a position where we can make the case in a very compelling way that we are a pure fund manager when we have $2.9 billion of bonds on our balance sheet which is reminiscent of the bond fund that we were. So, I think that complicates the story and our goals are really to try to simplify the story as much as we can.

**Nicole Jacoby - Liberation Investments - Analyst**

And is there anything -- *so you generally thought about the bond issue but I guess you're not commenting right now on the specifics of it?*

**Marc Schnitzer - Centerline Holding Company - President and CEO**

We've thought about that and many other options. But, clearly that's one that would come to mind right away.

(Emphasis added.)  Also, during the November 8, 2007 conference call, Defendant Schnitzer

reiterated the Company's purported commitment to continue its historic dividend policy, stating:

*"...we're confident that we will earn CAD in excess of our dividend and would therefore not*

*recommend a change in dividend policy to our Board."*  At the time of Defendant Schnitzer's

statements on November 9, 2007, CW 1 had been working on the transaction since June 2007 and

CW 2 had been working on it since the fall of 2007.

### 3.    Third Quarter Form 10-Q Filed With the SEC on November 9, 2007

114.    On November 9, 2007, Centerline filed with the SEC its quarterly report on Form 10-

Q for the third quarter of 2007 (the "Third Quarter 10-Q"), which was signed by Defendants

Schnitzer and Levy. Defendants Schnitzer and Levy certified this filing pursuant to Sections 302 and 906 of SOX, stating that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of Centerline." The Third Quarter 10-Q reiterated the financial results reported in the Company's November 9, 2007 press release and Form 8-K, including that the fair value of the Company's tax-exempt bond portfolio was then $2.578 billion as compared to $2.39 billion at the end of 2006. In addition, the Third Quarter 10-Q reported $70.2 million in revenue from the Affordable Housing segment, representing approximately 44.3% of the Company's total revenue for the third quarter of 2007.

115. The Third Quarter 10-Q represented that the Company's tax-exempt bond portfolio was continuing to produce positive yields and that revenue from this portfolio had increased during 2007, *inter alia*, as follows, without disclosing that the sale of the portfolio had been in the works for almost one year:

**Mortgage Revenue Bond Investing**

The increase in mortgage revenue bond interest income is primarily due to the higher portfolio balance due to acquisition activity in the past year offset by a lower weighted average yield when analyzed against the comparable period.

While generally declining yields of bonds acquired has gradually lowered the average yield of our portfolio, we continue to earn a positive spread on our portfolio. With an increase in the average portfolio balance, our level of securitizations also increased which resulted in higher interest expense and securitization fees. By entering into a fixed rate securitization in 2006 and using interest rate swaps to fix the rate on a large portion of our remaining securitizations, we believe that we have significantly mitigated the impact on spreads of fluctuating SIFMA rates.

116. With respect to the Centerline's business model, and in particular, its Affordable Housing segment (the segment responsible for managing the Company's tax-exempt bond portfolio) the Third Quarter 10-Q, *inter alia*, stated, without disclosing that the sale of the tax-exempt bond portfolio had been in the works for almost one year:

Affordable Housing brings together the users and providers of debt and equity capital to the affordable multifamily rental housing industry, and includes:

•    Mortgage Revenue Bond Investing - through the parent and our subsidiaries, we invest primarily in tax-exempt first mortgage revenue bonds issued by various state or local governments, agencies or authorities. The proceeds of

these mortgage revenue bonds are used to finance the new construction, substantial rehabilitation, acquisition, or refinancing of affordable multifamily housing properties located throughout the United States; ...

117.    With respect to the Company's disclosure controls, the Third Quarter 10-Q, *inter alia*, stated:

> EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES. Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) or Rule 15a-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this quarterly report. Based on such evaluation, such officers have concluded that our disclosure controls and procedures as of the end of the period covered by this quarterly report were effective to ensure that information required to be disclosed by the Company in the reports that the Company files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC rules and forms, and to ensure that such information is accumulated and communicated to the Company's management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

118.    The Defendants' statements in paragraphs 72-77, 79, 82-85, 88, 91, 92, 96, 99, 100-108, 112, 113, 115 and 116 were each materially false and misleading for the reasons set forth in paragraph 23 and because:

a.    Defendants knew but failed to disclose that the Company had a deal with Freddie Mac to sell its tax-exempt bond portfolio (which had historically generated a major part of the Company's revenue), before the end of 2007;

b.    Defendants' statements created the reasonable expectation in the investing public that the Company would continue to hold its tax-exempt bond portfolio for the foreseeable future rather than selling it before the end of 2007;

c.    Without the Company's tax-exempt bond portfolio, the Company would no longer be capable of paying the substantial dividends (with yields as high as 7.8% and tax-exempt status of approximately 74%) that Centerline investors expected and which provided investors with a regular and dependable stream of tax-exempt income that served as the basis for investors' decisions to purchase Centerline shares;

d.    The planned sale of the Company's tax-exempt bond portfolio to Freddie Mac would be a transformational transaction that would completely change Centerline's business model from a company whose major revenue source was its tax-exempt bond portfolio to a pure alternative asset management company;

e.    The transformation of the Company's business model to a pure asset management company would change the risk profile of investing in the Centerline securities and make Centerline a significantly riskier investment;

f.    Centerline was in critical need of capital to fund its growth plans; and

g.    The Company was in the process of engineering a related party transaction with TRCLP that would divert a significant portion of the Company's future income to insiders, including defendants Ross and Blau who own and control TRCLP, by providing them approximately 12.2 million new convertible preferred shares at $10.75 per share that will pay an 11 percent annual dividend and, through the convertible feature of the shares, effectively provide defendants Ross and Blau a call option on 20 percent of the Company, in exchange for TRCLP's $131 million "investment" in Centerline.

