**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE CENTERLINE HOLDING COMPANY
SECURITIES LITIGATION

)
)
)
)
)

**Consolidated C.A.**
**No. 08-CV-00505 (SAS)**

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**
**THE CONSOLIDATED CLASS ACTION COMPLAINT**

Richard A. Rosen
Daniel J. Leffell
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Phone: (212) 373-3000
Fax: (212) 757-3990
rrosen@paulweiss.com

*Attorneys for Marc D. Schnitzer and Robert L. Levy*

Peter L. Simmons
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
1 New York Plaza
New York, NY 10022
Tel: 212-859-8455
Fax: 212-859-4000
peter.simmons@friedfrank.com

*Attorneys for Defendants Stephen M. Ross and Jeffrey T. Blau*

Jennifer F. Beltrami
WOLFBLOCK LLP
250 Park Avenue
New York, NY 10177
Tel: 212-883-4955
Fax: 212-672-1155
jbeltrami@wolfblock.com

*Attorneys for Centerline Holding Company*

**Table of Contents**

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 3

THE CLAIMS ................................................................................................................ 6

ARGUMENT .................................................................................................................. 8

I.   CENTERLINE DID NOT HAVE A DUTY TO DISCLOSE THE DECEMBER
     2007 TRANSACTIONS BEFORE THEY WERE FINALIZED. ...................... 8

     A.   SEC Regulations Establish That There Was No Duty to Disclose
          Information About the Transactions at Issue Before They Became
          Subject to Definitive Agreements on December 28, 2007. ...................... 9

          1.   The Complaint Does Not Plead a Duty to Disclose Before
               December 28, 2007, Because it Does Not Allege ANY "Material
               Definitive Agreement" Before That Date. .................................. 11

          2.   The Complaint Does Not Plead Facts Establishing a Duty to
               Provide Advance Disclosure Regarding the Freddie Mac
               Transaction as a "Disposition of a Significant Amount of Assets." .......... 14

          3.   The Complaint Does Not Plead Facts Establishing a Duty to
               Provide Advance Disclosure Regarding the TRCLP Investment as
               an "Unregistered Sale of Equity Securities." .............................. 14

     B.   Even Apart from SEC Rules, Defendants Were Under No Duty to
          Disclose the Prospective Transactions or Dividend Cut Where the
          Terms of the Initiatives Were Subject to Continuing Negotiations,
          and No Final Agreement Had Been Reached. ...................................... 15

     C.   The Complaint Does Not Adequately Plead a Duty to Disclose
          Based on Statements Alleged to Be Misleading Absent the
          Disclosures at Issue. .......................................................................... 18

II.  THE COMPLAINT DOES NOT ADEQUATELY ALLEGE ANY FALSE
     STATEMENT OF FACT AND, ACCORDINGLY, SHOULD BE DISMISSED. .......... 22

III. THE COMPLAINT DOES NOT ADEQUATELY PLEAD SCIENTER. .......... 22

IV.  THE COMPLAINT DOES NOT ADEQUATELY PLEAD LOSS CAUSATION. ........ 28

Doc#: USI:5282892v8

**Page**

A.  The Complaint Does Not Allege Any Corrective Disclosure With Respect to Any Pre-December 28, 2007 Stock Price Decline, and Thus Does Not State a Claim Based on Any Declines Prior to That Date...................................................................................................................29

B.  The Complaint Does Not Plead Loss Causation With Respect to the December 28, 2007 Price Drop Because It Does Not Distinguish Which of the Transactions and Initiatives Announced on That Date Caused the Actual Loss Plaintiffs Allegedly Suffered.....................31

CONCLUSION.............................................................................................................34

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*60223 Trust* v. *Goldman Sachs,*
    540 F. Supp. 2d 449 (S.D.N.Y. 2007)...............................................................29, 30

*Acito* v. *IMCERA Group, Inc.,*
    47 F.3d 47 (2d Cir. 1995)............................................................................27

*In re AOL Time Warner, Inc. Sec. Litig.,*
    503 F. Supp. 2d 666 (S.D.N.Y. 2007)..................................................................31

*Atlantic Gypsum Co., Inc.* v. *Lloyds Int'l. Corp.,*
    753 F. Supp. 505 (S.D.N.Y. 1990) ....................................................................27

*Basic Inc.* v. *Levinson,*
    485 U.S. 224 (1988)....................................................................................9

*Bay Harbour Mgmt. LLC* v. *Carothers,*
    Nos. 07-1124-cv, 07-1157-cv, 2008 WL 2566557 (2d Cir. 2008) ...........................26

*Bell Atlantic* v. *Twombly,*
    127 S. Ct. 1955 (2007).........................................................................22-23, 31, 34

*Benzon* v. *Morgan Stanley Distribs., Inc.,*
    420 F.3d 598 (6th Cir. 2005) ...........................................................................9

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997).........................................................................17

*In re Carter-Wallace, Inc. Secs. Litig.,*
    220 F.3d 36 (2d Cir. 2000)...........................................................................24

*Castillo* v. *Dean Witter Discover & Co.,*
    No. 97 Civ. 1272, 1998 WL 342050 (S.D.N.Y. June 25, 1998).........................9, 24

*CDnow, Inc. Sec. Litig.,*
    138 F. Supp. 2d 624 (E.D. Pa. 2001) ................................................................15

*Chien* v. *Skystar Bio Pharmaceutical Co.,*
    No. 3:07CV781, 2008 WL 2790005 (D. Conn. July 17, 2008).............................15

*Chill* v. *Gen. Elec. Co.,*
    101 F. 3d 263 (2d Cir. 1996) ..........................................................................22

**Page(s)**

*Conley* v. *Gibson*,
    355 U.S. 41 (1957)................................................................................22

*Davidoff* v. *Farina*,
    No. 04 Cir. 7617, 2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)............................................27

*DeBruyne* v. *Equitable Life Assurance Soc'y of United States*,
    720 F. Supp. 1342 (N.D. Ill. 1989) ......................................................................11

*Digital Island Sec. Litig.*,
    223 F. Supp. 2d 546 (D. Del. 2002)..............................................................8, 10

*In re Discovery Labs Sec. Litig.*,
    No. 06-1820, 2006 U.S. Dist. LEXIS 79823 (E.D. Pa. 2006) .................................16

*In re Duane Reade Sec. Litig.*,
    No. 02 Civ. 6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003), *aff'd sub*
    *nom. Nadoff* v. *Duane Reade Inc.*, 107 Fed. Appx. 250 (2d Cir. 2004) ..................................19

*Dura Pharm., Inc.* v. *Broudo*,
    544 U.S. 336 (2005) ........................................................................ passim

*Flamm* v. *Eberstadt*,
    814 F.2d 1169 (7th Cir. 1987) ......................................................................16

*Friedman* v. *Mohasco Corp.*,
    929 F.2d 77 (2d Cir. 1991)..........................................................................18

*In re Gametech*, CIV 98-268-PHX-ROS,
    1999 U.S. Dist. LEXIS 22289 (D. Ariz. June 1, 1999) ...........................................16

*Ganino* v. *Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000).........................................................................30

*Gant* v. *Wallingford Bd. of Educ.*,
    69 F.3d 669 (2d Cir. 1995)............................................................................3

*Garber* v. *Legg Mason*,
    537 F. Supp. 2d 597 (S.D.N.Y. 2008)...........................................................29, 31

*Geiger* v. *Solomon-Page Group*,
    933 F. Supp. 1180 (S.D.N.Y. 1996)............................................................10, 24

*In re Geopharma, Inc. Sec. Litig.*,
    399 F. Supp. 2d 432 (S.D.N.Y. 2005)..............................................................34

*Glazer* v. *Formica Corp.*,
    964 F.2d 149 (2d Cir. 1992).........................................................................15

**Page(s)**

*Greenberg* v. *Crossroad Systems, Inc.*,
364 F.3d 657 (5th Cir. 2004) ...............................................................................32, 33

*Hampshire Equity Partners II, L.P.* v. *Teradyne, Inc.*,
No. 04 Civ. 3318, 2005 WL 736217 (S.D.N.Y. Mar. 30, 2005) ...........................25

*Hershfang* v. *Citicorp*,
767 F. Supp. 1251 (S.D.N.Y. 1991).......................................................................18

*In re Initial Pub. Offering Sec. Litig.*,
399 F. Supp. 2d 261 (S.D.N.Y. 2005)...........................................................28, 29, 31

*J&R Mktg.* v. *Gen. Motors Corp.*,
519 F.3d 552 (6th Cir. 2008) .................................................................................10

*Joffee* v. *Lehman Bros.*,
410 F. Supp. 2d 187 (S.D.N.Y. 2006),
*aff'd* 209 Fed. Appx. 80 (2d Cir. 2006) ...............................................................29

*Joffee* v. *Lehman Bros., Inc.*,
No. 04 Civ. 3507, 2005 WL 1492101 (S.D.N.Y. June 23, 2005)......................22, 31

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001).......................................................................23, 24, 26

*Kramer* v. *Time Warner, Inc.*,
937 F.2d 767 (2d Cir. 1991).....................................................................................3

*Krouner* v. *Am. Heritage Fund, Inc.*,
No. 94 Civ. 7213, 1996 WL 393584 (S.D.N.Y. July 15, 1996) .............................10

*Lattanzio* v. *Deloitte & Touche LLP*,
476 F.3d 147 (2d Cir. 2007)............................................................................29, 32

*Lentell* v. *Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005)...........................................................................28, 29, 31

*Leykin* v. *AT&T Corp.*,
423 F. Supp. 2d 229 (S.D.N.Y. 2006).....................................................................29

*In re Medimmune, Inc., Sec. Litig.*,
873 F. Supp. 953 (D. Md. 1995) ............................................................................16

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
No. 02 MDL 1484, 2008 WL 2324111 (S.D.N.Y. June 4, 2008)................31, 32, 33

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, Nos. 02 MDL 1484 & 07 CIV
6677, 2008 WL 2019680 (S.D.N.Y. May 8, 2008) .................................................29

**Page(s)**

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
   289 F. Supp. 2d 416 (S.D.N.Y. 2003)..............................................................................28

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,*
   272 F. Supp. 2d 243 (S.D.N.Y. 2003)..............................................................................10

*In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.,*
   No. 03 Civ. 8208, 2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006).....................................10, 23

