UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

IN RE CENTERLINE HOLDINGS
COMPANY SECURITIES LITIGATION

**OPINION AND ORDER**

**08 Civ. 505 (SAS)**

------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/4/09

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

Lead Plaintiff Centerline Investor Group[1] brings this securities fraud

action on behalf of persons who purchased stock in Centerline Holding Company

("Centerline" or "the Company") from March 12, 2007 to December 28, 2007

("the Class Period") to recover losses that resulted from the purchases of allegedly

artificially inflated stock.[2]  Lead Plaintiff asserts claims pursuant to Section 10(b)

of the Securities Exchange Act against Centerline and four of the Company's

senior officers and trustees, including Chief Executive Officer Marc D. Schnitzer,

---

[1]     Centerline Investor Group is comprised of J. Michael Fried, Joseph
A. Braddock, Norman Millman, and Ed Friedlander, as Trustee for the Ed
Friedlander Trust.  *See* Amended Consolidated Class Action Complaint ("Am.
Compl.") ¶ 1.

[2]     *See id.* ¶ 152.

Chief Financial Officer Robert L. Levy, Chairman of the Board of Trustees

Stephen M. Ross, and Managing Trustee Jeff T. Blau (collectively, "the Individual

Defendants" and together with Centerline, "defendants").[3]  Lead Plaintiff also

alleges claims under Section 20(a) of the Securities Exchange Act against the

Individual Defendants.[4]

In an Opinion and Order dated January 12, 2009 ("January Opinion

and Order"), this Court dismissed Lead Plaintiff's claims for failing to adequately

plead scienter.[5]  Lead Plaintiff has filed an Amended Consolidated Class Action

Complaint ("Amended Complaint"), and defendants have again moved to dismiss

all claims.  Because the Amended Complaint also fails to adequately plead

scienter, defendants' motion to dismiss is granted.

## II.    BACKGROUND

### A.    Facts

Centerline, a corporation formerly known as CharterMac, is a

statutory trust that operated as a "full service real estate finance and investing

---

[3]    *See id.* ¶ 1.

[4]    *See id.*

[5]    *See In re Centerline Holdings Co. Secs. Litig.*, 613 F. Supp. 2d 394
(S.D.N.Y. 2009).

company."[6] The Company's Affordable Housing segment was chiefly responsible

for managing Centerline's tax-exempt affordable housing bond portfolio and was a

major contributor to Centerline's revenues, representing approximately 44 to 52

percent of the Company's total revenues in the first three quarters of 2007.[7]

Because of the revenues generated by the Company's tax-exempt bond portfolio,

the Company "historically paid large, primarily tax-exempt dividends."[8]

In early 2007, Centerline and its officers and trustees began to work

on transforming the Company into an alternative asset management company.[9]  As

part of this plan, the Company negotiated and entered into an agreement with The

Federal Home Loan Mortgage Corporation ("Freddie Mac") to sell its tax-exempt

bond portfolio (the "transaction").[10]  This transaction was not announced to the

public until December 28, 2007.[11]  That day, the Company also announced that it

would cut its dividend from $1.68 to $0.60 per share and that The Related

---

[6]  Am. Compl. ¶ 2.

[7]  *See id.* ¶ 3.

[8]  *Id.* ¶ 4.

[9]  *See id.* ¶ 7.

[10]  *See id.* ¶¶ 32-33.

[11]  *See id.* ¶ 55.

3

Companies, L.P. ("Related") – Centerline's largest shareholder and a company owned by Ross and Blau – would be providing $131 million in financing in exchange for 12.2 million shares of convertible preferred stock that would pay an eleven percent dividend.[12]

At no time prior to the December 2007 announcement had defendants revealed that the Company was considering securitizing its bond portfolio even though defendants allegedly knew that the sale of the bond portfolio would decrease the Company's ability to pay high dividends.[13]  Indeed, on several occasions when defendants made statements about the operations of the Company, they allegedly omitted to disclose information regarding the plans to sell the bond portfolio or the capital needs of the Company.[14]  Thus, when the transaction, the dividend cut, and the investment by Related was announced by the Company on December 28, 2007, the news "shocked" the financial markets.[15]  The price of

---

[12]    *See id.* ¶¶ 55-56.

[13]    *See id.* ¶ 7.

[14]    *See id.* ¶¶ 17-19.