## VII.    THE TRUTH SUDDENLY EMERGES

### A.    The December 28, 2007 Press Release and Conference Call

119.    On December 28, 2007, Centerline issued a press release and concurrently filed with the SEC a current report on Form 8-K, signed by defendant Levy, that included as an exhibit the full text of the press release, revealing that the Company had sold its $2.77 billion tax-exempt and $30 million taxable affordable housing bond portfolio to Freddie Mac pursuant to Freddie Mac's Tax-Exempt Bond Securitization program, also known as the "TEBS" program. The December 28, 2007 press release, *inter alia*, stated:

> Centerline Holding Company (NYSE: CHC), the parent company of Centerline Capital Group Inc. ("Centerline" or the "Company"), *today announced the completion of a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac. For accounting purposes, most of the securitization will be treated as a sale. The transaction represents a major step in Centerline's plan to transform itself into an alternative asset management*

*company.    Centerline also announced a $131 million equity investment commitment from an affiliate of Related Companies, its largest shareholder.*

"Over the past several years, the strategic vision embraced by Centerline's Board of Trustees and management has been to transform Centerline into an alternative asset management company," said Marc D. Schnitzer, Chief Executive Officer and President of Centerline. "***With the securitization of our bond portfolio with Freddie Mac, we have accelerated our progress toward that goal.*** The transaction has materially improved our risk profile by reducing the funding and interest rate risk inherent in our liability structure. Centerline now has a leaner balance sheet, improved credit metrics and an increased percentage of revenues derived from asset management services. *As an alternative asset manager with $11.6 billion of assets under management, we aim to produce returns and growth comparable to other publicly-traded alternative asset managers.*"

"Centerline's goals are to increase assets under management and to create greater earnings power. With Related's investment, we have the resources to achieve our goals," continued Mr. Schnitzer. "Greater liquidity will enable us to capitalize on opportunities arising from the volatility in the capital markets. Our growth plans adhere to our core investment strategy of Buy-Watch-Fix: invest prudently, monitor performance diligently and manage investments aggressively."

Stephen M. Ross, Chairman of Related Companies and Centerline, added, "***Centerline has undergone an amazing evolution from the affordable housing firm I started 35 years ago to an industry leader in real estate investment and finance.*** Centerline has a premier, seasoned management team and a compelling growth story as an alternative asset manager. This equity investment in Centerline will help the Company implement its new initiatives and build the foundation for future expansion. I strongly endorse Centerline's growth strategy and the ability of the management team to execute it."

**Freddie Mac Transaction**

***Centerline completed a securitization of the Company's $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac.*** The bond portfolio is secured by mortgages on approximately 59,000 units of affordable multifamily properties in 31 states. *For accounting purposes, most of the securitization will be treated as a sale.* Centerline retained a high-yielding first-loss position (the "B-Piece") in the portfolio and will remain the primary and special servicer.

"We are thrilled to partner with Freddie Mac on this innovative transaction," said Mr. Schnitzer. "Retaining the B-Piece and our ongoing servicing arrangement creates a fund management structure for the bond portfolio similar to our other funds. Through our partnership with Freddie Mac, as their first Targeted Affordable Housing Lender, we will improve the competitiveness of our affordable housing business and assist in the expansion of assets under management."

Centerline used the proceeds from the Freddie Mac bond securitization to redeem its existing financing arrangements, retire corporate debt and pay the costs and expenses associated with the transaction.

In connection with the transaction, Centerline expects to record net, one-time charges of $45 million to $55 million in the fourth quarter of 2007. Net of minority interest allocations, the Company expects these charges to reduce net income by $30 million to $40 million. Gains incorporated in the net charge include a gain on the sale of the bonds, previously deferred revenues and recovery of impairment charges. Losses incorporated in the net charge include writing off deferred costs associated with the bonds and securitization trusts, recognizing fair value losses on certain interest rate swaps, costs to terminate existing financing arrangements and transaction related costs. These transaction-related costs of approximately $95 million will impact the Company's 2007 Cash Available for Distribution ("CAD"). Centerline has reduced the Company's previous CAD per share guidance for 2007 from $1.89 to a range of $1.70 to $1.75, exclusive of the transaction related costs associated with the securitization.

(Emphasis added.)

120. In the "Centerline Capital Group - Investor Presentation" dated December 28, 2007, Defendants characterized the sale of the tax-exempt bond portfolio as a *"[t]ransformational transaction* that positions Centerline as alternative asset manager." They also stated that one of the strategic benefits of the transaction was to *"[a]ttract [an] investor base with growth versus income focus."* (Emphasis added.)

121. In addition, the December 28, 2007 press release revealed that the Company had entered into a sweetheart deal with Related, a company controlled by TRCLP, which is owned and controlled by defendants Ross and Blau, in which TRCLP agreed to make a $131 million equity investment in Centerline in exchange for 12.2 million shares of newly-issued convertible preferred stock that will pay these insiders an 11% dividend, as follows:

**$131 Million Investment from An Affiliate of Related Companies**
An affiliate of Related Companies has committed to invest $131,250,000 in Centerline Holding Company through a newly-issued convertible preferred stock. *The preferred stock will pay dividends at an 11% annual distribution rate and will be convertible at a $10.75 per share conversion rate for an aggregate of approximately 12.2 million common shares of Centerline Holding Company.* The transaction, which is subject to completion of definitive documentation, is expected to close in January 2008. Centerline will use the net proceeds to reduce corporate debt and fund the Company's growth plans.

(Emphasis added.)

122.    Finally, the December 28, 2007 press release revealed that the Company would be slashing its dividend from $1.68 per share to $0.60 per share, and the amount of tax-exempt income would plummet from approximately 74% to 30% to 35% as follows:

> Change Dividend Policy: Effective in the first quarter of 2008, *Centerline's dividend on an annualized basis is expected to be $0.60 per share ($0.15 on a quarterly basis)*, subject to approval by our Board of Trustees. The Company will deploy its retained cash flows to fund growth and reduce debt. *Centerline anticipates 30% to 35% of the Company's income will be federally tax-exempt in 2008.*

(Emphasis added.)