*Nenni v. Dean Witter Reynolds, Inc.,*
   No. 98 Civ. A. 12454, 1999 WL 34801540 (D. Mass. Sept. 29, 1999)..................................10

*Phillips v. LCI Int'l., Inc.,*
   190 F.3d 609 (4th Cir. 1999) .........................................................................................22

*PPM Am. v. Marriott Corp.,*
   875 F. Supp. 289 (D. Md. 1995).....................................................................................15

*Reiss v. Pan American World Airways, Inc.,*
   711 F.2d 11 (2d Cir. 1983)........................................................................................ 16-17

*Robbins v. Moore Medical Group,*
   894 F. Supp. 661 (S.D.N.Y. 1995) ..................................................................................15

*Rombach v. Chang,*
   355 F.3d 164 (2d Cir. 2004)...........................................................................................34

*In re Sara Lee Corp. Sec. Litig.,*
   No 03 C 2303, 2006 WL 1980199 (N.D. Ill. July 10, 2006) ..............................................32

*San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos., Inc.,*
   75 F.3d 801 (2d Cir. 1996)..........................................................................................3, 16

*SEC v. Geon Industries, Inc.,*
   531 F.2d 39 (2d Cir. 1976) ............................................................................................15

*Shaw v. Digital Equip. Corp.,*
   82 F.3d 1194 (1st Cir. 1996)..........................................................................................10

*Shields v. Citytrust Bancorp, Inc.,*
   25 F.3d 1124 (2d Cir. 1994)...........................................................................................25

*TCS Capital Mgmt., LLC v. Apax Partners, L.P.,*
   NO. 06-CV-13447, 2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) .........................................15

*Tellabs v. Makor Issues & Rights, Ltd.,*
   127 S. Ct. 2499 (2007).......................................................................................... passim

**Page(s)**

*In re The Warnco Group Sec. Litig.*,
    388 F. Supp. 2d 307 (S.D.N.Y. 2005)..........................................................32

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993).............................................................................17

*Ulferts* v. *Franklin Res., Inc.*,
    554 F. Supp. 2d 568 (D.N.J. 2008) ..............................................................10

*United States* v. *Lake*,
    472 F.3d 1247 (10th Cir. 2007) ....................................................................10

*Ventry* v. *Sands (In Re Canandaigua Sec. Litig.)*,
    944 F. Supp. 1202 (S.D.N.Y. 1996)....................................................... 15-16, 24

*White* v. *Melton*,
    757 F. Supp. 267 (S.D.N.Y. 1991) ...............................................................10

*In re Worldcom Sec. Litig.*,
    303 F. Supp. 2d 385 (S.D.N.Y. 2004)...........................................................19

## FEDERAL STATUTES

Fed. R. Civ. P. 8(a)(2)............................................................................................22

Fed. R. Civ. P. 9(b) ...............................................................................................26

Fed. R. Civ. P. 12(b)(6)...........................................................................................3

## OTHER AUTHORITIES

DOWNES, JOHN & GOODMAN, JORDAN E., DICTIONARY OF FINANCE AND INVESTMENT
    TERMS (BARRONS, 2003) (6th Ed.)...............................................................7

Securities and Exchange Commission, Proposed Rule: Additional Form 8-K Disclosure
    Requirements, SEC Release No. 34-46084, 2002 WL 1315511 (June 17, 2004) ...................11

Securities and Exchange Commission, Final Rule: Additional Form 8-K Disclosure
    Requirements, SEC Release No. 34-49424, 2004 WL 536851 (Mar. 16, 2004).....................11

Richard D. Bernstein & Michael D. Gorfinkle, *Pleading and Proving Loss Causation in §*
    *10(b) Credit Crisis Cases*, 5 SEC. LITIG. REP. 14, 17 (May 2008)...........................................31

Defendants Centerline Holding Company ("Centerline" or the "Company"), Marc D. Schnitzer, Robert L. Levy, Stephen M. Ross, and Jeff T. Blau (collectively "Defendants"), respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Class Action Complaint For Violation of Federal Securities Laws (the "Complaint"), with prejudice.

### PRELIMINARY STATEMENT

The Complaint in this case is an ill-conceived reaction to a drop in Centerline's stock price following the prompt and truthful announcement on December 28, 2007, of several corporate initiatives. It fails to state a fraud claim under the federal securities laws for several reasons.

*First,* the gravamen of the Complaint is that defendants committed fraud by failing to disclose certain matters — the sale of the Company's tax-exempt bond portfolio, a related reduction in its dividend for 2008, and an additional investment in the Company by its largest stockholder — at some unspecified time before December 28, 2007. But SEC rules and judicial precedents establish that there is no duty to disclose such initiatives until they are the subject of definitive, enforceable agreements. The Complaint alleges no facts to indicate that any of these initiatives was ripe for disclosure before December 28, 2007, relying instead on wildly speculative inferences that are *contradicted* by the facts alleged in the Complaint. (*See infra,* pp. 9-18.)

*Second,* Lead Plaintiff attempts to cobble together a duty to disclose the matters at issue in advance by quoting at length from virtually every disclosure by the Company on any subject during the putative Class Period — March 12, 2007 through December 28, 2007 — and then pronouncing that they were all "materially false and misleading" because they failed to disclose the prospective initiatives at issue. Simply to read those disclosures, however, is to see that they

1

do not remotely suggest anything about the future that was inconsistent with the matters announced on December 28, 2007. The series of *ipse dixit* assertions that Lead Plaintiff advances to the contrary are untethered to any rational reading of the statements themselves. (*See infra*, pp. 18-22.)

*Third*, the Complaint does not allege any false statement of fact by any of the defendants. Because the statements that Lead Plaintiff claims to have been misleading by virtue of nondisclosure were not misleading as a matter of law, the Complaint does not plead any false or misleading statement or omission. (*See infra*, p. 22.)

*Fourth*, the Complaint does not plead facts supporting a "strong inference of *scienter*," as required to state a securities fraud claim. The relevant SEC rules and extensive case law informed defendants that they had no duty to make the disclosures on which Lead Plaintiff bases its claim, and thus the failure to disclose cannot possibly be reckless or in disregard of a clear duty. Moreover, Lead Plaintiff's attempt at *scienter* allegations is incoherent: it centers on the contention that defendants knew their announcements would cause a drop in the Company's stock price and that they were motivated to produce that drop in order to enable the Company's largest stockholder to make a further investment at a "bargain basement" price. But if defendants wanted to cause the stock price to drop, they would have disclosed sooner and not withheld this information. (*See infra*, pp. 22-28.)

*Fifth*, the Complaint does not adequately plead loss causation, which requires allegations of fact establishing that the stock price declined as a proximate result of a corrective disclosure revealing the alleged fraud. With respect to every day in the Class Period but the last one, the Complaint does not allege any such corrective disclosure, much less one that proximately caused a drop in Centerline's stock price. And as for the last day in the Class Period, December 28,

2007, the Complaint pleads no facts establishing that the drop in the stock price was proximately caused by an actionable corrective disclosure as opposed to other company-specific or market-related information, of which there was an abundance. (*See infra*, pp. 28-34.)

For these reasons, as more fully detailed below, the Complaint should be dismissed, with prejudice.

## STATEMENT OF FACTS[1]

For most of its history, Centerline was a full service investing and finance company with a core focus on real estate. (Cplt. ¶ 2; *see id.* ¶ 29.) For some time, up to and including the putative Class Period, the major part of Centerline's revenues were generated by its Affordable Housing business segment, which managed the Company's tax-exempt affordable housing bond portfolio. (*Id.* ¶ 3.) Based upon revenue earned from this portfolio, Centerline historically paid large, primarily tax-exempt dividends. (*Id.* ¶ 4.)

In early 2007, Centerline management embarked on a plan to transform the Company into an alternative asset management company, in order to "simplify the story of the Company," to gain for the Company the benefits of being viewed by the market as alternative asset managers, and thereby to "attract an investor base with growth versus income focus." (*Id.* ¶¶ 5, 43.) As part of that transformational strategy, Centerline ultimately entered into an agreement

---

[1]    Solely for purposes of this motion to dismiss under Rule 12(b)(6), Defendants necessarily accept as true the factual allegations of the Complaint. *Gant* v. *Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995). Nevertheless, the Court may consider "sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs* v. *Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007); *see also San Leandro Emergency Med. Group Profit Sharing Plan* v. *Phillip Morris Cos., Inc.*, 75 F.3d 801, 808-809 (2d Cir. 1996) (holding that judicial notice of full text of "integral" documents cited in the complaint is proper; a court may disregard allegations in the Complaint that are inconsistent with such documents); *Kramer* v. *Time Warner, Inc.*, 937 F.2d 767, 773-774 (2d Cir. 1991) (holding appropriate judicial notice of "public disclosure documents required by law. . . to be filed with the SEC").

3

with the Federal Home Loan Mortgage Corporation ("Freddie Mac") to securitize its tax-exempt bond portfolio to Freddie Mac, a transaction that was treated for accounting purposes as a sale. (*Id.* ¶ 5.) The securitization was announced on December 28, 2007. (*Id.* ¶¶ 8, 17.)

Although the thrust of the Complaint is that defendants committed fraud by failing to disclose the Freddie Mac transaction earlier in the year, Lead Plaintiff's own allegations establish that the transaction was a highly uncertain prospect, which required a very substantial lead time and a great deal of preparatory activity before a definitive agreement could be assured. As Lead Plaintiff puts it, the bond securitization was a "highly complex" and "time consuming" transaction, which had been "in the works for close to a year" before it was announced. (Cplt. ¶ 11.)