[15]    *Id.* ¶ 55.

4

Centerline stock tumbled twenty-five percent that day from $10.27 per share to close at $7.70 per share.[16]

Lead Plaintiff claims that "[d]efendants' statements . . . were materially false and misleading because they misrepresented and omitted the material facts" that (1) they planned to change Centerline's business from that of a real estate company to an alternative asset manager; (2) that they had intended to pay a modest dividend instead of their historical, mostly tax-free dividend; (3) that Centerline generally intended to make a change in Centerline's dividend policy; (4) that Centerline intended to rotate out its traditional investor base; (5) that Centerline was seeking new institutional investors to raise cash quickly; (6) that Centerline's changing dividend policy and rotating shareholder base was independent of the strategic plan; (7) that Centerline's liquidity had been stressed; and (8) that Centerline needed to sell its bond portfolio to survive.[17]  Lead Plaintiff seeks compensatory damages for losses incurred as a result of defendants' misconduct.

---

[16]     *See id.* ¶ 59.

[17]     *Id.* ¶ 40.

5

**B.     New Evidence**

Lead Plaintiff points to three new pieces of evidence that it claims demonstrate scienter (collectively, the "new evidence"). *First* is an internal Centerline memo dated November 25, 2007 (the "November 25 memo"), which discusses the company's financial issues, the background behind the Freddie Mac transaction, the general terms of the transaction, how it comports with the Company's vision, and the possible general implications of the transaction on investors.[18] Lead Plaintiff contends that the November 25 memo "admits [d]efendants' actual knowledge from early 2007 of the facts which [d]efendants omitted and misrepresented during the class period."[19] *Second* is a November 29, 2007 presentation prepared by Morgan Stanley for a Centerline Board Meeting, which lists – with greater detail – the implications of the transaction on the investor base. Those implications included the possibility of "creating selling pressure on stock" and "rotating" the investor base.[20] *Third*, Lead Plaintiff utilizes depositions of Centerline executives taken in a related case, all of which allegedly

---

[18]     *See id.* ¶¶ 21-22, 41-53.

[19]     *Id.* ¶ 41.

[20]     *Id.* ¶ 29.

6

evidence the Individual Defendants' knowledge of the transaction.[21]  Two statements are particularly relevant.  *First*, Schnitzer testified that discussions regarding the Freddie Mac transaction began "probably [in] mid-September" of 2007.[22]  *Second*, Levy testified that the plan to change the company was "the transformative transaction in [Centerline]'s recent history" characterized by "materiality across the board."[23]

### C.   New Statements

Armed with this new evidence, the Amended Complaint focuses on many of the same statements pled in the original Complaint – statements made during conference calls with analysts.  However, Lead Plaintiff uses the new evidence to reformulate the statements as either misleading[24] or as proof that the defendants should have disclosed more information.[25]

The Amended Complaint also alleges that different statements were made during those conference calls – but not raised in the original Complaint –

---

[21]     *See id.* ¶¶ 8, 9, 11, 13, 20, 25, 26, 27, 28, 30, 33, 36, 37, 38.  The case referred to is *Carfagno v. Schnitzer*, 08 Civ. 912 (SAS).

[22]     *Id.* ¶ 33.

[23]     *Id.* ¶ 9.

[24]     *See id*. ¶¶ 39-40.

[25]     *See id.* ¶¶ 41-53.

that provide proof of scienter or were misleading (the "new statements").  In

particular, Lead Plaintiff alleges new statements in which the Individual

Defendants said that Centerline's "strategic vision has come together,"[26] that a

"new organization structure . . . should provide [shareholders with] more clarity on

profitability, growth and returns,"[27] that the Individual Defendants worry about

"creat[ing] meaningful growth that many [analysts] would be excited by,"[28] that

there is no "concern about access to capital"[29] or access to funds to "securitize our

bonds,"[30] and that Centerline will "earn [Cash Available for Distribution ("CAD")]

in excess of our dividend and [management] would therefore not recommend a

change in dividend policy to our Board."[31]

---

[26]     *Id.* ¶ 39(b) (Schnitzer on the May 10, 2007 conference call).

[27]     *Id.* ¶ 39(d) (Levy on the May 10, 2007 conference call).

[28]     *Id.* ¶ 39(i) (Levy on the August 9, 2007 conference call).