123.    During an analyst conference call on December 28, 2007 – immediately after the stunning announcement that the Company had sold its tax-exempt bond portfolio to Freddie Mac and had abruptly changed its business model from a company whose major revenue source was its tax-exempt bond portfolio to an alternative asset manager – Defendant Schnitzer, in his prepared remarks at the beginning of the call, revealed that the Company had been engineering this institutional metamorphosis for nearly a year, stating: "This morning, *we announced the closing of a transformational transaction that has been in the works for close to a year* and a significant strategic investment in our firm by our largest shareholder." (Emphasis added.)

124.    Defendant Schnitzer also revealed additional information about the Freddie Mac transaction, including the fact that Centerline was retaining a $140 million "first loss" piece of the portfolio, *i.e.*, Centerline would remain on the hook for the first $140 million in defaults and principal losses on the entire tax-exempt bond portfolio. Specifically, Schnitzer, *inter alia*, stated:

> The Freddie Mac transaction is a fixed-rate securitization of our bond portfolio, slightly over $2.8 billion. That securitization has an all-in cost of approximately 5.39%. The portfolio's current coupon is somewhere between 6.5% and 6.6%. The transaction will give us sale treatment for accounting purposes with respect to the majority of the portfolio and *Centerline will retain a $140 million high-yielding B-Piece, top loss piece*, and we will remain the primary and special servicer for the portfolio.

*  *  *

**Tony Howard - J.J.B. Hilliard, W.L. Lyons, Inc. - Analyst**

When you say first loss, does that mean you take the hit before Freddie Mac takes the hit on the entire portfolio, or just the 140 million part?

**Marc Schnitzer - Centerline Holding Company - President and CEO**

The $140 million, Tony, is a top loss for the entire portfolio. *So the first $140 million of losses in the portfolio comes out of that $140 million.*

(Emphasis added.)

125.     Defendant Schnitzer also stated that, contrary to his Class Period representations that there was no liquidity problem, the capital raised from the sale of the 11% Cumulative Preferred to TRCLP was needed immediately:

MARC SCHNITZER: ... The way the transaction was structured as a convertible preferred was to provide us with the ability to access the capital as soon as possible which we need to begin to grow our business next years. *This capital is needed immediately. So we didn't have the luxury to continue to test a very unstable market and we needed the capital .... The capital is critical to our growth plans.*

(Emphasis added.) Defendant Schnitzer elaborated on the liquidity problem in the February 28, 2008 conference call:

Funding costs have significant increased and *there is little if any liquidity.* Had we not completed the transaction with Freddie Mac, we would be facing a very difficult expensive environment to fund our bond portfolio with very little if any spread income.

(Emphasis added.)

126.     Analysts and private investors were appalled by Centerline's announcement and, during the December 28, 2007 analyst conference call, vented their anger and frustration at Defendants' concealment of their move to radically change the Company's business model by selling its tax-exempt mortgage revenue bond portfolio and slashing its dividend.  For instance, analyst Tony Howard of J.J.B. Hilliard, W.L. Lyons, Inc., observed that this transaction changed the entire basis for investing in Centerline and characterized this transaction as "punishing" Centerline's shareholders, stating:

Final question, Marc. Was it considered as far this transformation as far as why not take the Company the private, since basically our shareholders and a lot of *shareholders have owned your stock over the years for the dividend and for the tax-free status.* So in some way, *you're basically not only transforming the Company, but you are changing the shareholder base. So you are basically punishing the income ... shareholders* for a more growth-oriented shareholders that may want to buy your stock in the future.

malts437870-01c.wpd                                    55

(Emphasis added.)

127.    In addition, investors expressed their disgust with the related party transaction with TRCLP that defendants Ross and Blau were using to enrich themselves at the expense of the Company's outside investors, as follows:

**Matt West Private Investor**

This capital raise makes no sense to me. *If Related wants to participate in and fund the growth of the Company, they should be taking the same equity risk as the rest of common shareholders. They're getting an 11% coupon and a call option on 20% of the Company with no equity risk. It speaks of an affiliated entity getting a sweetheart deal.* You said there were other parties to talk to. If you want to raise capital and you want to fund growth, you owe it to your investors to get on the road and do a marketed deal. How is this an acceptable way to raise capital?

\*  \*  \*

**Patrick Collins Private Investor**

I have to agree with the prior two callers. *I'm actually disgusted by this transaction. How could insiders reach such a favorable deal for themselves?* If you really feel like they are being -- attempting to support all shareholders, then we should open this up to a rights issue and they backstop it with a preferred, right? So open up the -- for capital raise as a rights issue, and then whatever is not taken up, then they can put in the preferreds. *But this is too favorable of a deal. And I will also agree that you're completely alienating your shareholders here. Your shareholders are looking for dividend yields,* and now you're saying, will if that didn't, we're going to change it. *You're running this like it's a private company.* I would be disgusted if I were you at what you've done – I'm just disgusted. I would be ashamed at what I did.

**Marc Schnitzer - Centerline Holding Company - President and CEO**

There are really two issues there again. As we said before, the critical issues on the preferred were testing it in the marketplace, which it was; the timing of the investment and the market conditions. And based on the terms that were available from third parties in the marketplace, *the need for the timing of the capital and an extremely unstable market,* we feel that this is an attractive transaction.

**Patrick Collins Private Investor**

*Well, your shareholders are clearly not agreeing with you.* Your equities hit a brand-new load [sic] today on meaningful volume on even a slow day. So you're wrong. So I really kind of question your thinking on this, and *I am just disgusted by it.* What shareholder consent is going to be required to get this through?