Among other things, the Freddie Mac transaction involved intensive due diligence on the properties underlying the bond portfolio — approximately 52,000 occupied apartment units with an additional 5,500 units in construction or rehabilitation, which would take at least nine months to investigate and analyze (*id.* ¶¶ 54-55) — and to obtain the necessary consents and waivers (*id.* ¶ 11). In addition, before the transaction with Freddie Mac could be completed, Centerline had to complete the "time-consuming process" of negotiating with numerous counterparties to "unwind" credit enhancements on more than 300 bonds and to substitute collateral, a process that "would require at least 6 to 9 months." (*Id.* ¶¶ 50-51.) Until the transaction with Freddie Mac, Centerline had placed tax-exempt bonds in a trust and sold trust certificates backed by collateral in the trust. (*Id.* ¶ 45.) In order to sell the trust certificates, Centerline, which was not a rated company, had to obtain a credit enhancement certificate on the bonds, for which it paid a fee to Merrill Lynch, Freddie Mac, Fannie Mae, MBIA, FGIC, or other companies with AAA ratings. (*Id.*) Centerline also issued tax credit investments, turning to Merrill Lynch and other rated

4

companies to guarantee or put a "wrap" on the investments, using the tax-exempt bonds as collateral. (*Id.* ¶ 47.) Because Freddie Mac was a rated entity, it did not need the credit enhancements placed on the bonds it was receiving from Centerline (*id.* ¶ 49) and, indeed, "would not have accepted Centerline's tax-exempt bonds until the credit enhancements had been unwound" (*id.* ¶ 56). Thus, all of the credit enhancements issued by Merrill Lynch and others had to be "unwound," either by each individual bond or in packages of bonds, depending on the particular credit enhancing company. (*Id.* ¶ 49.) Similarly, all credit enhancements on tax credit investments also had to be "unwound," and different collateral, in compliance with the terms of instruments or as agreed by the holders, had to be substituted for the tax-exempt bonds, which would be sold to Freddie Mac. (*Id.*)

A further step that had to be completed before the transaction with Freddie Mac could take place was the termination of securitization trusts in which Centerline had deposited tax-exempt bonds as collateral for trust certificates that the Company sold. (*Id.* ¶¶ 52-53.) Because investors in the trust certificates generally anticipated that the trust certificates would be long-term investments, Centerline had to negotiate compensation with those investors in order to terminate the trusts, release the collateral, and sell the bonds to Freddie Mac. (*Id.* ¶ 53.)

On December 28, 2007, after all of the foregoing steps had been completed, Centerline was able to issue a press release announcing that it had completed a securitization of its $2.8 billion tax-exempt affordable housing bond portfolio with Freddie Mac, representing "a major step in Centerline's plan to transform itself into an alternative asset management company." (Cplt. ¶ 119, quoting Centerline Press Release dated Dec. 28, 2007.) "As a result of [the Freddie Mac] transaction," the press release also stated that the Company's dividend policy would change effective in the first quarter of 2008, such that its dividend, on an annualized basis,

was expected to be $0.60 per share (as compared with $1.68 per share in 2007), and the tax-exempt percentage of the Company's income in 2008 was anticipated to be 30% to 35% (as compared with 74% in 2006). (*Id.* ¶¶ 4, 17.) Finally, the December 28, 2007 press release also announced that the Company had obtained a $131 million equity investment commitment from an affiliate of The Related Companies ("TRCLP"), its largest shareholder, through issuance of convertible preferred stock that would pay dividends at 11% annually and would be convertible at a $10.75 per share (the "TRCLP Investment"). (*Id.* ¶ 121, quoting Centerline Press Release dated Dec. 28, 2007.)

Centerline's common share price, which had declined from $19.75 to $10.27 between March 12, 2007 and December 27, 2007, fell by a further $2.57 per share on December 28, 2007, closing at $7.70 per share at the end of the class period. (*Id.* ¶ 22.)

## THE CLAIMS

Lead Plaintiff does not claim that any of the transactions or initiatives announced on December 28, 2007, was unlawful or violated any duty owed to Centerline stockholders. Nor does Lead Plaintiff claim that any of the defendants engaged in insider trading, misstated any financial results, engaged in any accounting improprieties or published unduly optimistic forecasts or projections. Instead, the Complaint mechanically catalogs a dozen press releases, SEC filings and conference calls by Centerline — essentially all of the Company's public communications with investors and capital markets during the Class Period — and then makes exactly the same pronouncement, in exactly the same words, about each of them: regardless of their varying content and subject matter, Lead Plaintiff asserts that each of the Company's statements during the Class Period was "materially false and misleading" because it did not disclose that Centerline was "in the process" of selling its bond portfolio to Freddie Mac, and created the "false impression that the Company would retain its tax-exempt portfolio (and

6

continue paying substantial tax-exempt dividends out of income generated by this portfolio) for the foreseeable future." (Cplt. ¶¶ 14, 73, 78, 86, 95, 109.)

The catalog concludes with a general assertion that all of the statements referred to in 29 paragraphs, spanning 25 pages of the Complaint, were materially false and misleading because they all failed to disclose that the Company "had a deal" with Freddie Mac to sell its tax-exempt bond portfolio, and created the "reasonable expectation in the investing public" that the Company would continue to hold its tax-exempt bond portfolio "for the foreseeable future." (Cplt. ¶ 118(a)-(b); *see also id.* ¶ 23(a)-(b).) The Complaint further asserts that all of these statements were materially false and misleading because the Company would no longer be capable of paying substantial dividends without the tax-exempt bond portfolio (*id.* ¶ 118(c); *see also id.* ¶ 23(d)), and the "planned sale of the Company's tax-exempt bond portfolio . . . would be a transformational transaction that would completely change Centerline's business model, thereby changing the risk profile of investing in Centerline securities" (*id.* ¶ 118((d)-(e); *see also id* ¶ 23(e)).[2] Finally, the Complaint also refers briefly to the TRCLP Investment as another

---

[2] The Complaint also states in this context that Centerline "was in critical need of capital to fund its growth plans" (*id.* ¶ 118(f)); *see also id.* ¶ 23(c)), which it asserts was "contrary to . . . Class Period representations that there was no liquidity problem." (*Id.* ¶¶ 23, 125.) But the only way Lead Plaintiff can fabricate this supposed contradiction is by confusing the different conditions represented by the terms "liquidity problem" and "need for capital." *See* DOWNES, JOHN & GOODMAN, JORDAN E., DICTIONARY OF FINANCE AND INVESTMENT TERMS 96 (BARRONS, 2003) (6th Ed.) (defining "Capital Requirements" as, *inter alia*, "permanent financing needed for the normal operation of a business"); *id.* at 386 (defining "Liquidity" as, *inter alia*, the "ability to buy or sell an asset quickly and in large volume without substantially affecting the asset's price," and as the "ability to convert to cash quickly")). In any event, even if the two were the same, a need for capital at year-end 2007, in connection with a transformation of the business, in "a very unstable market" and in the midst of a developing market-wide crisis of confidence, does not support an inference that statements made months *earlier*, in very different circumstances, were untrue. (*See, e.g.*, Cplt. ¶ 15 (quoting August 2007 statement that Centerline had "sufficient capital resources to execute [its] business plan"); ¶ 99 (quoting August 2007 statement that Centerline "was not experiencing any liquidity problems")). Indeed, the Complaint itself quotes an August 2007 statement by Mr. Levy alerting the public to the potential impact of market

reason why all of the Company's statements were materially false and misleading (*id.* ¶ 118(g)), although it does not mention that transaction in connection with any specific statement alleged to be false and misleading.[3]

Based on these allegations, Lead Plaintiff purports to assert claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5, issued pursuant to the 1934 Act, on behalf of a class of "all persons or entities that purchased the common stock of [Centerline] during the period from March 12, 2007 through December 28, 2007." (Cplt. ¶ 1.)

## ARGUMENT

## I.

## CENTERLINE DID NOT HAVE A DUTY TO DISCLOSE THE DECEMBER 2007 TRANSACTIONS BEFORE THEY WERE FINALIZED.

The Complaint does not identify any false statement by any defendant but, instead, purports to assert securities fraud claims based on a failure to disclose allegedly material information. (*See supra*, pp. 6-7.)[4] Consequently, Lead Plaintiff cannot state a claim in the absence of a duty to disclose the information at issue: "It is axiomatic that there is no securities fraud without a duty to disclose." *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 551 (D.

---

conditions on liquidity. (*See id.* ¶ 100 (quoting August 9, 2007 statement that "we are being very careful to maintain our liquidity in the face of the recent market turbulence."))

[3] The Complaint also contains several pages of allegations about a rights offering that the Company implemented in the months following the close of the Class Period to enable all stockholders to purchase convertible preferred stock on the same terms as TRCLP (Cplt. ¶¶ 131-140), but it does not purport to assert any claims in connection with those allegations.

[4] The Complaint does contain conclusory assertions to the effect that, "Defendants repeatedly assured investors that Centerline would retain its tax-exempt bond portfolio and would continue paying substantial dividends . . . for the foreseeable future," and "misrepresented the future of the tax-exempt bond portfolio." (Cplt. ¶¶ 8, 11.) Those assertions, however, are not tied to any specific statement, and the Complaint does not identify any statement that meets these descriptions.

Del. 2002) (citation omitted). *See Basic Inc.* v. *Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading.").

Here, Lead Plaintiff is at a loss to find any basis for a duty to disclose the transactions at issue before December 28, 2007, because both the SEC and the courts have rejected a requirement to disclose transactions before they have reached a level of finality that the Centerline transactions did not reach until that date. Thus, Lead Plaintiff focuses its effort on the theory that a duty to disclose arose from statements that Centerline *did* make, all of which were admittedly true, but which Lead Plaintiff contends were misleading without the disclosures at issue. Merely to read those statements, however, is to reject that contention: on their face, none of them creates any "false impression" that required correction by premature disclosure of any of the matters announced on December 28, 2007.