[29]     *Id.* ¶ 39(k) (Schnitzer and Levy on the November 8, 2007 conference call).

[30]     *Id.* ¶ 39(i) (Schnitzer on the November 8, 2007 conference call).

[31]     *Id.* ¶ 106 (Levy on the November 8, 2007 conference call).

8

## III.   LEGAL STANDARD

### A.   Motion to Dismiss

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must "accept as true all of the factual allegations contained in the complaint"[32] and "draw all reasonable inferences in the plaintiff's favor."[33]  However, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[34]

To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[35]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[36]

---

[32]   *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 572 (2007).  *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

[33]   *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[34]   *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation omitted).

[35]   *See Twombly*, 550 U.S. at 564.

[36]   *Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949 (May 18, 2009) (quotation omitted).

9

Plausibility "is not akin to a probability requirement," rather plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[37]  Pleading a fact that is "merely consistent with a defendant's liability" does not satisfy the plausibility standard.[38]

### B.   Section 10(b) and Rule 10b-5 of the Securities Exchange Act

#### 1.   Prima Facie Case

"To prevail in a Rule 10b-5 action based on subsection [10](b), a plaintiff must prove that 'in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury.'"[39]

#### 2.   Omissions of Material Information

"To be actionable, [] a statement must [] be misleading."[40]  In cases of omissions, defendants will only be liable for violating the securities laws when

---

[37]     *Id.* (quotation omitted).

[38]     *Id.* (quotation omitted).

[39]     *Vacold LLC v. Cerami*, 545 F.3d 114, 121 (2d Cir. 2008) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999)).

[40]     *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).

10

they are "subject to a duty to disclose the omitted facts."[41]  Thus, "[s]ilence, absent

a duty to disclose, is not misleading under Rule 10b-5."[42]

A duty to disclose arises in the following situations: (1) "[W]hen a

corporate insider trades on confidential information;" (2) When a "statute or

regulation requir[es] disclosure;" and (3) "[W]hen a corporation [] make[s] a

disclosure – whether it be voluntary or required – there is a duty to make it

complete and accurate."[43]  A duty to disclose may also arise "whenever secret

information renders prior public statements materially misleading, not merely

when that information completely negates the public statements."[44]

### 3.    Scienter

"'The requisite state of mind, or scienter, in an action under [S]ection

10(b) and Rule 10b-5, that the plaintiff must allege is 'an intent to deceive,

---

[41]     *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)
(citing *Basic*, 485 U.S. at 239 n.17).

[42]     *Basic*, 485 U.S. at 239 n.17.  *Accord Glazer v. Formica Corp.*, 964
F.2d 149, 156 (2d Cir. 1992) (". . . there is no liability under Rule 10b-5 unless
there is a duty to disclose [the information]").

[43]     *Glazer*, 964 F.2d at 157 (quoting *Roeder v. Alpha Indus., Inc.*, 814
F.2d 22, 26-27 (1st Cir. 1987)).

[44]     *In re Time Warner*, 9 F.3d at 268.

manipulate or defraud.'"[45]  In addition, under the Private Securities Litigation

Reform Act of 1995, plaintiffs in securities fraud actions must "state with

particularity facts giving rise to a strong inference that the defendant acted with

the required state of mind."[46]  A plaintiff may satisfy this requirement "by alleging

facts (1) showing that defendants had both motive and opportunity to commit the

fraud or (2) constituting strong circumstantial evidence of conscious misbehavior

or recklessness."[47]

Under the first prong, "[t]o show motive and opportunity, plaintiffs

must allege a likelihood that defendants could realize 'concrete benefits' through

the deception."[48]  The conduct of defendants under the second prong must be

conduct that is "'highly unreasonable'" and which represents "'an extreme

departure from the standards of ordinary care . . . to the extent that the danger was

either known to the defendant or so obvious that the defendant must have been

---

[45]     *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000)) (internal quotation marks omitted).

[46]     *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)).

[47]     *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Ganino*, 228 F.3d at 168-69).