\*  \*  \*

**Parker Phillips Private Investor**

I would just like to -- *I would echo the disgust and frustration of previous shareholders who have spoken on this call.* I think this is a -- *I think this transaction is contemptuous of your existing shareholders.* But in any event, I would like to ask about the timing of this announcement where it's a Friday morning, two days before the end of the year. Why announce this transaction today? Why not wait until the first part of next year, and why not wait at least until a day when people are in the office by and large, particularly your shareholders, who are probably on vacation, most of them? *It just seems strange that you would choose today to announce this transaction.* Could you address that?

* * *

**Matt West Private Investor**

Just a closing remark related to the investor by Related. It says that the transaction is expected to close in January 2008. If it hasn't closed, I would suggest not closing it, especially not on the terms that you have put forth. *When investors are using words like disgusted, egregious and disingenuous on a call, I think it's evident that this is a bad transaction.* The right thing to do might be to do, if you really need capital now, which is arguable, you could do a rights offering and let Related backstop it. And finally, if you are this out of step with institutional shareholders, maybe the right thing to do is just put this company up for sale.

(Emphasis added.)

128.    On this news, Tony Howard of Hilliard Lyons downgraded Centerline from Neutral to Under-perform and dropped coverage of Centerline:

> *On Friday, December 28, we downgraded Centerline Holding Company from Neutral to Underperform.*
>
> *We are dropping coverage of Centerline Holding Company.*
>
> **Dropping Coverage and valuation Issues to Consider**
> *We are dropping coverage of Centerline Holding Company.* The change in CHC's business strategy, the significant dividend cut, and the potential conflict in offering an expensive convertible preferred to The Related Companies makes **Centerline no longer suitable for our income-oriented investors, in our opinion.**

(Emphasis added.)

129.    Defendants' disclosure that Centerline had sold its tax-exempt bond portfolio to Freddie Mac and had changed its business model without warning from a company whose major source of revenue was its tax-exempt bond portfolio that paid dividends with yields as high as 7.4%, to a riskier alternative asset management company that would be unsuitable for investors seeking income from dividends, as well as the revelations regarding the sweetheart deal with an entity owned

and controlled by insiders Ross and Blau – TRCLP – revealed to the market the falsity of the Company's Class Period statements (and material omissions) and caused real economic harm to Lead Plaintiff and the class. Indeed, these revelations caused the price of Centerline stock to plummet from $10.27 per share on December 27, 2007, to close at $7.70 per share on Friday, December 28, 2007, representing a 25% single-day decline, on unusually heavy trading volume of 4,152,688 shares. The PSLRA 90-day look-back price is $4.16 per share, a 59.5% decline from the $10.27 closing price on December 27, 2007. The stock has continued to fall, closing at $1.70 on July 3, 2008.

130.    As a result of continuing liquidity problems, Centerline's $0.15 quarterly dividend was cut again, as announced on June 17, 2008, to $0.075 per share for the second quarter of 2008. Defendants cited "our strategy to preserve capital."

B.    **The Rights Offering**

1.    **Background Regarding TRCLP's and Defendant Ross' and Blau's Dominance and Control Over Centerline**

131.    According to the Company's Definitive Proxy Statement filed with the SEC on Form DEF 14A, on April 23, 2007, TRCLP is "the Company's only shareholder owning more than 5% of our outstanding voting shares." TRCLP, through its ownership of Related General II, L.P., owns 685 common shares and 10,194,400 Special Common Units of Centerline's subsidiary, Centerline Capital Company, LLC (formerly known as CharterMac Capital Company LLC), which are convertible into common shares of the Company on a one-for-one basis, subject to certain restrictions, and the associated 10,194,400 Special Preferred Voting Shares. Related General II, L.P. is owned by TRCLP.

132.    TRCLP profits from its close relationship with Centerline through various services contracts and management agreements, including the following:

a.    Related Management Company, which is wholly owned by TRCLP, received $4.3 million in fees in 2006 "for performing property management services for various properties held in investment funds" managed by Centerline (*see* 2007 Proxy Statement);

malta437870-01c.wpd                          58

b.    $620,000 paid to TRCLP in 2006 for services that included "office management, payroll, human resources and other office services." *See* 2007 Proxy Statement.

133.    Defendant Ross' dominance and control over the Company is further demonstrated by options he was granted at below market price as consideration for a related party transaction with Centerline in 2003, and the Company's subsequent agreement to cancel Ross' remaining unexercised options and replace them with substitute options to allow Ross to avoid adverse tax consequences under Section 409A ("Section 409A") of the Internal Revenue Code of 1986. Specifically, on July 18, 2007, the Company filed with the SEC a current report on Form 8-K disclosing that the Company had entered into an agreement with Ross to cancel unexercised options to purchase 800,000 shares of Centerline common stock at $17.78 per share, which were granted to Ross on November 17, 2003. The Form 8-K revealed that these options were granted to Ross at a price below the market price of Centerline stock on the date of grant, in connection with the Company's acquisition of Related Capital Company (now known as Centerline Affordable Advisors LLC). To avoid the consequences under Section 409A for unexercised options that are granted with an exercise price less than the fair market value of the underlying common shares on the date of the grant, the Company agreed to provide defendant Ross with substitute options at the same price and same expiration date (November 17, 2013), to replace the 800,000 remaining unexercised options from the Related Capital Company acquisition.

### 2.    Defendants Ross and Blau Materially Increased Their Control of Centerline Through TRCLP's Sweetheart Deal With Centerline

134.    On January 25, 2008, Centerline closed on the $131 million investment from Related, selling 11,216,628 Convertible Preferred shares at $11.70 per share for aggregate proceeds of $131,234,548 in a private offering. The Convertible Preferred shares have a liquidation preference of $11.70 per share, are convertible into common shares at an initial conversion price of $10.75 per share and pay cash distributions at a rate of 11% per year, subject to declaration by Centerline's Board of Trustees.