A.    **SEC Regulations Establish That There Was No Duty to Disclose Information About the Transactions at Issue Before They Became Subject to Definitive Agreements on December 28, 2007.**

When the SEC has determined the scope and timing of required disclosure, there is no duty to disclose information on that subject or to do so at an earlier time than contemplated by the SEC rules. Thus, for example, in *Benzon* v. *Morgan Stanley Distribs., Inc.*, 420 F.3d 598 (6th Cir. 2005), the Sixth Circuit Court of Appeals explained that Morgan Stanley did not have a duty to disclose certain information concerning broker compensation where the SEC had not imposed a duty to disclose such information: "Current SEC regulations . . . do not impose a disclosure obligation . . . [t]herefore, Defendants had no duty to disclose [the material information at issue]. . .". Courts in this District have held likewise. *See, e.g., Castillo* v. *Dean Witter Discover & Co.*, No. 97 Civ. 1272, 1998 WL 342050, at *9 (S.D.N.Y. June 25, 1998) (declining to impose a duty to disclose internal incentive structures, holding that "[i]f such a duty should exist, it is for the SEC or Congress, not this Court, to create a definition of the extent and

9

nature of such a duty to disclose."); *Geiger* v. *Solomon-Page Group*, 933 F. Supp. 1180, 1187-88

(S.D.N.Y. 1996) (observing that "in the face of detailed requirements" on the subject at issue, the

fact that the SEC "does not require disclosure of this fact . . . reflects the SEC's expert view that

such disclosure is not required."); *Krouner* v. *Am. Heritage Fund, Inc.*, No. 94 Civ. 7213, 1996

WL 393584, at *3 (S.D.N.Y. July 15, 1996) (finding that mutual fund need not disclose

investments in excess of limits suggested in SEC rules); *White* v. *Melton*, 757 F. Supp. 267, 273

(S.D.N.Y. 1991) (finding "no genuine issue of material fact precluding the conclusion that

defendants duly complied with the requirements of the SEC," and granting motion for summary

judgment).[5]

_____

[5] *See also J&R Mktg.* v. *Gen. Motors Corp.*, 519 F.3d 552, 563 (6th Cir. 2008) (finding that plaintiffs had "failed to point [the court] to any regulation or statute requiring [the defendant] to include all nonpublic, material information in its registration statement," and that the court was "not authorized to impose" such a "wide-ranging duty," as the determination of appropriate disclosure limits is the role of Congress and the SEC, not the judiciary); *United States* v. *Lake*, 472 F.3d 1247, 1258-59 (10th Cir. 2007) (defendant not liable for failure to disclose use of corporate jet where his usage fell below the threshold at which Regulation S-K, Item 402, requires such disclosure); *Shaw* v. *Digital Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996) (noting that "[t]he information required to be stated in a registration statement is spelled out both in Schedule A to Section 7(a) of the Securities Act and in various regulations promulgated by the SEC.") (internal quotation marks and citations omitted); *Ulferts* v. *Franklin Res., Inc.*, 554 F. Supp. 2d 568, 576-577 (D.N.J. 2008) (declining to create a duty to disclose information in a prospectus in the absence of a "statutory or regulatory duty."); *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208, 2006 WL 1008138, at *7 (S.D.N.Y. Apr. 18, 2006) (no duty to disclose the allocation of broker compensation, management bonuses, or sales contests in mutual fund prospectuses because SEC rules did not require such disclosures); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 248-49 (S.D.N.Y. 2003) (dismissing claims that defendants were liable for failing to disclose that defendant mutual fund's "broker-dealer affiliate provided investment banking services to companies in which the [f]und invested," because "[p]laintiff has not and cannot identify any SEC regulation or other legal authority that would require a mutual fund to disclose that information."); *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d at 552 (finding defendant had no duty to disclose in its tender offer documents agreements that it had with customers, as SEC did not require such disclosure), *aff'd*, 357 F.3d 302 (3d Cir. 2004); *Nenni* v. *Dean Witter Reynolds, Inc.*, No. 98 Civ. A. 12454 (REK), 1999 WL 34801540, at *6 (D. Mass. Sept. 29, 1999) (no duty to disclose in registration statements and prospectuses that mutual funds were not transferable to a brokerage account at other broker-dealers because no SEC rule mandates such

Here, the SEC has adopted rules expressly addressing the required disclosure with respect to transactions and events such as those at issue here and has rejected the type of anticipatory disclosure on which Lead Plaintiff's claims depend.

1.    **The Complaint Does Not Plead a Duty to Disclose Before December 28, 2007, Because it Does Not Allege ANY "Material Definitive Agreement" Before That Date.**

In 2004, the SEC amended the disclosure requirements for Form 8-K to require disclosure, within four business days, of the entry into any "material definitive agreements" not made in the ordinary course of business. *See* Final Rule: Additional Form 8-K Disclosure Requirements, SEC Release No. 34-49424, 2004 WL 536851, at *4, *6 (Mar. 16, 2004) ("SEC Final Rule Release"). Significantly, the amendment as originally proposed would have required disclosure of "material" agreements, including "letters of intent and other non-binding agreements." Proposed Rule: Additional Form 8-K Disclosure Requirements, SEC Release No. 34-46084, 2002 WL 1315511, at *5 (June 17, 2002) ("SEC Proposed Rule Release"). During the notice-and-comment period, however, "many commentators" opposed this proposal on the ground that its adoption "could cause significant competitive harm to the company and create excessive speculation in the market." SEC Final Rule Release Item 1, 2004 WL 536851, at *6. In addition, "several companies . . . stated that they use letters of intent extensively, but that few such letters culminate in a completed transaction." *Id.* In response to these comments, the SEC "eliminated the requirement that companies disclose their entry into non-binding agreements" from the final rule, which requires disclosure only of "material *definitive* agreements," within

---

disclosure); *DeBruyne* v. *Equitable Life Assurance Soc'y of United States*, 720 F. Supp. 1342, 1353 (N.D. Ill. 1989) (granting fund managers' motion to dismiss upon finding that Form N-1A disclosures were not misleading where they complied with SEC guidelines), *aff'd*, 920 F.2d 457 (7th Cir. 1990).

four business days after they are entered into. *Id.* at \*4, \*6 (emphasis added).  A material definitive agreement is defined as:

> an agreement that provides for obligations that are material to and *enforceable against the registrant*, or rights that are material to the registrant *and enforceable by the registrant* against one or more other parties to the agreement, in each case whether or not subject to conditions.

*Id.* (emphasis added); SEC Form 8-K, Item 1.01(b).

Thus, the SEC affirmatively *rejected* any requirement that information about a transaction be disclosed unless and until it has reached the point of a definitive, enforceable agreement.  In this case, however, Lead Plaintiff seeks to impose the very disclosure requirement that the SEC rejected.

*First*, the Complaint does not allege any facts suggesting the existence of an enforceable agreement between Centerline and Freddie Mac at any time prior to December 22, 2007 (four business days before the December 28, 2007 announcement).  Very much to the contrary, it repeatedly refers to the Freddie Mac transaction as being "planned" or in "process" throughout the Class Period. (*See, e.g.,* Cplt. ¶¶ 74, 76, 85, 86, 95, 109, 118(d).)  More fundamentally, Lead Plaintiff alleges in detail the complexities of the transaction, including negotiations with numerous third-parties concerning hundreds of bonds and massive due diligence regarding tens of thousands of apartment units, all of which necessarily made the transaction highly uncertain and had to be completed before an "enforceable" agreement was possible. (*See supra,* p. 4.)

Lead Plaintiff attempts to skate past this dispositive defect in its pleading with vague assertions that defendants "failed to disclose that Centerline had entered into an agreement" or "agreed" or "had a deal" to sell the tax-exempt bond portfolio to Freddie Mac. (Cplt. ¶¶ 74, 78, 92, 118(a).)  But the Complaint alleges no facts to support those characterizations, relying instead on speculation that "Centerline *would have had* a firm agreement with Freddie Mac for

12

almost one year before the end of the Class Period." (*Id.* ¶ 51, emphasis added; *see also id.* ¶ 11 (the transaction "could not be accomplished in less than nine months after the parties reached agreement"). In fact, the Complaint makes clear that Lead Plaintiff is alleging, at most, a "term sheet" (*id.* ¶ 56), and it does not plead any facts supporting even that characterization — much less the existence of an enforceable, definitive agreement, which is necessary to trigger a duty to disclose. Nor does the Complaint indicate how there could possibly have been a "firm agreement" on key terms such as price, without knowing the market value of the portfolio at the conclusion of "nine months" of due diligence — nor how an "enforceable" agreement could have existed without such terms.

*Second*, given that there was no duty to disclose information about the Freddie Mac transaction before it was the subject of a definitive, enforceable agreement, there could not have been any duty to disclose the possibility of a reduction in Centerline's dividend before that time. Lead Plaintiff alleges no basis for requiring anticipatory disclosure regarding the dividend reduction, other than the fact that it was a foreseeable consequence of the securitization of the bond portfolio. It would be nonsensical to require disclosure of the anticipated *consequence* of a future transaction when the transaction itself is too uncertain to require disclosure.

*Third*, as for the TRCLP Investment, Lead Plaintiff does not allege any facts suggesting that this transaction was the subject of a definitive, enforceable agreement at any time earlier than December 22, 2007 (that is, four business days before the December 28 disclosure, *see supra*, pp. 11-12). Indeed, far from presenting any specific allegations at all about *when*, or even *if*, any agreement was reached prior to actual disclosure, Lead Plaintiff does not even speculate about when such a transaction "would have" been negotiated. There is simply nothing in the

13

Complaint to suggest anything about the TRCLP Investment was not disclosed in a timely fashion.

   2.    **The Complaint Does Not Plead Facts Establishing a Duty to Provide Advance Disclosure Regarding the Freddie Mac Transaction as a "Disposition of a Significant Amount of Assets."**

The SEC instructions for Form 8-K also require disclosure, within four business days, of "the acquisition or disposition of a significant amount of assets." Form 8-K, Item 2.01. Once again, however, the SEC has made clear that disclosure of such an acquisition or disposition is not required until it has been consummated, as the instructions expressly provide for disclosure "[i]f the registrant . . . *has completed* the acquisition or disposition of a significant amount of assets," and the disclosure is required to include "the date of *completion* of the transaction. . . ." *Id.* Item 2.01(a) (emphasis added). Thus, the SEC has determined *not* to require anticipatory disclosure of a prospective disposition of assets. That determination governs here, as the Complaint does not assert — even in conclusory or speculative terms — that the Freddie Mac transaction was completed before December 22, 2007.

   3.    **The Complaint Does Not Plead Facts Establishing a Duty to Provide Advance Disclosure Regarding the TRCLP Investment as an "Unregistered Sale of Equity Securities."**

Finally, Form 8-K requires disclosure "[i]f the registrant sells equity securities in a transaction that is not registered under the Securities Act." Form 8-K, Item 3.02(a). As with the provisions regarding material definitive agreements and dispositions of assets, within two business days, Item 3.02(a) expressly provides that there is "*no obligation* to disclose information under this Item 3.02 *until the registrant enters into an agreement enforceable against the registrant*, whether or not subject to conditions, under which the equity securities are to be sold." (emphasis added). As previously noted, Lead Plaintiff does not contend that any

14

such agreement existed with regard to the TRCLP Investment before December 22, 2007, much

less plead any facts suggesting that was the case. (*See supra*, pp. 13-14.)