[48]     *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001) (quoting *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)).

aware of it.'"[49]  "[I]f Plaintiffs cannot make the 'motive' showing, then they could

raise a strong inference of scienter under the 'strong circumstantial evidence'

prong, 'though the strength of the circumstantial allegations must be

correspondingly greater' if there is no motive."[50]

> At least four circumstances may give rise to a strong
> inference of the requisite scienter: where the complaint
> sufficiently alleges that the defendants (1) "benefitted in a
> concrete and personal way from the purported fraud;" (2)
> "engaged in deliberately illegal behavior;" (3) "knew facts
> or had access to information suggesting that their public
> statements were not accurate;" or (4) "failed to check
> information they had a duty to monitor."[51]

"For an inference of scienter to be strong, 'a reasonable person [must] deem [it]

cogent and *at least as compelling* as any opposing inference one could draw from

the facts alleged.'"[52]  Thus, a court "must engage in a comparative evaluation; it

---

[49]     *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001)
(quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).

[50]     *Kalnit*, 264 F.3d at 142 (quoting *Beck v. Manufacturers Hanover
Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987), *overruled on other grounds by United
States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) (en banc)).

[51]     *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan
Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (quoting *Novak v. Kasaks*, 216 F.3d
300 (2d Cir. 2000)).

[52]     *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (quoting *Tellabs, Inc. v. Makor
Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (emphasis in original)).

must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged."[53]

### B.   Control Person Liability Under Section 20(a) of the Exchange Act

"To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."[54]

## IV.   DISCUSSION

### A.   Section 10(b) and Rule 10b-5

Lead Plaintiff has abandoned the "motive and opportunity" theory with respect to defendants' scienter.[55]   Instead, Lead Plaintiff now claims that defendants consciously misbehaved and were reckless in failing to disclose the

---

[53]   *Tellabs*, 551 U.S. at 314.

[54]   *ATSI Commc'ns, Inc.*, 493 F.3d at 108 (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

[55]   Lead Plaintiff relied primarily on the "motive and opportunity" theory when originally alleging scienter.  Indeed, the discussion of these allegations comprised a large portion of the January Opinion and Order, where I held that the plaintiff did not sufficiently plead that defendants had a motive or opportunity to commit fraud. *See In re Centerline*, 613 F. Supp. 2d at 399-401.

14

pending transaction or misleading investors when making statements that they knew (or should have known) were false.

Defendants argue that the Amended Complaint still fails to plead a Section 10(b) claim because it has not properly alleged that defendants consciously misbehaved or were reckless.[56]  In particular, defendants argue, *first*, that Lead Plaintiff primarily relies, again, on the same statements that were already ruled to be insufficient to establish scienter and, *second*, that the new evidence and new statements are also insufficient to establish scienter.[57]

To the extent that Lead Plaintiff relies on statements made throughout 2007 that were already found insufficient to plead scienter, this Court relies on the same reasoning found in the January Opinion and Order.[58]  Further, many of Lead Plaintiff's revised allegations surrounding those statements are merely the product

---

[56]     *See* Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint ("Def. Mem.") at 22-24.  Defendants also claim that the Amended Complaint does not plead any false or misleading statement or omission.  However, this Court need not address that issue because the scienter ground is dispositive and this opinion – like the January Opinion and Order – should not be construed as making a determination that any of the statements are or are not actionable under Section 10(b).  *See In re Centerline*, 613 F. Supp. 2d at 404 n.66.

[57]     *See* Def. Mem. at 23.

[58]     *See In re Centerline*, 613 F. Supp. 2d at 401-04.

of artful pleading.  For example, Lead Plaintiff suggested – when re-pleading a

statement on which this Court has already ruled – that Schnitzer "knew that

Centerline's liquidity was 'stressed'" while making purportedly false statements in

an August 9, 2007 conference call.[59]  However, Schnitzer used the word "stressed"

to describe Centerline's liquidity status only in the November 25 memo – more

than three months later.[60]

Indeed, because many of the proposed statements have already been

determined to be insufficient and the new pleadings do not alter that conclusion,

the Court need not address them again.  The remainder of this opinion will discuss

Lead Plaintiff's new alleged misstatements and omissions.

### 1.    Misstatements

Lead Plaintiff alleges that the defendants knew that several of their

statements were misleading.  Lead Plaintiff, in its brief, specifically points to nine

allegations that supposedly "establish [d]efendants' knowledge of facts that

rendered their public statements materially false or misleading."[61]  One such

---

[59]      Am. Compl. ¶ 39(e).

[60]      *Id.* ¶ 21.