135.    Following heated expressions of anger and disgust by Centerline's shareholders on

malta437870-01c.wpd

59

December 28, 2007, over the sale of the tax-exempt bond portfolio and the "sweetheart" deal with TRCLP and Related, Defendants decided to issue a rights offering to make the 11% Cumulative Preferred available to Centerline's shareholders on the same terms made available to Related ("Rights Offering"). Accordingly, by Prospectus Supplement dated March 7, 2008, Centerline initiated a Rights Offering to each record owner of Centerline stock on February 4, 2008, which granted each such record owner a non-transferable subscription right for each common share or common share equivalent owned on February 4, 2008. Each such record owner was entitled to purchase one 11.0% Cumulative Convertible Preferred share, Series A-1, for $11.70 in cash for every six rights which were granted. The proceeds of the Rights Offering would be used to redeem for $11.70 per share a number of Convertible Preferred shares originally purchased by Related in the private offering equal to the number of Convertible Preferred shares subscribed for in the Rights Offering, with Related retaining any Convertible Preferred shares that were not purchased in the Rights Offering.

136. Thus, the Rights Offering purported to give shareholders the same opportunity as Related had to invest in the Convertible Preferred shares. Related did not participate in the Rights Offering and agreed to "backstop" the offering by retaining any Convertible Preferred shares that it had already purchased in the private offering that were not purchased in the Rights Offering.

137. Prior to the private offering, TRCLP, defendants Ross and Blau and Related (the "Related Group") owned 12,011,974 common shares and common share equivalents and controlled approximately 17.8% of Centerline's voting power. On February 4, 2008, the record date for the Rights Offering, the Related Group owned 24,220,152 common shares and common share equivalents and controlled approximately 30.4% of Centerline's voting power.

### 3. The Terms of the Conversion Price of the 11% Cumulative Preferred Shares Discouraged Other Potential Investors

138. According to the Prospectus Supplement for the Rights Offering, two investment bank affiliates had negotiated with Centerline to invest in the 11% Cumulative Preferred Stock. The investment bank affiliates insisted upon a conversion price that would float without a floor for a

specified period after the announcement of the bond portfolio securitization and related transactions or that would float with a floor well below the prevailing market price of Centerline's common shares, apparently based upon a recognition that the price of Centerline common stock would plummet upon the announcement of the sale of the tax-exempt bond portfolio and the drastic reduction of the dividend. However, Centerline's Board of Trustees terminated negotiations with the investment bank affiliates and instead focused on negotiations with Related, which resulted in a fixed $10.75 conversion price, despite the fact that a material decline in Centerline's price upon the announcement of the sale of the tax-exempt bond portfolio and the drastic dividend cut were known and foreseeable to Defendants.

139.    Indeed, on the last trading date prior to the February 4, 2008 record date for the Rights Offering, the price of Centerline common stock closed at $6.34 per share. On March 7, 2008, the date of the Prospectus Supplement, Centerline common stock closed at $4.43 per share. By April 15, 2008, after the completion of the Rights Offering, Centerline common stock closed at $3.60 per share.

140.    Therefore, the $10.75 conversion price rendered the 11% Cumulative Preferred an uneconomic investment for Centerline's public shareholders and very few of them participated in the Rights Offering. Only 400,000 out of more than 10.8 million 11% Cumulative Preferred shares were purchased by Centerline's public shareholders for $4.4 million, and Centerline redeemed the same number of shares from Related. As a result of the unattractive terms of the Rights Offering and the virtual non-participation of Centerline's shareholders, as of April 11, 2008, defendant Ross had voting control over 10,843,492 11% Cumulative Preferred Shares, Series A-1, and, in addition to the 13,280,387 common shares which he beneficially owned, had a voting ownership percentage of 29.1% of Centerline.[2] Further, as long as an affiliate of TRCLP retains at least 50% of the 11% Cumulative Preferred shares, the Board of Trustees has agreed to nominate one Board representative

---

[2] Defendant Blau, defendant Ross' partner in TRCLP, held an additional 13% of Centerline's common stock.

designated by the affiliate for election as an "independent trustee" to the Board.

## VIII.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS PROXIMATELY CAUSED ECONOMIC LOSS TO CENTERLINE'S INVESTORS

141.    On March 12, 2007, the first day of the Class Period, Centerline announced its financial results for the fourth quarter and full year 2006, including revenues derived from its $2.397 billion tax-exempt bond portfolio and the year-over-year growth in revenues from and assets held in the tax-exempt bond portfolio.  Following this news, the price of Centerline shares closed relatively flat at $19.75 per share.

142.    During the Class Period, Defendants maintained the artificial inflation in Centerline's stock prices by continuing to make false and misleading statements regarding the Company's business model and ongoing business strategy, including statements concerning its tax-exempt bond portfolio, which generated a large proportion of the Company's total revenues and enabled Centerline to pay annual dividends of as much as $1.68 per share (providing dividend yields as high as 7.8%, of which approximately 74% was tax-exempt).  The income from these dividends and relatively low risk profile served as the basis for risk-averse income oriented investors to purchase Centerline shares.  The Defendants' misstatements and omissions, as alleged herein, created the false impression that Centerline would retain its tax-exempt bond portfolio (which had been a core holding since the Company's founding) and continue paying out large annual largely tax-exempt dividends for the foreseeable future.  But for Defendants' material misstatements and omissions, as alleged herein, Centerline's stock would not have traded at the elevated levels it did during the Class Period.

143.    The artificial inflation in Centerline's stock price began to be eliminated when, on the last day of the Class Period (December 28, 2007), the market learned that, contrary to Defendants' statements during the Class Period: (i) the Company had sold its $2.8 billion tax-exempt bond portfolio to Freddie Mac, thereby transforming the Company overnight into a pure asset management firm; (ii) the Company was slashing its annual dividend from $1.68 per share to $0.60 per share and drastically reducing the tax-exempt component from approximately 74% to

malis437870-01c.wpd                                        62

approximately 30%; and (iii) the Company had cut a sweetheart deal with a related entity – an affiliate of TRCLP – owned and controlled by defendants Ross and Blau, in which Related agreed to provide $131 million in financing to Centerline in exchange for 12.2 million shares of newly-issued convertible preferred stock that will pay these insiders an 11% dividend, thereby diverting a material portion of the Company's income to insiders at the expense and to the great detriment of Centerline shareholders.