**B.    Even Apart from SEC Rules, Defendants Were Under No Duty to Disclose the Prospective Transactions or Dividend Cut Where the Terms of the Initiatives Were Subject to Continuing Negotiations, and No Final Agreement Had Been Reached.**

Even absent the governing SEC rules discussed above, courts are in agreement that no

duty to disclose arises prior to the completion of a binding agreement or the completion of the

transaction.[6] This principle is no less applicable than otherwise in the case of "transformational"

(Cplt. ¶ 6) events and transactions, such as mergers — which are "the most important event that

can occur in a small corporation's life, to wit, its death." *Glazer* v. *Formica Corp.*, 964 F.2d 149,

157 (2d Cir. 1992) (holding that there was no duty to disclose a potential merger before the

agreement was finalized, where defendants were not trading in the issuer's stock and there were

no false or misleading statements) (quoting *SEC* v. *Geon Industries, Inc.*, 531 F.2d 39 (2d Cir.

1976) (Friendly, J.)).[7] Similarly, an issuer is not obligated to disclose a new strategic plan before

it is implemented. *Ventry* v. *Sands (In Re Canandaigua Sec. Litig.)*, 944 F. Supp. 1202, 1208-

---

[6]    *See TCS Capital Mgmt., LLC* v. *Apax Partners, L.P.*, NO. 06-CV-13447, 2008 WL 650385, at *21 (S.D.N.Y. Mar. 7, 2008) ("Prior to signing the . . . agreement, [the third party] could have withdrawn from the negotiations for any reason, so there was nothing definitive to disclose," and thus no duty to disclose); *PPM Am.* v. *Marriott Corp.*, 875 F. Supp. 289 (D. Md. 1995) (holding that no duty to disclose accrued, because the merger deal was still in flux during the negotiation period).

[7]    *See also Chien* v. *Skystar Bio Pharmaceutical Co.*, No. 3:07CV781, 2008 WL 2790005, *7 (D. Conn. July 17, 2008) (defendant "was under no duty to disclose the pendency of merger talks . . . until September 20, when an agreement was finally reached"); *Robbins* v. *Moore Medical Group*, 894 F. Supp. 661, 675 (S.D.N.Y. 1995) (granting defendants summary judgment where plaintiffs alleged, *inter alia*, that defendants had committed fraud by not warning of the potential sale of a subsidiary until six months after they had begun exploring the option of selling the subsidiary; "[n]o statute or regulation required that Defendants reveal their consideration of selling [the subsidiary] before they actually decided to do so in November of 1990."); *In Re CDnow, Inc. Sec. Litig.*, 138 F. Supp. 2d 624 (E.D. Pa. 2001) (dismissing claims that 10-K was misleading where it did not mention the likely failure of a merger; defendants were "not liable for failing to inform the public that the merger would not go through" because the merger was not certain until the day the deal was signed).

15

1209 (S.D.N.Y. 1996) (granting summary judgment for defendants and holding that the failure to disclose a strategy that resulted in decreased profits but aimed to increase market share by reducing product prices was not fraudulent).[8] This principle acquires special force where the fate of the transaction or event at issue depends on someone other than the issuer.[9]

The rationale behind this principle is obvious: if each phase and contingency associated with a transaction or the disposition of assets were required to be disclosed to investors, the market would be flooded with information about contingencies and hypothetical transactions, as companies scrambled to play it safe by over-disclosing. The ensuing information overload "could easily result in misleading the public more than not reporting" — to the detriment of the public. *See In re Medimmune, Inc., Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995). Additionally, such advance disclosure would likely diminish or destroy whatever competitive advantage the company was attempting to secure by means of the transaction in the first place. *See Flamm* v. *Eberstadt*, 814 F.2d 1169 (7th Cir. 1987) (dismissing complaint because target company's search for white knight was immaterial as a matter of law prior to agreement on deal price and structure); *Reiss* v. *Pan American World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir. 1983) (noting that merger negotiations "are inherently fluid and the eventual outcome is shrouded in uncertainty. Disclosure may in fact be more misleading than secrecy so far as investment decisions are concerned.").

---

[8] *See also San Leandro Profit Sharing Plan*, 75 F.3d at 809-10 (affirming dismissal of claim that defendant's announcement that it was "committed to a strategy of increased prices to sustain profits," shortly before it radically cut prices in a move that cost the company $2 billion, was fraudulent; holding that defendant had violated no duty to disclose the ongoing price cut deliberations at the board level, and was under no duty to disclose transformational plans).

[9] *See, e.g., In re Discovery Labs Sec. Litig.*, No. 06-1820, 2006 U.S. Dist. LEXIS 79823 (E.D. Pa. 2006) (no duty to disclose company was in ongoing discussions with the FDA over approval for a new drug until FDA reaches a final conclusion); *In re Gametech*, CIV 98-268-PHX-ROS, 1999 U.S. Dist. LEXIS 22289 (D. Ariz. June 1, 1999) (no liability because undisclosed federal investigation was not controllable by defendant).

Accordingly, defendants had no duty to disclose anything about the Freddie Mac transaction before a binding agreement was reached. First, as alleged in the Complaint, the transaction could not be completed until Freddie Mac completed extensive due diligence. Unless that massive effort was intended as a waste of time and money, it would have to enable Freddie Mac to withdraw from further negotiations depending on what was revealed. Indeed, the Complaint alleges no facts suggesting that Freddie Mac was legally bound, at any time before December 22, 2007, to purchase the bond portfolio under *any* set of conditions. Moreover, the Freddie Mac transaction was also dependent on reaching agreement with numerous counterparties who had provided the Company with credit enhancements and "wraps," who are not alleged to have been under any compulsion to "unwind" their transactions with Centerline, and could have refused to do so.[10]

There is also no legal authority requiring the advance disclosure of prospective changes in dividend policy. Thus, defendants were under no duty to disclose in advance that the Freddie Mac transaction "would result in the drastic reduction of the dividend and a drastic reduction in its tax-free component." (Cplt. ¶¶ 84.) Because the dividend cut is alleged to have been "a result" of the Freddie Mac transaction (Cplt. ¶ 17), it was no less dependent on the decisions of Freddie Mac and other third parties than the transaction itself.

---

[10]    Because defendants violated no duty to disclose, Lead Plaintiff's assertions that investors would have liked to have known that Centerline was negotiating with Freddie Mac, or that the Company wanted to sell its bond portfolio (*see, e.g.*, Cplt. ¶¶ 4-8), are beside the point. Where there was no duty to disclose the potential securitization, there could be no liability for Centerline's decision not to inform the market of the deal until it had been finalized, even if the underlying information was material. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) (citing *Time Warner* and noting that "[e]xcept for specific periodic reporting requirements . . . there is no general duty on the part of a company to provide the public with all material information.").

Finally, defendants had no duty to disclose the TRCLP Investment before December 28, 2007, because the Complaint does not allege that either party was bound more than four business days before that date to proceed with that transaction, and it therefore depended, at least, on a final decisions by both parties, either of which could have withdrawn from negotiations.[11]

**C.    The Complaint Does Not Adequately Plead a Duty to Disclose Based on Statements Alleged to Be Misleading Absent the Disclosures at Issue.**

Recognizing that SEC rules and the case law demolish any claim of a generalized duty to disclose in advance the matters announced on December 28, 2007, Lead Plaintiff focuses its effort on assertions that statements made by defendants during the Class Period were "false and misleading" due to the nondisclosure of those matters and therefore gave rise to a duty to disclose. The effort fails.

As previously noted, Lead Plaintiff's attempt to plead statements that were misleading due to nondisclosure consists of wholesale cutting and pasting from every public communication by the Company over a nine-month period, in each instance followed by the rote incantation that the cited communication was "materially false and misleading" because it did not disclose that Centerline was "in the process" of selling its bond portfolio to Freddie Mac, and created the "false impression that the Company would retain its tax-exempt portfolio (and continue paying substantial tax-exempt dividends out of income generated by this portfolio) for the foreseeable

---

[11] In any event, courts have long held that statements made regarding the continuation of dividends amount to mere opinion. In *Hershfang* v. *Citicorp*, 767 F. Supp. 1251, 1252-53 (S.D.N.Y. 1991), for example, the Court dismissed securities fraud claims based on statements by Citibank officers that the bank intended to implement "a customary dividend increase" and that it planned no dividend reduction. The court held that although the dividend was subsequently reduced, the statements were mere opinions, and "not intentional misrepresentations about [defendant's] financial condition or a guarantee that the bank would not lower its dividend." *Id.* (citing *Friedman* v. *Mohasco Corp.*, 929 F.2d 77, 70 (2d Cir. 1991)). The statement at issue here is similarly not actionable.

future." (*See supra*, pp. 6-7.)  But the quoted statements do not reasonably create any such "impression."

For example, the Complaint asserts that the Company's Form 10-K for 2006 was misleading and created the "false impression" quoted above, by virtue of references to the then-current size of the bond portfolio, the amount of the Company's dividend in 2005 and 2006, and an increase in revenue bond interest income due primarily to "expanding our revenue bond portfolio in 2005 and 2006." (Cplt. ¶¶ 76-78.)  Obviously, these accurate historical statements say nothing about the future and therefore cannot be misleading with respect to the future.[12]

What is more, these are all historical matters that Centerline was *required* to include in its Form 10-K. *See* Form 10-K, Items 1, 5; 17 CFR §§ 229.101(b), 229.201(c).  If every such required historical disclosure created a duty to forecast future changes regarding the matters reported, the express SEC rules providing that such disclosure is *not* required would be nullified. And virtually all of the other statements that Lead Plaintiff asserts to be false and misleading due to nondisclosure of the potential bond sale are similarly limited to truthful reporting of historical or present facts, in most cases, facts for which reporting is required.[13]

---

[12] *In re Worldcom Sec. Litig.*, 303 F. Supp. 2d 385, 389-90 (S.D.N.Y. 2004) (dismissing complaint on the basis that a company's "disclosure of accurate historical data" is not actionable under federal securities law); *In re Duane Reade Sec. Litig.*, No. 02 Civ. 6478 (NRB), 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ("Defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy. Plaintiffs do not allege, nor is there any evidence that the statements are false, and contrary to plaintiffs' suggestions, disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future."), *aff'd sub nom. Nadoff* v. *Duane Reade Inc.*, 107 Fed. Appx. 250 (2d Cir. 2004).