[61]      Lead Plaintiff's Memorandum in Opposition to Defendants' Motion
to Dismiss the Amended Consolidated Class Action Complaint ("Lead Pl. Mem.")
at 22.  The nine allegations of knowledge are: 1. Schnitzer admitting that paying

statement that is allegedly false or misleading stems from a November 8, 2007

conference call. During that call, Schnitzer and Levy said that there was no

"concern about access to capital" despite allegedly knowing that "Centerline's

lenders were insisting on a material infusion of capital, Centerline had reached its

maximum corporate borrowing limit and Centerline had to sell the bond portfolio

in order to survive."[62]

---

the dividend was "an increasing burden to the Company" and the Company could
no longer afford "paying out 90% or more of Centerline's cash earnings as
dividends" (quoting Schnitzer's deposition and the November 25 memo,
respectively); 2. Schnitzer knowing that it was imperative that the Company
materially reduce its dividend "regardless of completion of" the plans (quoting the
November 25 memo); 3. Schnitzer admitting that Centerline's "thesis has been that
this evolution will cause a migration of our shareholder base from one that is retail
and income oriented to one that is more institutional and focused on earnings
growth" (quoting the November 25 memo); 4. Levy testifying that the defendants
wanted to "convert" Centerline's shareholder base to an institutional base in an
attempt to "raise capital quickly" (quoting Levy's deposition); 5. Centerline's
Board of Trustees being advised that the meaningful dividend reduction would
result in a "likely rotation" of the shareholder base and downward pressure on
Centerline's stock (quoting the November 29 presentation and deposition of a
non-party); 6. Levy admitting that there was anticipation of "weakness in the stock
price" (quoting Levy's deposition); 7. that the defendants knew that "they would
be running a company that is different than today's Centerline in several important
respects" (quoting the November 25 memo); 8. that defendants were "mindful of
the risks that are inherent in the significant changes that are envisioned" (quoting
the November 25 memo); and 9. that defendants knew there would be mass sell-
offs of Centerline's stock (quoting the November 25 memo).

[62]    Am. Compl. ¶ 39(k).

The problem with Lead Plaintiff's nine allegations of knowledge is that they originate from either the November 25 memo, the November 29 presentation, or deposition testimony in which no time-frame was specified by the deponent. Because all of the alleged misstatements were made *prior* to November 25th, these allegations of knowledge do not support Lead Plaintiff's contention that defendants knew the statements were false when made. The nine allegations are also insufficient because Lead Plaintiff has failed to identify any misstatements made *after* either the November 25 memo, which is the only time Lead Plaintiff has alleged that defendants indicated any doubt about the financial condition of Centerline, or the November 29 presentation, which is the only time Lead Plaintiff has alleged that defendants were apprised of the risks of the plan. Therefore, Lead Plaintiff has not alleged that the defendants knew or should have known that the statements were false *at the time any of their misstatements were made*.[63] Lead

---

[63] Like the January Opinion and Order, this Court need not address the accuracy of each statement. *See In re Centerline*, 613 F. Supp. 2d at 403 n.66. However, in that opinion, I noted that many of the statements simply were not misleading. *See id.* The same determination applies to some of the new statements. For example, one of the new statements is taken out of context – Levy's November 8, 2007 comment that there would be no recommended change in the dividend to the Board was explicitly limited to 2007, not to the future generally, as Lead Plaintiff alleges. *See* Nov. 8, 2007 Conf. Call Tr., attached as Ex. A to 4/30/09 Declaration of Richard Rosen, attorney for Schnitzer and Levy, at 5. This Court may consider "sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the

18

Plaintiff has pointed to no evidence or statements indicating that the defendants intentionally misled investors.[64]  In short, Lead Plaintiff has not pled with particularity any misstatement that was made intentionally or recklessly. Accordingly, Lead Plaintiff has failed to sufficiently plead that defendants acted with scienter when they made any of the newly alleged misstatements.

### 2.    Omissions

In the January Opinion and Order, I held that "the Complaint does not allege any facts to show that defendants knew they should have disclosed information of the transactions prior to the date of the announcement, but recklessly failed to do so."[65]  In an attempt to cure this deficiency, Lead Plaintiff now alleges, based on the new evidence, that the Individual Defendants omitted material facts when making statements.  For example, Lead Plaintiff alleges that Levy had stated that the "new organization structure and new segment reporting provides a clear and accurate representation of how we think about and run our

---

complaint by reference[.]"  *Tellabs*, 551 U.S. at 322.