144.    As a direct and proximate result of the December 28, 2007 disclosures, Centerline's stock price fell from $10.27 per share on December 27, 2007, to close at $7.70 per share on Friday, December 28, 2007, representing a 25% single-day decline, on unusually heavy trading volume of 4,152,688 shares. By comparison, the stock market, as reflected in by Dow Jones Industrial Average, went up on December 28, 2007, closing at 13,365.87 on modest holiday volume of 2,420,510,000 shares traded, as compared to its close on the previous trading day of 13,359.61.

145.    The foregoing allegations describe Lead Plaintiff's theory of damages, demonstrate that Lead Plaintiff's damages were caused by the scheme to defraud as alleged herein, and negate any inference that Lead Plaintiff's losses were the result of general market conditions or other factors wholly unrelated to the false and misleading information complained of herein. Upon further investigation and expert analysis, Lead Plaintiff may assert that there were additional inflationary or corrective events that caused or contributed to the damages Lead Plaintiff incurred.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

146.    As alleged herein, Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Centerline, their control over, and/or receipt and/or

modification of Centerline's materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Centerline, participated in the fraudulent scheme alleged herein.

147.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

### 1.    Facts Which Give Rise to a Strong Inference of Scienter

148.    In particular, Defendants' scienter is demonstrated by, among other things:

a.    Defendant Schnitzer admitted on December 28, 2007 that the Company had a deal to sell its tax-exempt bond portfolio to Freddie Mac and had been working on the transaction for "close to a year" before disclosing this transformational transaction to investors as a *fait accompli* on December 28, 2007;

b.    Defendants intended, as one of the strategic benefits of the transformational transaction, that the sale of the Company's tax-exempt bond portfolio and consequent slashing of the Company's annual dividend from $1.68 per share to $0.60 per share, would completely change the investor profile for Centerline from risk-averse investors seeking tax-free income to more risk-tolerant growth investors, *i.e.*, changing the investment thesis over-night;

c.    The Individual Defendants were highly motivated to commit fraud so that they could engineer the Related transaction (which masqueraded as a $131 million investment in Centerline) but in reality effectively diverted the Company's income from public shareholders to defendants Ross and Blau and their affiliated companies and increased their voting control over Centerline from approximately 17% to almost 30%;

d.    The Company's tax-exempt bond portfolio, which had assets of approximately $2.8 billion, and the income it generated, were core to Centerline's business and, therefore, the

malta437870-01c.wpd                                      64

Individual Defendants, who were among the Company's most senior officers and trustees, knew or were reckless in not knowing about the plan to sell this portfolio to Freddie Mac and the impact of this transformational transaction on the Company and its shareholders, including slashing its annual dividend from $1.68 per share to $0.60 per share and materially reducing the tax-exempt benefits;

e.      With respect to Defendant Schnitzer, the Company's CEO, President and Managing Trustee, the Company's April 23, 2007 Proxy Statement states, "[Schnitzer] directs the day-to-day operations of the Company and is responsible for corporate development and strategic planning," and, therefore, had actual knowledge of the Freddie Mac transaction at all times during the Class Period;

f.      Defendants Ross and Blau control Centerline and, therefore, knowledge of the transformational transaction of selling the tax-exempt bond portfolio and slashing the dividend is imputed to them.  Defendant Ross controlled approximately 17% of the voting shares of Centerline during the Class Period and almost 30% after the TRCLP deal, in which Defendant Ross enhanced his control of Centerline without paying a control premium.

g.      Defendants knew or were reckless in not knowing of the agreement with Freddie Mac to sell the tax-exempt bond portfolio because of the magnitude of the transaction costs of approximately $89 million, virtually wiping out 2007 CAD, and requiring close to one year to complete and its status as the cornerstone to the Company's strategic plan to transform itself into an alternative asset manager;

h.      Defendant Ross had a compelling personal financial incentive for causing Centerline to sell the tax-exempt bond portfolio, with the resulting drop in the price of Centerline stock, because he had spoken to investment banks about taking Centerline private before the sale of the tax-exempt bond portfolio and has again spoken with investment banks about a going-private transaction at a much lower price than prior to the sale of the portfolio, now that the price of Centerline stock is languishing at less than $2 per share;

i.      CW 1 began working on the transaction (Project Spinnaker) in June 2007 and

CW 2 began in the fall of 2007. Therefore, employees at various levels and performing various functions for Centerline were actively involved in the transaction during the period when Defendants were concealing the transaction from investors and misrepresenting the future of the tax-exempt bond portfolio and the dividend; and

        j.    Defendants knew that a material transaction was "in the works" and should have been disclosed to investors because according to CW 1, Defendants closed the blackout window after the August 9, 2007 earnings announcement in order to prevent Centerline employees from trading Centerline stock during the existence of a material non-public transaction.

        **2.**    **Defendants Schnitzer and Levy, Who Were Beholden to Defendant Ross for Their Lucrative Employment, Had Compelling Personal Motivations to Serve Defendant Ross' Interests, Even if His Interests Conflicted With Those of Public Investors**

        149.    Defendant Ross founded Centerline and TRCLP and owns approximately 92% of TRCLP, which in turn, owns Related General. Related General owned, as of April 23, 2007, 685 common shares and 10,194,400 Special Common Units of Centerline Capital Company LLC ("Centerline Capital") which are convertible into Centerline common shares on a one-for-one basis (subject to certain restrictions) and the associated 10,194,400 Special Preferred Voting Shares which gave Related General control over 12.8% of Centerline. Defendant Ross also directly owned 475,345 Centerline common shares and 400,000 options exercisable for Centerline common shares on a one-for-one basis which, together with the Centerline holdings of Related General, gave defendant Ross ownership and control over 13.9% of Centerline common shares and related voting power.