[13] *See, e.g.*, Cplt. ¶¶ 72-73 (March 12, 2007 statement that Centerline "completed several major initiatives in 2006 that significantly changed our Company and transformed [it] from a firm focused on affordable and multifamily housing to a full-service real estate finance and investment company"); *id.* ¶¶ 91-95 (May 10, 2007 statement that "[w]ith respect to our tax-exempt bond business the current supply in the market is low and the demand is at an all time high"); *id.*. ¶¶ 99-109 (August 9, 2007 statement that "operating fundamentals in the commercial

To the limited extent that the Complaint contains any variations on this theme, it does no better. For example, Lead Plaintiff points to "[t]he assertion [in Centerline's March 12, 2007 press release and Form 8-K] that Centerline had achieved 'the completion of corporate re-engineering,'" and claims that this statement "served to reassure investors who sought the continuation of Centerline's conservative, predictable, largely tax-exempt revenue" stream "and concealed the agreement . . . to dispose of the tax-exempt bond portfolio. . . ." (Cplt. ¶ 72.) But the quoted statement does not mention tax-exempt revenue or any "conservative" or predictable revenue stream, even with respect to the past or present — much less with respect to future "continuation." To the contrary, the passage quoted in the Complaint refers to the Company's acquisition of "one of the nation's leading high-yield CMBS fund mangers," the "launch of . . . a credit risk products company," the "rollout of a new credit approval process," the "divesture of two non-core investments," and the "completion of a corporate reengineering" that was aimed at creating "a more efficient operating platform while maintaining a high level of service" and involved a "branding initiative." (Cplt. ¶ 72.) These are not complicated or ambiguous matters, and on their face they could scarcely be further removed from the points on which Lead Plaintiff claims they "reassured" investors.

The only statement cited by Lead Plaintiff that even arguably touches on future plans regarding the bond portfolio is a statement by Mr. Schnitzer in a November 8, 2007, conference call, in response to an analyst who asked "whether Centerline had considered selling its tax-exempt bond portfolio in order to transform the Company into a pure asset management firm." (Cplt. ¶ 113.) Mr. Schnitzer responded that Centerline had "thought about that and many other

---

real estate and affordable housing sectors are healthy" and "[t]he credit quality of our bond portfolio remains very strong"); *id.* ¶¶ 111-117 (November 9, 2007 10-Q statement that "the Company's tax-exempt bond portfolio was continuing to produce positive yields and that revenue from this portfolio had increased during 2007").

options. But clearly, that's one that would come to mind right away." (*Id.*) That statement was

of course accurate, and it could not possibly create an "impression" that Centerline would *refrain*

from selling its bond portfolio, a possibility that Mr. Schnitzer expressly acknowledged. No

more is required in the absence of a definitive agreement.

Similarly, Lead Plaintiff claims that it was misleading for defendants not to disclose the

potential dividend reduction by virtue of a November 2007 statement that management "would…

not recommend a change in dividend policy to our Board." (Cplt. ¶ 113; *see also id.* ¶ 12.) But it

is Lead Plaintiff that misleadingly fails to disclose that the quoted statement expressly referred to

the *2007* dividend -- which was not cut – not to any future plans for the 2008 dividend policy.[14]

Lacking any actual misleading statement on which to base a claim, Lead Plaintiff is

ultimately forced into the bizarre assertion that a duty to make advance disclosures of future

plans arose from the following warning in Centerline's 2006 10-K:

> OUR BOARD OF TRUSTEES CAN CHANGE [ITS] BUSINESS POLICIES
> UNILATERALLY
>
> Our board of trustees may amend or revise our business plan and certain other
> policies without shareholder approval. Therefore, our shareholders have no
> control over changes in our policies, including our business policies with respect
> to acquisitions, financing, growth, debt, capitalization and distributions, which are
> determined by our board of trustees

(Cplt. ¶ 79-80.) According to Lead Plaintiff, this warning was misleading because it did not

disclose that the Company was attempting to do precisely what this warning reserved the right to

do: change its business. (*Id.* ¶ 80.) That reasoning depends on an assumption that by expressly

---

[14] During the November 8, 2007 conference call, Mr. Schnitzer in fact stated: "Finally, *we are reiterating our CAD per share earnings guidance that we gave on the second quarter conference call. At that time, we provided guidance for flat growth in 2007. We remain comfortable with that guidance.* Based on our current outlook, we're confident that we will earn CAD in excess of our dividend and would therefore not recommend a change in dividend policy to our Board." (Rosen Dec., Ex. B at 5 (emphasis added).)

reserving the right to take an action, an issuer is representing that it will not take that action —
thus rendering the reservation of rights meaningless.    No more need be said about this
allegation.[15]

## II.

### THE COMPLAINT DOES NOT ADEQUATELY ALLEGE ANY FALSE STATEMENT OF FACT AND, ACCORDINGLY, SHOULD BE DISMISSED.

As noted above, the Complaint does not identify any false statement by any defendant.
Nor does the Complaint adequately plead any omission that was required to be disclosed in order
to make any statement not misleading.  (*See supra*, pp. 6-8.)  Accordingly, Lead Plaintiff has
failed to state a critical element of a Section 10(b) claim: a false or misleading statement.[16]

## III.

### THE COMPLAINT DOES NOT ADEQUATELY PLEAD SCIENTER.

In order to state a claim under Section 10(b), Lead Plaintiff is required to plead facts
sufficient to raise a strong inference of *scienter.  See Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
127 S. Ct. 2499, 2509-10 (2007).  The Supreme Court also recently laid to rest the "no set of
facts" motion to dismiss rubric of *Conley* v. *Gibson*, 355 U.S. 41 (1957), and made it clear, in
*Bell Atlantic* v. *Twombly*, 127 S. Ct. 1955 (2007), that Rule 8(a)(2)'s standard of a "short and
plain statement of the claim" requires something more than "labels and conclusions," and that a

---

[15]    *Cf. Phillips* v. *LCI Int'l., Inc.*, 190 F.3d 609 (4th Cir. 1999) (public statement by
company's chief executive that "[w]e're not a company that's for sale," made at time he knew
company was engaged in merger negotiations, was not material misstatement made with intent to
defraud).

[16] *Chill* v. *Gen. Elec. Co.*, 101 F. 3d 263, 266 (2d Cir. 1996); *Joffee* v. *Lehman Bros., Inc.*,
No. 04 Civ. 3507 (RWS), 2005 WL 1492101, at *8 (S.D.N.Y. June 23, 2005) (noting that, in
order to state a cause of action under Section 10(b) and Rule 10b-5, plaintiffs must plead facts
showing that, in connection with the purchase or sale of securities, the defendant (1) made a
misstatement or omission, (2) of a material fact, (3) with scienter, (4) on which plaintiffs relied,
(5) that proximately caused plaintiff's injury).

"formulaic recitation of the elements of a cause of action will not do." *Id.* at 1965. Rather, the "factual allegations" of a complaint must now "be enough to raise a right to relief above the speculative level" – that is, Lead Plaintiff must demonstrate "plausible grounds to infer" that the elements of the pleaded violation have occurred. *Id.* at 1965 (citations omitted).

To meet these standards with respect to *scienter*, the Complaint must either (a) plead facts showing that defendants had both motive and opportunity to commit fraud, or (b) alleging facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit* v. *Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001) (quotation omitted). In this context, recklessness means "highly unreasonable" conduct that "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 142 (citation and internal quotation marks omitted). In determining whether a complaint adequately pleads *scienter*, courts must "consider plausible nonculpable explanations for defendant[s'] conduct, as well as inferences favoring the plaintiff." *Tellabs*, 127 S. Ct. at 2510. Thus, "[a] complaint will survive . . . *only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference* one could draw from the facts alleged." *Id.* (emphasis added).

The present Complaint fails this test.

*First*, even if defendants were under a duty to disclose in advance information about the matters announced on December 28, 2007, the SEC rules and case law providing to the contrary (*see supra*, pp. 9-18) negate any inference that defendants knew they had to disclose (or were reckless in failing to disclose) those matters prior to that date. *See In re Morgan Stanley & Van Kampen Mut. Fund Secs. Litig.*, 2006 WL 1008138, at *11 (finding lack of scienter because

"defendants could reasonably believe that the law did not require disclosure . . . ."); *Geiger*, 933 F. Supp. at 1191 ("It cannot be conscious misbehavior or recklessness for a defendant to fail to disclose in a prospectus information that is neither material nor required to be disclosed under applicable SEC regulations"). As a result, the facts alleged in the Complaint do not show, as they must to plead *scienter*, that defendants engaged in "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . ." *In re Carter-Wallace, Inc. Secs. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (quotation marks omitted). No cogent or compelling inference of *scienter* may be drawn, let alone one "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 127 S. Ct. at 2510. Rather, the more compelling inference is that defendants did not disclose the Freddie Mac transaction, the dividend cut or the TRCLP Investment until there was something to disclose. *See Kalnit*, 264 F.3d at 143 (Where the complaint "does not present facts indicating a clear duty to disclose, plaintiff's scienter allegations do not provide strong evidence of conscious misbehavior or recklessness."); *Castillo*, 1998 WL 342050, at *11 (same).

*Second*, even in the absence of rules and case law telling defendants they had no duty to disclose, the facts alleged in the Complaint would not be sufficient to plead *scienter*. *See In Re Canandaigua Sec. Litig.*, 944 F. Supp. at 1214 ("Absent some allegation that defendants knew or were highly unreasonable in not knowing that they were doing something illicit, the complaint fails to adequately plead scienter."). Apart from pages of allegations to the effect that the individual defendants knew about the prospective transactions they were working on (Cplt. ¶¶ 146-148), the only allegations relevant to *scienter* consist of an attempt to fabricate a fraudulent motive. But Lead Plaintiff's allegations on this point are incoherent. At the core of those allegations is the notion that defendants expected Centerline's stock price would fall in response

to information about the Freddie Mac transaction, the dividend cut and the TRCLP Investment, and that Mr. Ross, who was Chairman of Centerline's Board of Trustees and Chairman, CEO and General Partner of TRCLP, had a "compelling personal and financial motivation" to cause Centerline's stock price to "plummet," which "paved the way for defendant Ross to take the Company private at a 'bargain basement' price." (Cplt. ¶¶ 10, 32.) Here, Lead Plaintiff alleges that as a result of TRCLP investing $131 million in new cash into Centerline in return for convertible preferred stock, Messrs. Ross and Blau received "a call option on 20% of the Company" (Cplt. ¶ 118(g)) which can only be exercised at the price of $10.75 per share (*id.*). But Lead Plaintiff concedes this conversion right to be an "uneconomic" proposition (Cplt. ¶ 140) in light of the drop in the stock price that it claims was an anticipated and desired result of the investment and other simultaneously announced transactions. Thus, Lead Plaintiff is left arguing that Messrs. Ross and Blau intentionally drove down the stock price specifically to obtain an "uneconomic" and unexercised conversion right – a financially irrational proposition that hardly suggests a motive to commit fraud.