[64]    For example, Lead Plaintiff does not allege any evidence that any of the Individual Defendants made a remark taking one position, but had *previously* made a remark (or were apprised of knowledge) indicating the opposite position or even ambivalence as to the position now taken.

[65]    *In re Centerline*, 613 F. Supp. 2d at 401.

19

business . . . and should provide our [] shareholders more clarity on the profitability, growth and returns to our basic business segments" despite knowing that investors "had neither 'clarity' nor a 'clear and accurate representation' of Centerline's business because [d]efendants were then implementing an undisclosed strategic plan to make Centerline a different company than it was [when the statement was made] on May 10, 2007."[66] Lead Plaintiff argues that disclosure of Centerline's plans was necessary to make statements like these not misleading.[67]

However, these allegations must fail because the only evidence of any knowledge about Centerline's financial condition is the November 25 memo and the only evidence that the Individual Defendants had any idea of the realistic effects of the transaction is the November 29 presentation – both of which occurred well after any of defendants' alleged omissions.[68] Lead Plaintiff has

---

[66]    Am. Compl. ¶ 39(d) (internal quotation omitted).

[67]    *See* Lead Pl. Mem. at 17.

[68]    Indeed, the new evidence pled by Lead Plaintiff demonstrates that – if anything – the defendants should *not* have disclosed the transaction until November 25, 2007. Until that point, the transaction – and its subsequent effects – were mere speculation. *See* Am. Compl. ¶¶ 22, 49 ("[I]t is *likely* that[] management would propose that the board consider a material reduction in the company's dividend in 2008 regardless of completion of Project Spinnaker" and that "[m]anagement is mindful of the risks that are inherent in the significant

20

failed to prove that – at the time any of the statements were made – the Individual

Defendants knew they should disclose information but decided not to do so.[69]

The defendants argue, again, that Lead Plaintiff has failed to indicate

what duty the defendants breached.[70] More specifically, they contend that they

simply did not have a duty to disclose the transaction prior to December 28, 2007,

the date on which it was disclosed.[71] Lead Plaintiff argues that "[d]efendants'

deceptive public statements gave rise to their duty to disclose the new strategic

---

changes that are *envisioned*.") (emphasis added). Indeed, if Lead Plaintiff had its
way, defendants would be placed in a precarious situation. If defendants had
disclosed the transaction earlier – such as when they were asked by analysts on
November 8, 2007 – the stock price would have dropped then but Lead Plaintiff
would likely contend that such disclosure was still not early enough. However, if
they *had* disclosed the transaction as a possible relief for the company's problems
too early – with the stock subsequently falling on that news – and the transaction
was not consummated, Lead Plaintiff would likely challenge that disclosure.
Finally, if the Individual Defendants had not planned the company's overall
transformation – the sale of its bond division and the change in dividend policy –
at all, then Lead Plaintiff would likely have brought an action against defendants
for breaching their fiduciary duty by not entering into a transaction that would
have saved the company.

[69]    *See ECA*, 553 F.3d at 199.

[70]    *See* Defendants' Reply Memorandum of Law In Further Support of
Their Motion to Dismiss the Consolidated Amended Class Action Complaint at 3.

[71]    *See id.* at 9.

plan for Centerline."[72]  Specifically, it claims that Centerline had a duty to disclose

the new strategy if it was "under active and serious consideration."[73]

      As I noted in the January Opinion and Order, consistent with SEC

regulations, the defendants had no duty to disclose the impending Freddie Mac

transaction, the subsequent lowering of Centerline's dividend, or Related's

investment unless Lead Plaintiff could point to the completion of a definitive

agreement before December 21, 2007.[74]  The Amended Complaint again fails to

allege any such agreement.

      Even if there was a duty to disclose, Lead Plaintiff has not pled that

the defendants acted with the requisite state of mind to breach that duty.[75]  *First,*

---

[72]     Lead Pl. Mem. at 11.

[73]     *Id.* at 18 (citing *Time Warner*, 9 F.3d at 268).

[74]     *See In re Centerline*, 613 F. Supp. 2d at 402.  In that opinion, I noted that the SEC mandates disclosure of "material definitive agreements not made in the ordinary course of business within four business days of entry into such agreements." *Id.* (quotation omitted).  I noted that December 21, 2007 was four business days prior to December 28, 2007.  Here, Lead Plaintiff has pointed to Levy's statement that the transaction was characterized by "materiality across the board." Am. Compl. ¶ 9.  Indeed, an admission of materiality is not relevant to this discussion because there are several other necessary conditions that must exist before a duty to disclose is triggered – such as the existence of a "definitive agreement" – and such an agreement was not consummated until December 28, 2007.