        150.    Through his substantial ownership of Centerline and TRCLP, his direct and substantial influence over the composition of the boards of these companies, and his relationships with the senior executives and members of the boards of these companies, throughout the Class Period, defendant Ross dominated and controlled the management of these companies, including the hiring, firing, and compensation of all senior executives of Centerline.

151.    Defendant Ross hired defendant Schnitzer in 1988, shortly after he received his MBA from the Wharton School of the University of Pennsylvania. Defendant Schnitzer has spent almost his entire career working for defendant Ross and has been handsomely rewarded for his loyalty with highly lucrative executive positions at Centerline and other Ross affiliated entities. Defendant Ross handpicked defendant Schnitzer to be Centerline's Chief Executive Officer, President, and managing trustee, and defendant Ross is also responsible for defendant Schnitzer's installation as Chairman of the Board of Trustees of American Mortgage Acceptance Company ("AMAC"), a publicly traded real estate investment trust that is affiliated with Ross and TRCLP. In 2006, defendant Schnitzer received total compensation from Centerline of approximately $2,145,786, and in 2007 he received total compensation from Centerline of approximately $4,505,191.

152.    Defendant Ross hired defendant Levy in November 2001 as Centerline's Director of Capital Markets, and has been responsible for defendant Levy's ascension to his current positions as Chief Financial Officer of Centerline and AMAC. Like defendant Schnitzer, defendant Levy's relationship with defendant Ross has been extremely lucrative. For example, in 2006 defendant Levy received total compensation from Centerline of approximately $1,154,760, and in 2007 he received total compensation from Centerline of approximately $1,990,785.

153.    By reason of their high salaries, bonus compensation, equity awards, the promise of continued lucrative employment with Centerline and fear of retribution by defendant Ross and other entities affiliated with defendant Ross and TRCLP, defendants Schnitzer and Levy were highly motivated to protect and further defendant Ross' personal interests in their management of Centerline, including pursuing business strategies and transactions desired by and intended to benefit personally defendant Ross, even when such strategies and transactions were deleterious to and conflicted with the interests of public shareholders of the Company.

154.    Because of defendant Ross' control and influence over Centerline and defendants Schnitzer and Levy, they were highly motivated to conceal from the investing public the fact that Centerline was in the process of selling its tax-exempt bond portfolio to Freddie Mac and that as a

result of this "transformational transaction," contrary to their Class Period representations, the Company would be forced to slash its high-yield dividend and abandon its income-oriented investors in favor of new growth-oriented investors. The misrepresentations and omissions of defendants Schnitzer and Levy during the Class Period inured to the benefit of defendant Ross – specifically, his interest in taking Centerline private at a "bargain basement" price – and to the detriment of Lead Plaintiff and the Class.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

155.    At all relevant times, the market for Centerline common stock was an efficient market for the following reasons, among others:

a.    Centerline common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, Centerline filed periodic public reports with the SEC and the NYSE;

c.    Centerline regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, through analyst and investor conference calls and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.    Centerline was followed by securities analysts, including Tony Howard, Vice President of J.J.B. Hilliard, W.L. Lyons, Inc., who wrote reports that were distributed to the sales force and certain customers of their brokerage firms. Value Engine and Price Target Research also followed Centerline and issued regular reports and recommendations during the Class Period. Each of these reports was publicly available and entered the public marketplace.

156.    As a result of the foregoing, the market for Centerline common stock promptly digested current information regarding Centerline from all publicly available sources and reflected such information in Centerline's common stock price. Under these circumstances, all purchasers of

Centerline common stock during the Class Period suffered similar injury through their purchase of Centerline common stock at artificially inflated prices, and a presumption of reliance applies.

## XI.  NO STATUTORY SAFE HARBOR

157.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Centerline who knew that those statements were false when made.

## XII.  CLASS ALLEGATIONS

158.    Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Centerline during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and trustees of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

159.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Centerline's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by Centerline or its transfer agent and may be notified of the

pendency of this action by mail, using a form of notice similar to that customarily used in securities

class actions.

160.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal

law that is complained of herein.

161.    Lead Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

162.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

a.    Whether the federal securities laws were violated by Defendants' acts as

alleged herein;

b.    Whether the documents, reports, filings, releases and statements disseminated

to the Class by Defendants during the Class Period misrepresented material facts about the business,

performance and financial condition of Centerline;

c.    Whether Defendants participated in and pursued the common course of

conduct and fraudulent scheme complained of herein;

d.    Whether Defendants acted knowingly or with deliberate recklessness in

misrepresenting material facts; and

e.    Whether the market price of Centerline common stock during the Class Period

was artificially inflated due to the misrepresentations complained of herein.

163.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. BASIS OF ALLEGATIONS

164.    As also alleged in paragraph 40, Lead Plaintiff, individually and on behalf of all other persons similarly situated, by its undersigned attorneys, alleges the following based upon personal knowledge as to itself and its own acts and paragraphs 34, 36, 64 and 151-153, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, SEC filings, wire and press releases published by and regarding Centerline, securities analysts' reports and advisories about the Company, information obtained from confidential sources, and information readily obtainable on the Internet. Lead Plaintiff also believes that substantial evidentiary support for the allegations set forth herein will be obtained after a reasonable opportunity for discovery.

## COUNT I

### Against All Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

165.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

166.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Lead Plaintiff and other members of the Class to purchase Centerline common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

167.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Centerline common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and the Individual Defendants are sued as controlling persons as alleged below.

168.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Centerline as specified herein.

169.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Centerline's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Centerline and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Centerline common stock during the Class Period.