Even accepting as true the suggestion that Mr. Ross was motivated to drive down the stock price — he was not — it would motivate a rational person in Mr. Ross's position to *disclose* the transactions at the earliest possible time. Indeed the Complaint expressly alleges that Mr. Ross expected "to profit from the surprising announcement" (*id.*) — *not* from *withholding* the information that was announced.[17]

---

[17] *See Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) ("[i]n looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest."); *Hampshire Equity Partners II, L.P.* v. *Teradyne, Inc.*, No. 04 Civ. 3318, 2005 WL 736217, at *3 (S.D.N.Y. Mar. 30, 2005) (finding no scienter where plaintiffs alleged that defendants were "hedging their bets" by retaining a potential supplier, while also planning to terminate the supplier because "allegations of irrational motive cannot support a fraud claim under Rule 9(b).").

If Lead Plaintiff is correct that the December 28, 2007, announcement drove down (and was intended to drive down) Centerline's stock price, then Mr. Ross logically could have achieved the same result by having the transaction announced *earlier*. The Complaint alleges no facts that might explain why Mr. Ross chose to defer his enjoyment of the supposed benefits of a low Centerline stock price for "nearly a year" while the Freddie Mac transaction was "in the works" (Cplt. ¶ 19). To the contrary, if Lead Plaintiff's motive allegations are accepted, it was irrational for Mr. Ross to wait until December 28, 2007, to issue the announcements — *after* TRCLP agreed to invest $131 million in Centerline preferred stock with a $10.75 conversion price based on pre-announcement stock trading levels. A rational person with the motives that Lead Plaintiff ascribes to Mr. Ross would have wanted the stock to "plummet" *before* agreeing to the conversion price in a preferred stock investment rather than locking in an "uneconomic" conversion price. Nothing about Lead Plaintiff's theory of Messrs. Ross and Blau's supposed scienter makes any economic sense.

As for the other defendants, the only motive that Lead Plaintiff imputes to them is a supposed motive to please Mr. Ross, to whom they are allegedly "beholden." But that motive, even if supported by factual allegations — which it is not[18] — would not support an inference of *scienter*, because the alleged motive of Mr. Ross himself is *contrary* to the alleged fraud, for the

---

[18]    The asserted basis for this characterization consists of allegations that Messrs. Schnitzer and Levy had "high salaries, bonus compensation, equity awards, the promise of continued lucrative employment" and were motivated by "fear of retribution by defendant Ross and other entities affiliated with Ross." (Cplt. ¶ 153.) It is black letter law, however, that a plaintiff cannot create a strong inference of scienter by simply pleading motives that are common to most market participants. *See, e.g., Bay Harbour Mgmt. LLC v. Carothers*, Nos. 07-1124-cv, 07-1157-cv, 2008 WL 2566557, at *2 (2d Cir. 2008) (citing *Kalnit*, 264 F.3d at 139 ("Sufficient motive allegations entail concrete benefits that could be realized by [the fraud]. Motives that are generally possessed by most [market participants] do not suffice...")); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (holding that allegations of "incentive compensation" do not give rise to a strong inference of fraudulent intent).

reasons laid out in the preceding paragraph. Moreover, even if an alleged desire to achieve a low stock price could establish *scienter* in this case, the Complaint alleges no facts suggesting that Centerline, or Messrs. Schnitzer, Levy or Blau, were so motivated; the only plausible inference is to the contrary, given that *all* of the individual defendants own significant quantities of Centerline stock and/or options (with exercise prices over $17 per share),[19] and none is alleged to have sold during the Class Period.[20]

Finally, as a last resort, the Complaint asserts that defendants' desire to attract a base of institutional investors "Give[s] Rise to a Strong Inference of Scienter." (Cplt. ¶ 148(b) & p. 64.) But there is nothing improper about attracting institutional investors. Moreover, if the transactions at issue were motivated to attract institutional investors, defendants would have been motivated to announce these transactions even earlier. In any event, the Complaint nowhere alleges facts indicating how defendants stood to derive any benefit from attracting institutional investors — other than the benefit of a higher stock price in the long term, which was available to all putative class members — let alone that any inference of an improper benefit that is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 127 S. Ct. at

---

[19]    *See e.g.* Cplt. ¶ 133 (alleging that during the Class Period, Centerline awarded Mr. Ross options to purchase 800,000 shares of Centerline stock at $17.78 per share); ¶ 137 (alleging that Messrs. Ross and Blau owned over twelve million common shares and/or equivalents in the Company prior to TRCLP's convertible preferred investment); Rosen Dec., Ex. A at 53 (Centerline proxy statement dated April 23, 2007 reflecting Mr. Schnitzer's direct or beneficial ownership of 1,244,731 common shares and Mr. Levy's ownership of 112,936 common shares as of March 31, 2007).

[20]    *Davidoff* v. *Farina*, No. 04 Cir. 7617, 2005 WL 2030501, at *11 & n.19 (S.D.N.Y. Aug. 22, 2005) (concluding defendants lacked scienter because "it would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail."); *see also Atlantic Gypsum Co., Inc.* v. *Lloyds Int'l. Corp.*, 753 F. Supp. 505, 514 (S.D.N.Y. 1990) (allegations that members of banking institutions advanced a substantial sum of money to a new venture and then intentionally prevented borrowers from completing construction project in order to acquire the borrower's company undercut inference of scienter because "plaintiffs' theory of an alleged scheme to defraud defies logic").

2505; *see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 289 F. Supp. 2d 416, 428 (S.D.N.Y. 2003) (finding allegations that defendants sought to attract investment banking business insufficient as a matter of law to establish concrete and personal benefits).

## IV.

### THE COMPLAINT DOES NOT ADEQUATELY PLEAD LOSS CAUSATION.

In order to state a claim under Section 10(b), Lead Plaintiff must plead facts establishing "loss causation" — *i.e.*, that the alleged fraud caused it economic loss. *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 341 (2005). In *Dura*, the Supreme Court held that allegations that defendants' misrepresentations or omissions caused the price at which plaintiffs purchased their stock to be artificially inflated, standing alone, do not adequately plead loss causation. *Id.* at 346-347. Rather, a plaintiff must plead that "the truth became known" – *i.e.*, that some kind of "corrective disclosure" entered the market, or that the risks concealed by a defendant's omission somehow materialized – *before* the stock price drop from which the plaintiff claims a loss. *Id.* at 347.[21] Moreover, and equally critical, a plaintiff who claims that a corrective disclosure triggered his losses must plead facts establishing *how* the disclosure revealed the defendant's alleged prior misrepresentations or omissions — *i.e.*, how the corrective disclosure revealed the

---

[21] *Accord Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) ( "'[A] plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.") (ellipsis in original) (internal citations omitted); *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) ("[I]n material misstatement or omission cases, a court cannot presume dissipation of the inflationary effect; a plaintiff must explicitly allege a disclosure or some other corrective event.") (internal citations omitted).

defendant's prior misrepresentations or omissions.[22]    In the Second Circuit, securities fraud

claims are routinely dismissed for failure to adequately allege loss causation.[23]

Here, the Complaint does not plead any corrective disclosure to support a finding of loss

causation at any time before December 28, 2007, and it should be dismissed to the extent it

purports to seek recovery for any decline in Centerline's stock price before that date.  In addition,

as for the disclosures on December 28, 2007, the Complaint does not adequately plead facts

establishing that the revelation of alleged fraud caused the reduction in stock price, and the

Complaint should therefore be dismissed as to that price decline, as well.

**A.    The Complaint Does Not Allege Any Corrective Disclosure With Respect to Any
Pre-December 28, 2007 Stock Price Decline, and Thus Does Not State a Claim Based
on Any Declines Prior to That Date**

*Dura* clarified that a district court cannot sustain a securities fraud claim based on alleged

misrepresentations that "do[] not proximately cause any economic loss."  *Dura*, 544 U.S. at

---

[22]    *See Leykin* v. *AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) (claims dismissed because plaintiffs failed to distinguish the effects of the disclosure of the alleged fraud from the effect of other market factors).  As the *Dura* Court observed, a lower price can result from many non-actionable factors:

> If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase *might* mean a later loss.  But that is far from inevitably so.  When the purchaser subsequently resells such shares, even at a lower price, *that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.*

544 U.S. at 341-43 (second emphasis added).

[23]    *See Lentell*, 396 F.3d at 164, 175-78; *see also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, Nos. 02 MDL 1484 & 07 CIV 6677, 2008 WL 2019680, at *10-*14 (S.D.N.Y. May 8, 2008); *Garber* v. *Legg Mason*, 537 F. Supp. 2d 597 (S.D.N.Y. 2008); *Lattanzio* v. *Deloitte & Touche LLP*, 476 F.3d 147, 151 (2d Cir. 2007); *Joffee* v. *Lehman Bros.*, 410 F. Supp. 2d 187, 190 (S.D.N.Y. 2006), *aff'd* 209 Fed. Appx. 80 (2d Cir. 2006); *60223 Trust* v. *Goldman Sachs*, 540 F. Supp. 2d 449, 451 (S.D.N.Y. 2007); *In re Initial Public Offering Sec. Litig.*, 399 F. Supp. at 307-08.