[75]     *See ECA*, 553 F.3d at 200 ("'[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud

Lead Plaintiff has not alleged that the defendants knowingly breached a duty.

*Second*, Lead Plaintiff has not alleged that the defendants should have been aware

of a duty that they breached.  Instead, Lead Plaintiff relies on conclusory

allegations that the defendants *should have* disclosed the transaction earlier than

they did without any explanation as to the duty they held.[76]  As the Second Circuit

has noted, "a corporation is not required to disclose a fact merely because a

reasonable investor would very much like to know that fact."[77]  Centerline

reserved the right to alter its business model – whether those decisions were

---

claim . . . . Only where such allegations are coupled with evidence of
corresponding fraudulent intent might they be sufficient.'") (citing *Novak*, 216
F.3d at 309).

[76]     *See, e.g.*, Am. Compl. ¶ 73 ("The purported risk disclosure was also
materially misleading because, even if shareholder approval was not required to
approve the Board's decision to make a material change in Centerline's business
and dividend policy, [d]efendants were not absolved of their obligation to disclose
fully and truthfully to investors who were then purchasing Centerline stock the
strategic plan and changes which [d]efendants were implementing.").

[77]     *In re Time Warner*, 9 F.3d at 267.  *Accord In re Burlington Coat
Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) (citing *Time Warner* and
noting that "[e]xcept for specific periodic reporting requirements . . . there is no
general duty on the part of a company to provide the public with all material
information"); *Glazer*, 964 F.2d at 156 ("'Even if all information is material, there
is no liability under Rule 10b-5 unless there is a duty to disclose.'") (quoting
*Backman v. Polaroid Corp.*, 910 F.2d 10, 12 (1st Cir. 1990) (en banc)).

23

popular or not and also reserved the right not to disclose information about its business decisions until the law required them to do so.[78]

Defendants' conduct cannot be described as "highly unreasonable" nor can it be said that it "represents an extreme departure from ordinary standards of care," particularly when there was no duty to disclose in the first place. Defendants therefore did not act with scienter with respect to any of the newly alleged omissions. Because Lead Plaintiff has not remedied the deficiencies in its original complaint, its securities fraud claims are dismissed.

### B.    Section 20(a) Control Person Liability

Lead Plaintiff's Section 20(a) claims are based on the Individual Defendants' control of Centerline.[79]  Because Lead Plaintiff's Section 10(b) claims have been dismissed and Lead Plaintiff has alleged no other primary violation of the securities laws against the Individual Defendants, Lead Plaintiff's Section 20(a) claims are also dismissed.

---

[78]    *See* Am. Compl. ¶ 72 (citing Centerline's 2006 10-K, which reserves the right to change business policies "with respect to acquisitions, financing, growth, debt, capitalization and distributions, which are determined by our board of trustees").

[79]    *See id.* ¶ 157.

## V.    CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted.

Because Lead Plaintiff has already been given the opportunity to remedy the

deficiencies in the Complaint, leave to re-plead is denied.  The Clerk of the Court

is directed to close this motion (docket no. 88) and this case.

SO ORDERED:

Dated:   New York, New York
         August 4, 2009

Shira A. Scheindlin
U.S.D.J.

25

**- Appearances -**

## For Lead Plaintiff:

Sherrie R. Savett, Esq.
Barbara A. Podell, Esq.
Eric Lechtzin, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

Lawrence A. Sucharow, Esq.
Joseph Sternberg, Esq.
Ann E. Gittleman, Esq.
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
(212) 907-0700

**For Defendants Schnitzer and Levy:**

Richard A. Rosen, Esq.
Daniel J. Leffell, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

**For Defendants Ross and Blau:**

Peter L. Simmons, Esq.
Fried, Frank, Harris, Shriver & Jacobson LLP
1 New York Plaza
New York, NY 10022
(212) 859-8455

**For Defendant Centerline Holding Company:**

Jennifer F. Beltrami, Esq.
Wolfblock LLP
250 Park Avenue
New York, NY 10017
(212) 883-4955