170.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or trustees at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or trustee of the Company was privy to and participated in the creation, development and reporting of the Company's plans and/or reports; (iii) each of these Defendants

enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's operations at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

171.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Centerline's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' misstatements of the Company's business and operations throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

172.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Centerline common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Centerline common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff and the other members of the Class acquired Centerline common stock during the Class Period at artificially high prices and were damaged thereby.

173.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding Defendants' plans to dispose of Centerline's tax-exempt bond portfolio, reduce the dividend as well as the tax-exempt portion of the dividend and the Company's liquidity crisis, which facts were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Centerline common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

174.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

175.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

## COUNT II

### Against the Individual Defendants for Violations of Section 20(a)
### of the Exchange Act

176.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

177.    The Individual Defendants acted as controlling persons of Centerline within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company and/or their ownership of Centerline securities, and participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to information about the planned sale of Centerline's tax-exempt bond portfolio and related transactions and copies of the Company's reports, press releases, public filings and other statements

alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

178.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

179.    As set forth above, Centerline and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE,** Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated: July 7, 2008

**LABATON SUCHAROW LLP**

By: _____

Lawrence A. Sucharow (LS-1726)
lsucharow@labaton.com
Joseph Sternberg (JS-0144)
jsternberg@labaton.com
Ann E. Gittleman (AG-8367)
agittleman@labaton.com
140 Broadway
New York, NY 10005
Tel. (212) 907-0700
Fax: (212) 818-0477

**BERGER & MONTAGUE, P.C.**

By: _____

Sherrie R. Savett
ssavett@bm.net
Barbara A. Podell
bpodell@bm.net
Eric Lechtzin
elechtzin@bm.net
1622 Locust Street
Philadelphia, PA 19103
Tel. (215) 875-3000
Fax (215) 875-4604

*Co-Lead Counsel for Lead Plaintiff*
*Centerline Investor Group and the Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE CENTERLINE HOLDING COMPANY
SECURITIES LITIGATION

Civil Action No. 08-CV-00505 (SAS)

## CERTIFICATE OF SERVICE

I, Rachel L. Messier, am over the age of 18 years and not a party to this action. My
business address is 140 Broadway, New York, New York 10005. On July 7, 2008, I
served copies of the Consolidated Complaint on the attorneys listed below via U.S.
Postal Service delivery:

Marian P. Rosner
Robert C. Finkel
James A. Harrod
James Kelly-Kowlowitz
**WOLF POPPER LLP**
845 Third Avenue
New York, NY 10022
mrosner@wolfpopper.com
jkelly@wolfpopper.com
rfinkel@wolfpopper.com
jharrod@wolfpopper.com
jkelly@wolfpopper.com

Evan J. Smith
**BRODSKY & SMITH, LLC**
240 Mineola Blvd.
Mineola, NY 11501
esmith@brodsky-smith.com

Richard A. Maniskas
D. Seamus Kaskela
**SCHIFFRIN BARROWAY TOPAZ &
KESSLER, LLP**
280 King of Prussia Road
Radnor, PA 19087
rmaniskas@sbtklaw.com

Curtis V. Trinko
**LAW OFFICES OF CURTIS V. TRINKO, LLP**
16 West 46th Street, 7th Fl.
New York, NY 10036
ctrinko@trinko.com

Kim Elaine Miller
Lewis Kahn
**KAHN GAUTHIER SWICK, LLC**
12 East 41st Street, 12th Fl.
New York, NY 10017
kimmiller25@yahoo.com

Samuel H. Rudman
David A. Rosenfeld
**COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP**
58 South Service Road, Suite 200
Melville, NY 11747
drosenfeld@csgrr.com

Jeffrey S. Abraham
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, NY 10119
jabraham@aftlaw.com

Antonio Vozzolo
**FARUQI & FARUQI, LLP**
369 Lexington Avenue, 10th Fl.
New York, NY 10017
avozzolo@faruqilaw.com

Jacob A. Goldberg
**FARUQI & FARUQI, LLP**
2600 Philmont Ave., suite 324
Huntingdon Valley, PA 19006
jgoldberg@faruqilaw.com

Jonathan Auerbach
Jerome M. Marcus
**MARCUS & AUERBACH, LLC**
400 Greenwood Ave., Suite 200
Wyncote, PA 19095-1825
auerbach@marcusauerbach.com

Beth Ann Kaswan
**SCOTT & SCOTT, LLP**
29 West 57th Street
New York, NY 10019
bkaswan@scott-scott.com

Jennifer F. Beltrami
**WOLF BLOCK, LLP**
250 Park Avenue
New York, NY 10177
jbeltrami@wolfblock.com

Richard A. Rosen
**PAUL WEISS RIFKIND WHARTON &
GARRISON LLP**
1285 Avenue of the Americas
New York, NY 10158-0038
rrosern@paulweiss.com

Steven Cooper
**REED SMITH LLP**
599 Lexington Avenue, 29th Fl.
New York, NY 10022
scooper@reedsmith.com

Sarah R. Wolff
**REED SMITH LLP**
10 South Wacker Drive, 40th Fl.
Chicago, IL 60606-7507
swolff@reedsmith.com

Ralph M. Stone
Thomas G. Ciarlone
**SHALOV STONE BONNER & ROCCO LLP**
485 Seventh Avenue, Suite 1000
New York, NY 10018
rstone@lawssb.com
tciarlone@lawssb.com

Corey Holzer
Michael I. Fistel, Jr.
**HOLZER HOLZER & FISTEL, LLC**
1117 Perimeter Center West, Ste. E-107
Atlanta, GA 30338
cholzer@holzerlaw.com
mfistel@holzerlaw.com

_____
Rachel L. Messier

Subscribed and Sworn before me
on July 7, 2008.


_____
Notary Public

DANETTE L. McKENZIE
Notary Public, State of New York
No. 01MC6087432
Qualified in Queens County
Commission Expires Feb. 18, 2011