346.[24]  Lead Plaintiff here does not even attempt to plead facts showing that the decline in

Centerline's share price from $19.75 to $10.27 between March 12, 2007 to December 27, 2007

(one day before the close of the Class Period), was caused by a corrective disclosure or

materialization of a concealed risk.[25]  Although Centerline's share price trended downward

during this part of the class period, Lead Plaintiff does not and cannot assert that any alleged

misrepresentations or omissions — including the sale of Centerline's tax-exempt bond portfolio,

a cut in the Company's dividend rate or the TRCLP Investment — was revealed to the market

during this period, or that Centerline's share price "fell significantly after the truth became

known" on or prior to December 28, 2007.  *Dura*, 544 U.S. at 347.

Lead Plaintiff's failure to identify any corrective disclosures *prior* to December 28, 2007,

or to allege any causal relationship between such corrective disclosure and a drop in stock price

makes it impossible, as a matter of law, for it to obtain recovery for any decline in Centerline's

share price from March 12 to December 27, 2007.  Dismissal is thus required for any claims

predicated on a pre-December 28, 2007 loss.  *See 60223 Trust* v. *Goldman, Sachs & Co.*, 540 F.

Supp. 2d at 461 (holding that complaint's failure to account for "gradual loss of value . . . during

---

[24]  To the extent Lead Plaintiff's claims are based on "artificial inflation" in Centerline's
stock price as a result of defendants' alleged misstatements (*see, e.g.*, Cplt. at ¶¶ 142-143), as
opposed to an associated loss proximately caused by defendants, those claims fail.  Under *Dura*,
no recovery is allowed for alleged misrepresentations that "lead[] to an inflated purchase price
but nonetheless do[] not proximately cause any economic loss."  *Dura*, 544 U.S. at 346.
Allegations such as that "Centerline's stock would not have traded at the elevated levels it did"
absent defendants' alleged "material misstatements and omissions" (Cplt. ¶ 142), are untethered
to any loss proximately caused by defendants, and fail to state a claim.

[25]  This Court may take judicial notice on a motion to dismiss of the price of a publicly
traded stock.  *Ganino* v. *Citizens Utilities Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000).

the time when the alleged false and misleading comments of an optimistic nature were being issued" was fatal to the attempt to plead loss causation).[26]

Moreover, the Complaint itself acknowledges that Centerline share prices were "dragg[ed] down" during the Class Period, as the "subprime mortgage crisis gathered momentum." (Cplt. ¶ 15), not because any alleged misstatements or omissions by defendants were revealed to the public. Dismissal is proper because Lead Plaintiff has failed to demonstrate that any decline in Centerline's share price before December 28, 2007 was "attributable to anything other than the market." *Garber*, 537 F. Supp. 2d at 617.[27]

**B.    The Complaint Does Not Plead Loss Causation With Respect to the December 28, 2007 Price Drop Because It Does Not Distinguish Which of the Transactions and Initiatives Announced on That Date Caused the Actual Loss Plaintiffs Allegedly Suffered.**

The Complaint also fails to allege loss causation with respect to the stock price drop on December 28, 2007, because it does not "distinguish the alleged fraud from the 'tangle of [other] factors' that affect a stock's price" on that date. *In re Merrill Lynch*, 2008 WL 2324111, at *7 (S.D.N.Y. June 4, 2008) (quoting *Dura*, 544 U.S. at 343). Where there is more than one

---

[26]    *See also Lentell*, 396 F.3d at 175 n.4 (noting that defendant's concealed opinions "could not have caused decrease in the value of those companies before the concealment was made public"); *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678-79 (S.D.N.Y. 2007) (granting motion to dismiss where there was no corrective disclosure); *Joffee*, 2005 WL 1492101, at *9 (dismissing securities fraud complaint under *Dura* where plaintiffs alleged that analyst reports artificially inflated company stock price, but analysts' fraudulent practices were not revealed until over two years after stock price decline); *In re Initial Public Offering Sec. Litig.*, 399 F. Supp. at 307-08 (failure to plead loss causation when alleged falsity of defendants' earnings estimates was never disclosed).

[27]    *See also In re Merrill Lynch & Co. Research Reports Sec. Litig.*, No. 02 MDL 1484, 2008 WL 2324111, *8 (S.D.N.Y. June 4, 2008) (plaintiffs failed to allocate the portion of the stock decline between the correction of allegedly false statements and the market conditions amidst the "well-documented busting of the Internet bubble."); Richard D. Bernstein & Michael D. Gorfinkle, *Pleading and Proving Loss Causation in § 10(b) Credit Crisis Cases*, 5 SEC. LITIG. REP. 14, 17 (May 2008) (Asserting that, under *Twombly*, a complaint that fails to allocate a stock price's decline between fraud and non-fraud factors should fail at the motion to dismiss stage).

31

disclosure on a particular day that potentially results in a stock price drop, a plaintiff cannot show loss causation by aggregating the impact of disclosures of actions or events that are *not* alleged to be problematic, with those that are alleged to have been improper:

> [I]n order for plaintiffs to show that a stock's price was actually affected through evidence of a significant price decrease following the revelation of the alleged 'truth' of earlier false statements, plaintiffs must demonstrate: (1) that the negative 'truthful' information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that *it is more probable than not that it was this negative statement, and no other unrelated negative statements, that caused a significant amount of the decline.*

*Greenberg* v. *Crossroad Systems, Inc.*, 364 F.3d 657, 666 (5th Cir. 2004) (emphasis added); *In re Sara Lee Corp. Sec. Litig.*, No 03 C 2303, 2006 WL 1980199 (N.D. Ill. July 10, 2006) (dismissing complaint which failed to link decline in stock price to misrepresentation as opposed disclosure regarding weakening markets which also explained missed earnings targets); *In re The Warnco Group Sec. Litig.*, 388 F. Supp. 2d 307, 317-318 (S.D.N.Y. 2005) (dismissing complaint where plaintiffs fail to apportion decline in the stock price between alleged fraud and concurrent, negative non-fraudulent disclosure). *See also In re Merrill Lynch*, 2008 WL 2324111, at *7 (plaintiffs must "ascribe some rough proportion of the whole loss to [the alleged] misstatements.").[28]   The allegations here do not allow this Court to ascribe any "rough proportion" to the share price decline that may be attributed to the alleged misstatements, and thus, fail to state a claim.

Although the Complaint makes much of Centerline's December 28, 2007 announcements of Freddie Mac transaction, the dividend cut and the TRCLP Investment, it is not enough merely to juxtapose those announcements with the $2.57 per share decline in the Company's stock price on that day.  (Cplt. ¶¶ 17, 22.)   On that day, the nation was in the midst of a deepening

---

[28] *See also Lattanzio*, 476 F.3d at 158 (plaintiffs failed to "allege[] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to Deloitte's misstatements.").

marketwide credit crisis, and Centerline also announced guidance for 2008 (using a GAAP-based earnings metric Centerline had not used in prior years) of anticipated earnings per share of between $1 and $1.10. Indeed, during the Company's analyst conference the same day, defendants indicated that the Company forecasted "bond originations . . . below the level that we had hoped," and that Centerline had been negatively affected by the market conditions, which had "magnified significantly" the "interest rate exposure as well as funding risk" faced by the Company. (Rosen Dec., Ex. C at 3, 17 (incorporated by reference at Cplt. ¶¶ 19-21, 123-128).) It is not difficult to see that any share price decline could easily have resulted from these conditions, particularly in view of Centerline's "risk-averse, income-oriented investors." (Cplt. ¶ 7.) Because the Complaint does not attempt to distinguish between the various initiatives and guidance announced on December 28, 2007, it does not show that it is "more probable than not," *Greenberg*, 364 F.3d at 666, that the share price decline on that day was caused by the alleged fraud.[29]

In sum, Lead Plaintiff has failed to "ascribe some rough proportion of the whole loss" to its allegations stemming from misstatements and omissions, and thus has failed to show that the alleged misstatements and omissions "'were much more consequential and numerous [and] were the proximate cause of plaintiffs' loss." *In re Merrill Lynch*, 2008 WL 2324111, at *7-*8 (internal citations omitted). Absent adequate allegations of loss attributable to the alleged disclosure statements, as opposed to other disclosures, the Complaint has pled only "the mere

---

[29] As with the earlier portion of the class period, Lead Plaintiff fails to account for the effect of the credit crisis and external market conditions on Centerline's share price during December 28, 2007. (*See supra*, pp. 30-31.)

possibility of loss causation" insufficient to state a claim, and thus should be dismissed under

*Dura. Twombly*, 127 S. Ct. at 1966 (citing *Dura*, 544 U.S. at 347).[30]

## CONCLUSION

For the reasons stated above, the Complaint should be dismissed with prejudice.

Dated: August 21, 2008
   New York, New York

        Respectfully submitted,

        _Daniel Leffell_

        Richard A. Rosen
        Daniel J. Leffell
        PAUL, WEISS, RIFKIND, WHARTON &
        GARRISON LLP
        1285 Avenue of the Americas
        New York, NY 10019
        Tel: 212-373-3000
        Fax: 212-373-2359
        rrosen@paulweiss.com

        *Attorneys for Marc. D. Schnitzer and Robert L. Levy*

---

[30] Lead Plaintiff's claims against Messrs. Schnitzer, Levy, Ross, and Blau (the "Individual Defendants") under Section 20(a) should be dismissed because, as shown in Points I-IV above, no claim has been stated against either Centerline or the Individual Defendants under Section 10(b), and thus any derivative claim against the latter under Section 20(a) must be dismissed. *Rombach* v. *Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004); *In re Geopharma, Inc. Sec. Litig.*, 399 F. Supp. 2d 432, 453-54 (S.D.N.Y. 2005) (Scheindlin, J.) ("a primary violation of section 10(b) is a prerequisite to finding control person liability under section 20(a).")

Peter L. Simmons
FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON LLP
1 New York Plaza
New York, NY 10022
Tel: 212-859-8455
Fax: 212-859-4000
peter.simmons@friedfrank.com

*Attorneys for Defendants Stephen M. Ross  and
Jeffrey T. Blau*

Jennifer F. Beltrami
WOLFBLOCK LLP
250 Park Avenue
New York, NY  10177
Tel:  212-883-4955
Fax:  212-672-1155
jbeltrami@wolfblock.com

*Attorneys for Centerline Holding Company*


        Filed on behalf of Marc. D. Schnitzer, Robert L. Levy, Stephen M. Ross, Jeffrey T. Blau,
and Centerline Holding Company upon consent.